Kenneth A. Goldberg, Esq. (KG 0295)
**GOLDBERG & FLIEGEL LLP**
60 East 42nd Street, Suite 3421
New York, New York 10165
(212) 983-1077
Attorneys For Plaintiff
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
LORETTA LOCICERO,

|  |  |  |
|---|---|---|
| | : | **No. 06 CV 4793 (FB) (JO)** |
| Plaintiff, | | |
| | : | |
| - against - | | **PLAINTIFF'S STATEMENT OF** |
| | : | **DISPUTED MATERIAL FACTS** |
| NEW YORK CITY TRANSIT AUTHORITY, | | **PURSUANT TO LOCAL RULE 56.1** |
| | : | |
| Defendant | | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiff Loretta Locicero ("Plaintiff" or "Ms. Locicero") submits the following statement

of disputed facts in opposition to Defendant's motion for summary judgment and Defendant's

Statement Of Material Facts Pursuant To Rule 56.1 ("Defendant's Statement") in the above-

referenced matter. Unless expressly admitted herein, Plaintiff denies the allegations in

Defendant's Statement. Plaintiff further denies Defendant's Statement to the extent it is

inconsistent with the additional facts set forth herein.[1]

---

[1]Citations to Points I through XXIX herein are to "Point 1", "Point 2", etc., and citations
to paragraphs within such points are to "¶ 1", "¶ 2", etc. Citations to deposition testimony are as
follows: (1) Plaintiff - "Pl. Dep.", "3/6/08 Pl. Dep.", "3/27/08 Pl. Dep.", etc.; (2) Titus
Byaruhanga - "TB Dep."; (3) Tim Forker - "TF Dep."; (4) Craig Stewart - "CS Dep."; (5) Donald
Tsang - "DT Dep."; (6) Patrick Damas - "PD Dep."; (6) Dorothy Ruiz - "DR Dep."; (7) Evelyn
Nau - "EN Dep."; (8) Dawn Irby - "DI Dep."; (9) Pam Noonan-Coppola - "PNC Dep."; and (10)
Osmond Ken Pearce - "KP Dep.". Citations to deposition exhibits are as follows: (1) Plaintiff -
"Pl. Dep. Exh."; and (2) Defendant - "Def. Dep. Exh.". Citations to Bates Stamped Documents
are simply to "Pl. Bates Nos." or "Def. Bates Nos." Copies of cited documents are annexed to
the certification of Plaintiff's counsel.

## PARAGRAPH BY PARAGRAPH RESPONSE PURSUANT TO RULE 56.1(b)

**I.    RESPONSES TO DEFENDANT'S ALLEGATIONS**

1.    Admit Paragraph 1.

2.    Deny Paragraph 2, except admit that Plaintiff was employed by Defendant from 1976 until she was unlawfully constructively discharged and, in connection with separating from Defendant, submitted papers to NYCERS. (Supra Points 2, 28 and ¶ 492, ¶ 686).

3.    Admit Paragraph 3 and refer to the Complaint for a more complete  description of Plaintiff's claims. (Compl.).

4.    Deny Paragraph 4, except admit that Plaintiff engaged in protected activities on numerous occasions. Defendant has listed only a few of the dates when Plaintiff made protected complaints. Plaintiff made protected complaints on or about, among other items, November 7, 2002, February 18, 2004, March 23, 2004, June 10, 2004, July 7, 2004, August 2004, etc. (Supra Points 13, 17, 19, 22, 24 and ¶ 569, ¶ 609, ¶ 624, ¶ 651, ¶ 665-666, ¶ 669).

5.    Deny Paragraph 5, except refer to the Complaint for a more complete description of the listed events, refer to the Complaint for a more complete  description of Plaintiff's claims, and refer to the extensive record in this case for the additional unlawful conduct against Plaintiff. (Supra Points 2 to 29).

6.    Deny Paragraph 6, except admit that Plaintiff was appointed to the civil service title of ATMA in 1976 and became a member of NYCERS, and admit that Plaintiff held a civil service title for most of her employment with Defendant, and state that Plaintiff relinquished by Computer Specialist position in the Fall of 2003 because Defendant had unlawfully denied her a raise with that promotion, had denied her computer work and other tools to do her job, and because Plaintiff's compensation was to decrease with the unionization of the Computer

- 2 -

Specialist position. (Supra Points 2, 12, 13, 14, 15 and ¶ 492-5, ¶ 586-7). Plaintiff further states

that she was unlawfully constructively discharged in 2005. (Supra Point 28 and ¶ 686-7).

Plaintiff held the titles of Assistant ATMA, Associate TMA, Principal TMA and Computer

Specialist during her employment. (Supra Points 2, 3, 12 and ¶ 494).

7.      Deny Paragraph 7, except admit that Defendant generally posted a JVN for

available positions, and state that Defendant made appointments to fill open positions without

posting any JVN and without a formal application process, including for Acting Director

positions. (Supra Points 10, 11 and ¶ 545, ¶ 551).

8.      Deny Paragraph 8, except admit that a JVN may set forth a title for a position and

state that an employee hired for such position may simultaneously have a separate civil service

title. Plaintiff further states that certain employees held positions without any permanent civil

service title, including among others Tim Forker, who was hired in 1999 with only a provisional

civil service title. (Supra Point 8 and ¶ 519; Pl. Dep. Exh. 48).

9.      Deny Paragraph 9, except admit that Plaintiff held the titles of Associate Transit

Management Analyst and Principal Transit Management Analyst. (Supra Points 2, 3 and ¶ 494).

10.     Admit Paragraph 10.

11.     Deny Paragraph 11, except refer Plaintiff's testimony about Joan Fitzgerald for a

complete statement of that testimony, and state that Plaintiff testified that she worked for Joan

Fitzgerald for about four years, and made accomplishments and had a successful experience. (Pl.

Dep. Tr. 68-71; 3/6/08 Pl. Dep. Tr. 191-2, 221).

12.     Deny Paragraph 12, except refer to Plaintiff's response to Paragraph 11. (Pl. Dep.

Tr. 68-71; 3/6/08 Pl. Dep. Tr. 191-2, 221).

13.     Admit Paragraph 13.

14.     Admit Paragraph 14.

15.     Admit Paragraph 15.

16.     Admit Paragraph 16 and refer to Plaintiff's complete application and resume materials for their terms.  (Supra Points 2, 3).

17.     Admit Paragraph 17.

18.     Admit Paragraph 18.

19.     Admit Paragraph 19.

20.     Admit Paragraph 20.

21.     Admit Paragraph 21.

22.     Deny Paragraph 22, except admit that Plaintiff testified that as of 1993, when she applied for a position in Car Equipment, she "had been conscripted into DC-37", that when Plaintiff joined the Force Account Unit her position was non-unionized, and that Plaintiff no longer paid union dues in the Force Account Unit which resulted in a net increase in take home pay.  (Pl. Dep. Tr. 72, 79).

23.     Admit Paragraph 23.

24.     Admit Paragraph 24.

25.     Admit Paragraph 25.

26.     Admit Paragraph 26.

27.     Admit Paragraph 27.

28.     Admit Paragraph 28.

29.     Admit Paragraph 29.

30.     Admit Paragraph 30.

31.     Admit Paragraph 31.

32.     Admit Paragraph 32 and refer to Plaintiff's complete deposition testimony and other testimony/documents for a more complete description of her job duties.  (Supra Points 2, 3 and ¶ 497-499).

33.     Admit Paragraph 33 and refer to Plaintiff's complete deposition testimony and other testimony/documents for a more complete description of her job duties. (Supra Points 2, 3 and ¶ 497-499).

34.     Admit Paragraph 34 and refer to Plaintiff's complete deposition testimony and other testimony/documents for a more complete description of her job duties. (Supra Points 2, 3 and ¶ 497-499).

35.     Deny Paragraph 35, except admit that as of 1997, when Plaintiff joined the Force Accounts Unit, her co-workers included Nau, Ruiz, Irby, Paz, Dockery, among others (Pl. Dep. Exh. 7; Supra Points 2, 3;).

36.     Deny Paragraph 36, except admit that Plaintiff testified that Paz worked for Nau on force account estimating and worked on other matters (Pl. Dep. Tr. 35), that Nau "focused on just the force estimating process" (3/6/08 Pl. Dep. Tr. 137), which required almost 100% of her time.  (Pl. Dep. Tr. 295).

37.     Deny Paragraph 37, except admit that Plaintiff testified that Akhtaruzzaman was mostly engaged in working on force account estimates (Pl. Dep. Tr. 317), but also did research reports under Titus Byaruhanga (Pl. Dep. Tr. 35).

38.     Admit Paragraph 38.

39.     Admit Paragraph 39.

40.     Deny Paragraph 40, except admit that Plaintiff testified that Ruiz "had a very specific function that was different than everybody else in the unit and she more or less performed it alone" (Pl. Dep. Tr. 31), and state that Ms. Ruiz was a Train Service Supervisor. (Supra Points 3, 4 and ¶ 503).

41.     Admit Paragraph 41 and refer to the complete testimony of Dawn Irby for a more complete description of her job duties.  (Supra Points 4, 9 and ¶ 504-506, ¶ 531-2, ¶ 537).

42.     Deny Paragraph 42, except admit that Plaintiff testified that at some point Mr. Forker assigned Rampersant the task of counting control center logs that had been performed by Dockery, which was out of title work for Rampersant, and was menial, humiliating work for Plaintiff. (Pl. Dep. Tr. 317).

43.     Deny Paragraph 43, except admit that Plaintiff testified that while Burbridge was in Plaintiff's unit, he worked on the CFCI program and "was the person in charge of the project." (Pl. Dep. Tr. 271).

44.     Deny Paragraph 44, except admit that Locicero was responsible for the Quarterly Reports, had other analyst duties, and had extensive computer duties and other duties. (Supra Points 2, 3 and ¶ 497-499).

45.     Deny Paragraph 45, except admit that Plaintiff testified that Mr. Forker took work away from "poorer workers" and gave it to better ones. (Pl. Dep. Tr. 26).

46.     Admit Paragraph 46.

47.     Admit Paragraph 47.

48.     Admit Paragraph 48 and refer to Plaintiff's complete testimony for its terms. (Pl.

Dep. Tr. 316).

     49.     Admit Paragraph 49.

     50.     Deny Paragraph 50, except admit that in April and May 1998, Plaintiff complained about incidents involving Marguerite Graham and refer to Def. Dep. Exh. 8 and Plaintiff's complete testimony regarding the exact complaints filed by Plaintiff.  (Def. Dep. Exh. 8; Pl. Dep. Tr. 82-86).

     51.     Deny Paragraph 51, except refer to Plaintiff's response to Paragraph 50.  (Def. Dep. Exh. 8; Pl. Dep. Tr. 82-86).

     52.     Deny Paragraph 52, except admit that Mr. Burbridge was hired as a Computer Associate and later became a Computer Specialist.  (Supra Point 7 and ¶ 516-517).

     53.     Admit Paragraph 53.

     54.     Admit Paragraph 54.

     55.     Deny Paragraph 55, except admit that Plaintiff testified that "most" employees of Defendant in computer titles were in TIS.  (Pl. Dep. Tr. 123-124).

     56.     Deny Paragraph 56, except admit that Burbridge was transferred into TIS and refer to the affidavit of Titus Byaruhanga regarding same.  (Pl. Dep. Tr. 123-124).

     57.     Admit Paragraph 57.

     58.     Admit Paragraph 58 and refer to Paragraphs 33-37 of the Complaint for a more complete description of Plaintiff's claims.  (Comp. ¶ 33-37; Supra Point 7).

     59.     Admit Paragraph 59 and refer to Paragraphs 33-37 of the Complaint for a more complete description of Plaintiff's claims.   (Comp. ¶ 33-37; Supra Point 7).

     60.     Admit Paragraph 60.

61.     Admit Paragraph 61.

62.     Admit Paragraph 62.

63.     Admit Paragraph 63 and aver that Burbridge requested and was granted two copies of Microsoft Visual Studio, which he never used.  (Pl. Dep. Tr. 270-272; Supra Point 7 and ¶ 516-517).

64.     Deny Paragraph 64, except admit that Burbridge requested and was granted two copies of Microsoft Visual Studio, which he never used.  (Pl. Dep. Tr. 270-272; Supra Point 7 and ¶ 516-517).

65.     Deny Paragraph 65, except admit that Plaintiff testified that she did not have access to Visual Basic 5, that  Plaintiff and Mr. Burbridge were performing different tasks, and that it was more efficient to have one person coding rather than two persons.  (Pl. Dep. Tr. 272-273).

66.     Admit Paragraph 66.

67.     Deny Paragraph 67, except admit that Plaintiff requested Lotus software for use in preparing the Quarterly Report.  (Pl. Dep. Tr. 274; Supra Point 7 and ¶ 516).

68.     Deny Paragraph 68, except admit that Plaintiff requested Lotus software for use in preparing the Quarterly Report, that Plaintiff's copy of Microsoft Office was malfunctioning, and that Plaintiff found Lotus to be a "more efficient system that used less resources on the computer and took less room in hard drive space."  (Pl. Dep. Tr. 274; Supra Point 7 and ¶ 516).

69.     Deny Paragraph 69, except admit that Plaintiff needed only one copy of the Lotus software in 1998 for the reasons stated in her testimony, and refer to same for its complete terms, wherein she stated "At the time I only needed one copy, because essentially I was assigned to do

the report alone." (Pl. Dep. Tr. 275).

70.     Admit Paragraph 70.

71.     Admit Paragraph 71.

72.     Admit Paragraph 72.

73.     Deny Paragraph 73, and aver that the Office of Security utilized Lotus to track abandoned rooms. (Pl. Dep. Tr. 281).

74.     Deny Paragraph 74, except admit that Plaintiff alleges that she was unlawfully denied tools and equipment for her job, that one of the tools and equipment that she was unlawfully denied was Lotus software requested in 1998, that another tool and equipment that was unlawfully denied was internet access, and refer to the Complaint for a more complete description of Plaintiff's claims. (Compl. ¶ 105; Supra Point 7 and ¶ 516-17, Supra Point 14-D and ¶ 579-85).

75.     Deny Paragraph 75 and refer to the response to Paragraph 74. (Compl. ¶ 105; Supra Point 7 and ¶ 516-17, Supra Point 14-D and ¶ 579-85).

76.     Admit Paragraph 76.

77.     Deny Paragraph 77, except admit that in or about late 2003 and early 2004 Plaintiff had discussions with Mr. Forker regarding the fact that she had no back up for preparation of the quarterly report and about Lotus software. Plaintiff had been using her own personal copy of Lotus at work because Defendant had denied her 1998 request to buy Lotus. Plaintiff was concerned that she was the only person working on the quarterly report and had no backup employee. She told Mr. Forker she was converting the quarterly report from Lotus to Microsoft Office to make it accessible to other employees using Microsoft Office. Mr. Forker

indicated that he would buy one copy of Lotus. Plaintiff told Mr. Forker that if he bought Lotus, he should buy three licenses so that multiple employees could use it and obtain internet access in order to support it. (Pl. Dep. Tr. 278-287, 295-7, 298-9; 3/6/08 Pl. Dep. Tr. 212-3). Plaintiff converted the quarterly report to Microsoft. (3/6/08 Pl. Dep. Tr. 212). Mr. Forker purchased only one copy (and one license) of Lotus. (Pl. Dep. Tr. 381-5; 3/6/08 Pl. Dep. Tr. 46; Def. Dep. Exh. 14, 15; Pl. Dep. Exh. 137). Notably, Plaintiff stated in her January 7, 2004 request for internet access that she needed such access for Lotus Software and the Quarterly Report. Mr. Stewart denied the request and Plaintiff converted the Quarterly Report to Microsoft Office. (Pl. Dep. Exh. 140 at P00928-9). On January 26, 2004, Mr. Forker suddenly requested the purchase of Lotus Software, already aware that Plaintiff converted the Quarterly Report to Microsoft, thereby eliminating the need for any purchase of Lotus. (Pl. Dep. Exh. 137; Def. Dep. Exh. 14).

78.     Deny Paragraph 78, except admit that Mr. Forker made certain allegations in a document marked as Def. Dep. Exh. 14 and refer to that document for the allegations therein. (Def. Dep. Exh. 14).

79.     Admit Paragraph 79.

80.     Admit Paragraph 80.

81.     Deny Paragraph 81, except admit that Plaintiff testified that after she was translating Lotus spreadsheets to Microsoft Office, she "felt that in the intervening years since the last time I had requested it that I had acquired enough extra skills to perhaps be able to make the transition, which I was beginning to do with the start of the year in 2004." (Pl. Dep. Tr. 281).

82.     Deny Paragraph 82, except admit that Plaintiff testified that "if it meant getting a backup I was going to transfer the report into Microsoft Office as best as I could..." (Pl. Dep. Tr.

279-280).

83.     Admit Paragraph 83.

84.     Deny Paragraph 84, except admit that Plaintiff was on medical leave from about

December 2001 to March 2002 (Dep. Tr. 8-12; Def. Dep. Exh. 1).  During Plaintiff's medical

leave, Defendant did not produce a quarterly report, nor did anyone else.  It was Plaintiff's

understanding that the report did not get produced because other employees were busy and

because they were busy they did not have time to learn Lotus. (Pl. Dep. Tr. 279, 286-8).

Defendant did not criticize Plaintiff for the fact that the quarterly report was not completed

during her leave.  (3/6/08 Pl. Dep. Tr. 182-3; Pl. Dep. Exh. 102).  Plaintiff had no back up, even

though other employees did. (Pl. Dep. Tr. 295-7).

85.     Deny Paragraph 85, except admit that Plaintiff testified that she prepared a "whole

series" of notes explaining how to prepare a Quarterly Report but everyone was busy and because

everyone was busy, no one had extra time to learn how to use Lotus to do the report.  (Pl. Dep.

Tr. 288).

86.     Deny Paragraph 86, except admit that in late 2003 or 2004, Plaintiff told Mr.

Forker that she needed a backup person in the event she had "another flare up with my back",

"surgery" or "any kind of extended therapy."  (Pl. Dep. Tr. 293).

87.     Admit Paragraph 87.

88.     Deny Paragraph 88, except admit that Plaintiff testified that in 2004, Plaintiff

completed the conversion of the Quarterly Report to Microsoft Office and, therefore, the report

"could be shared using Microsoft Office with the other employees of the Force Account unit."

(Pl. Dep. Tr. 285).

89.     Admit Paragraph 89 and refer to Paragraph 62 of the Complaint for a more complete description of its terms.  (Compl. ¶ 62).

90.     Admit Paragraph 90 and refer to Paragraphs 24, 63 and 64 of the Complaint for a more complete description of its terms.  (Compl. ¶ 24, 63, 64).

91.     Admit Paragraph 91 and refer to Paragraphs 65 and 67 of the Complaint for a more complete description of its terms.  (Compl. ¶ 65, 67).

92.     Admit Paragraph 92 and refer to Paragraphs 69 and 70 of the Complaint for its terms (Compl. ¶ 69, 70) and <u>supra</u> Point 15.

93.     Admit Paragraph 93.

94.     Deny Paragraph 94, except admit that TIS is supposed to provide network and computer support for Defendant's computers, and that Subways had its own separate TIS division.  (Pl. Dep. Tr. 392).

95.     Deny Paragraph 95, except admit that Plaintiff testified that most employees with computer titles were in TIS.  (Pl. Dep. Tr. 399).

96.     Deny Paragraph 96, except admit that Richard Burbridge transferred from Subways Capital Program to TIS and refer to the affidavit of Titus Byaruhanga.  (<u>Supra</u> Point 7 and ¶ 516-17).

97.     Deny Paragraph 97, except admit that Plaintiff performed computer work for her Unit and testified that "there was still an allowance for individual departments to maintain lower title computer specialists to do ad hoc work that would not be capable of being managed into TIS' full schedule."  (Pl. Dep. Tr. 392; <u>Supra</u> Points 2, 3 and ¶ 497-99).

98.     Deny Paragraph 98, except admit that although John Jue was designated an

technical and information systems liaison to Plaintiff's unit, he failed to provide the services required by Plaintiff's unit. (Supra Point 14-D and ¶ 584).

99.     Deny Paragraph 99, except admit that although John Jue was designated an technical and information systems liaison to Plaintiff's unit, he failed to provide the services required by Plaintiff's unit.  (Supra Point 14-D and ¶ 584).

100.    Admit Paragraph 100.

101.    Admit Paragraph 101.

102.    Deny Paragraph 102, except admit that although John Jue was designated an technical and information systems liaison to Plaintiff's unit, he failed to provide the services required by Plaintiff's unit. (Supra Point 14-D and ¶ 584).  Plaintiff also avers that after Defendant unlawfully denied her computer work, there was an occasion where at the apparent behest of John Jue, Plaintiff again resumed computer duties for her unit and that Mr. Jue "really appreciated having the assistance of not having to run up and down to deal with whatever problems we were coming up with." (Pl. Dep. Tr. 363-4).

103.    Admit Paragraph 103.

104.    Admit Paragraph 104.

105.    Admit Paragraph 105.

106.    Admit Paragraph 106.

107.    Deny Paragraph 107, except admit that Plaintiff testified that notwithstanding the fact that TIS was supposed to prepare "patches" and anti-virus programs, "the fact is that the machines were not getting patched" by TIS. (Pl. Dep. Tr. 120-121; Supra Point 14-D and ¶ 584).

108.    Admit Paragraph 108.

109.    Deny Paragraph 109, except admit that Plaintiff testified that she was not aware of any Transit policy regarding downloading patches and antivirus programs to Transit computers and that there were steps to take to download patches and programs, and that Defendant's partial quote of "Not exactly, not in those terms" is taken out of context.  (Pl. Dep. Tr. 119-120).

110.    Admit Paragraph 110.

111.    Admit Paragraph 111.

112.    Admit Paragraph 112.

113.    Deny Paragraph 113, except admit that Plaintiff was failed in error, which was subsequently corrected.  (Pl. Dep. Tr. 99, 200; Supra Point 12 and ¶ 555).

114.    Admit Paragraph 114 and aver that in or about August 2001, Plaintiff was notified that she passed the civil service exam.  (Pl. Dep. Tr. 99, 200; Supra Point 12 and ¶ 555).

115.    Admit Paragraph 115.

116.    Admit Paragraph 116.

117.    Deny Paragraph 117 and aver that prior to Plaintiff's December 2001 leave of absence, she advised Mr. Byaruhanga that she had passed the civil service exam.  (Pl. Dep. Tr. 394-6; Supra Point 12 and ¶ 555).

118.    Admit Paragraph 118 and aver that Mr. Byaruhanga told Plaintiff that "he didn't want to lose me, and that he was going to prepare the documents to process me for that promotion."  (Pl. Dep. Tr. 397-398).

119.    Admit Paragraph 119.

120.    Admit Paragraph 120.

121.    Admit Paragraph 121.

122.    Admit Paragraph 122.

123.    Admit Paragraph 123.

124.    Admit Paragraph 124.

125.    Admit Paragraph 125.

126.    Admit Paragraph 126.

127.    Deny Paragraph 127, except admit that Plaintiff testified that it was Plaintiff's understanding that as a Computer Specialist in the Force Account unit, "I would have 40 or 50 percent computer specialist duties and maybe another 40 or 50 percent of analyst duties" including continuing to produce the quarterly report and other duties that she previously had.  (Pl. Dep. Tr. 415-417).

128.    Admit Paragraph 128.

129.    Admit Paragraph 129.

130.    Admit Paragraph 130 and aver that the PER form approved by TIS and Plaintiff's Unit expressly provided that Plaintiff would have extensive computer duties in the Unit as a Computer Specialist.  (Pl. Dep. Exh. 76; Supra Point 12 and ¶ 557, ¶ 564).

131.    Deny Paragraph 131, except admit that Mr. Byaruhanga called Plaintiff at home during her medical leave of absence, asked her to provide a list of all the computer related tasks that she had done, and that Mr. Byaruhanga pursued a promotion for Plaintiff from ATMA to Computer Specialist from about March 2002 forward.  Plaintiff refers to supra Point 12 for additional details. (Pl. Dep. Tr. 396; Supra Point 12 and ¶ 556).

132.    Deny Paragraph 132, except admit that Byaruhanga prepared a PER and signed it March 19, 2002, which was approved by Mr. Stewart on April 2, 2002 (although the signature

date reads April 2, 2003), but that form was not approved by TIS. (Pl. Dep. Tr. 402-404; Supra Point 12 and ¶ 556-57).

133.   Admit Paragraph 133.

134.   Admit Paragraph 134.

135.   Deny Paragraph 135, except admit that Mr. Byaruhanga advised Mr. Stewart that a new PER had been prepared, which Mr. Byaruhanga signed on May 3, 2002 and Mr. Stewart signed on June 19, 2002. (Supra Point 12 and ¶ 556-57; Def. Exh. I-6).

136.   Admit Paragraph 136.

137.   Deny Paragraph 137, except admit that Mr. Byaruhanga prepared a revised PER and signed it July 29, 2002, that Mr. Stewart appointed Mr. Forker Acting Director Force Accounts effective in or about August 2002, that Mr. Stewart sent an email stating that he wanted Mr. Forker's input, and that Mr. Stewart signed the PER on September 18, 2002. (Pl. Dep. Exh. 76; Supra Points 10, 12 and ¶ 545, ¶ 556-57).

138.   Admit Paragraph 138.

139.   Deny Paragraph 139, except admit that TIS's approval was required for the PER and that Human Resources was involved in processing Plaintiff's promotion to Computer Specialist. (Supra Point 12 and ¶ 556-57).

140.   Admit Paragraph 140.

141.   Deny Paragraph 141, except admit that Plaintiff testified that she was unaware of any other ATMA in Craig Stewart's Unit that became a Computer Specialist. (Pl. Dep. Tr. 488).

142.   Admit Paragraph 142.

143.   Admit Paragraph 143.

144.    Deny Paragraph 144, except admit that Plaintiff was appointed to the position of Computer Specialist and that during her tenure in that position, Defendant did not fill Plaintiff's ATMA position in the Unit.  (Pl. Dep. Tr. 415-17; Pl. Dep. Exh. 7).

145.    Deny Paragraph 145, except admit that Plaintiff testified that Mr. Byaruhanga told her that she would receive a raise with promotion to Computer Specialist and that "He expected it would be in the area of 10 percent."  (Pl. Dep. Tr. 434; Supra Point 12 and ¶ 556-57).

146.    Deny Paragraph 146 and aver that, in addition to Mr. Byaruhanga, Plaintiff spoke with HR regarding a raise.  (Pl. Dep. Tr. 434-5; Supra Point 12 and ¶ 555, ¶ 559).

147.    Admit Paragraph 147.

148.    Admit Paragraph 148.

149.    Deny Paragraph 149, except admit that Plaintiff testified that Mr. Forker appeared "neutral" regarding the issue of Plaintiff receiving a raise and that Mr. Forker called Ms. Coppola in HR.  (Pl. Dep. Tr. 446-7).

150.    Admit Paragraph 150.

151.    Admit Paragraph 151.

152.    Admit Paragraph 152.

153.    Deny Paragraph 153, except admit that Plaintiff met with Mr. Stewart and Mr. Pearce on October 23, 2002.  (Pl. Dep. Tr. 447, 449).

154.    Deny Paragraph 154, except admit that Plaintiff testified that her meeting with Messrs. Stewart and Pearce lasted "almost exactly an hour" and that Plaintiff told Patrick Damas that Mr. Stewart called Ms. Coppola.  (Pl. Dep. Tr. 449-50).

155.    Admit Paragraph 155.

156.     Deny Paragraph 156, except admit that Plaintiff testified that Ms. Coppola told Plaintiff that she was receiving a change in title and not a promotion, that she had been performing computer specialist duties for approximately three years that Ms. Coppola was aware of, that Plaintiff's job duties were not changing, and that Plaintiff was not receiving a raise because she was earning more than the minimum salary for the position of Computer Specialist. (Pl. Dep. Tr. 427, 451-2).

157.     Admit Paragraph 157.

158.     Admit Paragraph 158.

159.     Deny Paragraph 159, except admit that Ms. Coppola told Plaintiff that there were no promotional lines for ATMA, which Plaintiff already knew, that there were promotional levels for Computer Specialist, and that such a promotion could result in a raise.  (Pl. Dep. Tr. 413, 468-9).

160.     Admit Paragraph 160.

161.     Admit Paragraph 161.

162.     Admit Paragraph 162.

163.     Deny Paragraph 163, except admit that Plaintiff testified that during the period November 2002-February 2003, in deciding whether to remain a Computer Specialist or return to ATMA, she considered whether the Computer Specialist position would be unionized since she had been denied a raise and unionization would therefore reduce her actual take home pay, and the possibility of promotion as a Computer Specialist.  (Pl. Dep. Tr. 469-70).

164.     Deny Paragraph 164, except admit that Plaintiff corresponded with Ms. Coppola by email, including January 30, 2002 and advised HR by phone of her decision regarding the

-18-

Computer Specialist position.  (Pl. Dep. Tr. 474, 476-77).

165.    Admit Paragraph 165 and refer to complete email for its complete contents (Def. Exh. J-17), and aver that Plaintiff advised HR by phone of her decision regarding the Computer Specialist position.  (Pl. Dep. Tr. 474, 476-77).

166.    Admit Paragraph 166.

167.    Admit Paragraph 167 and refer to Plaintiff's complaint for a more complete description of its terms.  (Supra Point 13 and ¶ 569-74).

168.    Admit Paragraph 168 and refer to Plaintiff's complaint for a more complete description of its terms.  (Supra Point 13).

169.    Admit Paragraph 169 and refer to Plaintiff's complaint for a more complete description of its terms.  (Supra Point 13).

170.    Deny Paragraph 170, except admit that Plaintiff identified Ms. Coppola as a respondent in her November 7, 2002 complaint.  (Supra Point 13 and ¶ 561, ¶ 572).

171.    Admit Paragraph 171.

172.    Deny Paragraph 172, except admit that Plaintiff alleged to Mr. Damas that if Ms. Coppola was dealing with a male employee she would not refuse to give him the raise and that Plaintiff was being treated differently because she is female (Pl. Dep. Tr. 441-452), and refer to Plaintiff's testimony regarding her complaint to Mr. Damas.  (Supra Point 13 and ¶ 569).

173.    Admit Paragraph 173.

174.    Deny Paragraph 174, except admit that Plaintiff's current salary of $64,995 was slightly above the minimum salary for Computer Specialist, and aver that Plaintiff was entitled to a raise with the promotion.  (Supra Points 12, 13).

175.    Deny Paragraph 175, except refer to the affidavit of Patrick Smith for the allegations therein and aver that Plaintiff was entitled to a raise with the promotion. (Supra Points 12, 13).

176.    Admit Paragraph 176.

177.    Deny Paragraph 177, except admit that Plaintiff testified that Defendant announced a hiring freeze for the period October 2001-August 2003 (Pl. Dep. Tr. 389) and that during the alleged hiring freeze, Defendant promoted male employees including Titus Byaruhanga, and that after the hiring freeze Defendant did not provide Plaintiff with a raise. (Supra Points 10, 12, 13, 14 and ¶ 543, ¶ 565).

178.    Deny Paragraph 178, except admit that during the alleged hiring freeze, Defendant promoted male employees including Titus Byaruhanga (Supra Points 10, 12, 13, 14 and ¶ 543, ¶ 565).

179.    Deny Paragraph 179, except admit that Defendant issued a December 18, 2002 letter to Plaintiff and refer to the letter for the allegations therein. (Supra Point 13 and ¶ 574).

180.    Admit Paragraph 180.

181.    Admit Paragraph 181 and refer to Plaintiff's October 1, 2003 memorandum for its terms. (Supra Point 15 and ¶ 586).

182.    Admit Paragraph 182.

183.    Admit Paragraph 183.

184.    Admit Paragraph 184.

185.    Deny Paragraph 185, except admit that between November 2003 and July 2004, there was no employee working as a Computer Specialist in the Force Accounts Unit. (Pl. Dep.

Exh. 7).

186.    Admit Paragraph 186.

187.    Deny Paragraph 187, except admit that Plaintiff alleges among other items that Defendant unlawfully denied her internet access as an act of discrimination and retaliation, and that Plaintiff identified John Jue as a younger male granted such access, and refer to the Complaint.  (Compl. ¶ 66, 68; Supra Point 14-D and ¶ 579-85).

188.    Deny Paragraph 188, except admit that Plaintiff alleges that Defendant unlawfully denied her internet access as an act of discrimination and retaliation, and that Plaintiff identified John Jue as a younger male granted such access, and refer to the Complaint.  (Compl. ¶ 66, 68, Supra Point 14-D and ¶ 579-85).

189.    Admit Paragraph 189.

190.    Admit Paragraph 190.

191.    Admit Paragraph 191.

192.    Admit Paragraph 192.

193.    Deny Paragraph 193, except admit that the security department required employees to apply for renewal of internet access, that Mr. Forker signed a written request for same regarding Plaintiff.  (Pl. Dep. Tr. 118, 127; Supra Point 14-D and ¶ 583-85).

194.    Admit Paragraph 194.

195.    Admit Paragraph 195.

196.    Deny Paragraph 196, except admit that Plaintiff testified that "we were requested to provide a justification letter which was completed about twenty days later."  (Pl. Dep. Tr. 126).

197.     Admit Paragraph 197.

198.     Admit Paragraph 198.

199.     Deny Paragraph 199, except admit that Plaintiff testified that the two most major reasons she wanted internet access was to use Technet to research computer issues and problems and to download virus definitions (Pl. Dep. Tr. 132), that Plaintiff's January 7, 2004 request for internet access set forth grounds for her need for internet access including for the Quarterly Report. (Pl. Dep. Exh. 140) and that TIS had failed to provide computer support to her Unit. (Supra Point 14-D and ¶ 583-85).

200.     Deny Paragraph 200 and aver that in Plaintiff's January 2004 request for internet access, she specifically stated that internet access was required for the Quarterly Report and other duties. (Pl. Dep. Exh. 140; Supra Point 14-D and ¶ 583-85).

201.     Deny Paragraph 201, except admit that Plaintiff requested internet access by memorandum dated October 1, 2003, which Mr. Stewart rejected. (Pl. Dep. Tr. 145; Supra Point 14-D and ¶ 583-85).

202.     Deny Paragraph 202, except admit that Plaintiff requested internet access in January 2004, stating that such access was needed for among either items, the Quarterly Report, which request Mr. Stewart rejected. (Pl. Dep. Tr. 119, 127, 132-133; Pl. Dep. Exh. 140; Supra Point 14-D and ¶ 583-85).

203.     Deny Paragraph 203, except admit that Plaintiff testified that she never heard that Forker, Stewart or "any other manager" made statements that directly reflected a negative attitude about women, older women or older workers, and aver that the actions of Messrs. Forker, Stewart and others reflected discriminatory animus. (Pl. Dep. Tr. 134-8; Supra Points 2-29).

-22-

204.     Deny Paragraph 204, except admit that Plaintiff testified that she never heard that Forker, Stewart or "any other manager" made statements that directly reflected a negative attitude about women, older women or older workers and aver that the actions of Messrs. Forker, Stewart and others reflected discriminatory animus. (Pl. Dep. Tr. 134-8; Supra Points 2-29).

205.     Admit Paragraph 205.

206.     Admit Paragraph 206, except that, in reference to Defendant's Footnote 3, Plaintiff's Points 2 to 29 contain a more complete list of Plaintiff's protected activities.  (Supra Points 13, 17, 19, 22, 24 and ¶ 569, ¶ 609, ¶ 624, ¶ 651, ¶ 665-666, ¶ 669).

207.     Admit Paragraph 207.

208.     Admit Paragraph 208.

209.     Deny Paragraph 209, except admit that Plaintiff testified that Mr. Forker was laid back "at times" and that Mr. Forker was not impatient "all the time"  (Pl. Dep. Tr. 29, 128-9), and Plaintiff identified three occasions when Mr. Forker had raised his voice with her (January 2004, May 2004 and June 2004) (Pl. Dep. Tr. 138-9).

210.     Deny Paragraph 210, except admit that Plaintiff testified that it was possible she discussed the Botanic Gardens and her interest in vinyl record with Forker, and that she offered to fix his home computer.  (Pl. Dep. Tr. 558).

211.     Deny Paragraph 211, except admit that Plaintiff identified, among others, Mr. Forker, Mr. Stewart (Pl. Dep. Tr. 110-113) and Mr. Pearce (3/6/08 Pl. Dep. Tr. 108) as persons that engaged in harassing conduct.

212.     Deny Paragraph 212, except admit that Defendant's counsel asked Plaintiff about incidents listed in the Complaint at various paragraphs, including paragraphs 64, 99, 102, 104,

105. (Pl. Dep. Tr. 563).

213. Deny Paragraph 213, except admit that Defendant's counsel asked Plaintiff about incidents listed in the Complaint at various paragraphs, including paragraphs 64, 99, 102, 104, 105. (Pl. Dep. Tr. 563), and admit that Plaintiff testified regarding specific incidents raised by Defendant's counsel, and further aver that Plaintiff identified various incidents, and further aver that Plaintiff referred Defendant's counsel to various evidentiary documents, including without limitation Plaintiff's exhibits to her NYSDHR complaint, which materials contain additional relevant incidents. (Supra Points 2-29).

214. Deny Paragraph 214, except admit that in or about November 2002, Mr. Forker denied Plaintiff computer work and directed her to exclusively perform analyst duties. (Pl. Dep. Tr. 356, 361-8; Supra Point 14-A and ¶ 575-76).

215. Deny Paragraph 215, except admit that TIS was supposed to provide computer support and refer to Points 1-29 above, and that liaisons in the operating departments were supposed to provide support. (Supra Point 14-D and ¶ 584).

216. Deny Paragraph 216, except admit that although John Jue was designated an technical and information systems liaison to Plaintiff's unit, he failed to provide the services required by Plaintiff's unit. (Pl. Dep. Tr. 123-5, 360; Supra Point 14-D and ¶ 584).

217. Deny Paragraph 217, except admit that although John Jue was designated an technical and information systems liaison to Plaintiff's unit, he failed to provide the services required by Plaintiff's unit. (Pl. Dep. Tr. 123-5, 360; Supra Point 14-D and ¶ 584). Plaintiff also avers that after Defendant unlawfully denied her computer work, there was an occasion where at the apparent behest of John Jue, Plaintiff again resumed computer duties for her unit and that Mr.

Jue "really appreciated having the assistance of not having to run up and down to deal with whatever problems we were coming up with" (Pl. Dep. Tr. 363-4), and admit that Plaintiff was competent to perform computer duties and willingly did so.

218.     Deny Paragraph 218, except admit that when Defendant unlawfully denied Plaintiff computer work, and Plaintiff asked Mr. Forker about how computers would be supported, Mr. Forker said, among other items, "well, Johnny is here, Johnny can do it." (Pl. Dep. Tr. 365).

219.     Admit Paragraph 219 and refer to Plaintiff's testimony at Pl. Dep. Tr. 364 and 472 for her specific testimony. (Pl. Dep. Tr. 364, 372).

220.     Admit Paragraph 220.

221.     Admit Paragraph 221.

222.     Deny Paragraph 222, except admit that Plaintiff alleges that the denial of computer work, including among other items when Plaintiff was a Computer Specialist, constituted an act of discrimination and retaliation and refer to the Complaint. (Supra ¶ 575-76; Compl. ¶ 63-64).

223.     Admit Paragraph 223.

224.     Admit Paragraph 224.

225.     Deny Paragraph 225, except admit that Plaintiff testified that she ultimately corrected a problem in "five minutes and it was over and that was the end of that" (Pl. Dep. Tr. 368).

226.     Deny Paragraph 226, except refer to the Complaint for Plaintiff's claims regarding denial of computer work and the facts stated herein regarding same (Supra Point 14 and ¶ 575-

76).

227.   Admit Paragraph 227.

228.   Admit Paragraph 228.

229.   Admit Paragraph 229.

230.   Admit Paragraph 230.

231.   Admit Paragraph 231.

232.   Deny Paragraph 232, except admit that Plaintiff provided Defendant's counsel with examples of tasks that Mr. Forker assigned to her, including work train manifests, preparing monthly reports previously done by Mr. Akhtaruzzaman, reconcile information between capital programs and contractors, and finishing logs for control center, and assisting Dellamae Rampersant, and that Mr. Forker assigned many tasks to Ms. Locicero during the six month period of January-June 2004 (Pl. Dep. Tr. 330-333; Supra Points 14-B, 21-B and ¶ 577, ¶ 641-46).

233.   Deny Paragraph 233, except admit that Mr. Forker assigned Plaintiff to develop an escalation factor, which task Plaintiff did not define as "menial." (Pl. Dep. Tr. 310; Supra Points 14, 14-B, 21-B and ¶ 577, ¶ 641-46).

234.   Admit Paragraph 234.

235.   Admit Paragraph 235.

236.   Deny Paragraph 236, except admit that Plaintiff testified that she believed that it was "Forker's obligation to elicit the best possible work" from Mr. Akhtaruzzaman and to be encouraging, instructing and developing Mr. Akhtaruzzaman's skills rather than just "dump the work on me." (3/6/08 Pl. Dep. Tr. 204).

237.   Deny Paragraph 237, except admit that Mr. Forker asked Plaintiff to reconcile "two analyses" that contained "[t]hings like flagging" (Pl. Dep. Tr. 312) and that in connection with working on Quarterly Reports, Plaintiff reviewed "multiple sources of data covering the exact same function." (Pl. Dep. Tr. 308).

238.   Admit Paragraph 238.

239.   Admit Paragraph 239.

240.   Deny Paragraph 240, except admit that Plaintiff testified that regarding an analysis, "I was probably the logical choice to do it, because I was the one who possessed the most information in order to reconcile what was going on." (Pl. Dep. Tr. 323).

241.   Deny Paragraph 241, except admit that Mr. Forker directed Plaintiff to count lines on work train manifests each day (Pl. Dep. Tr. 311, 315) which could require anywhere from 45 minutes to two hours of time (Pl. Dep. Tr. 315; <u>Supra</u> Point 14, 14-B and ¶ 577).

242.   Deny Paragraph 242, except admit Plaintiff testified that Mr. Stewart had directed Mr. Forker to collect the information (Pl. Dep. Tr. 315, 3/6/08 Pl. Dep. Tr. 147), that Plaintiff believed she should be "doing higher level work than doing this kind of menial work," and that such menial work was a "waste" of Plaintiff's time. (Pl. Dep. Tr. 311). Plaintiff also testified that Titus Byaruhanga had assigned such work to Ms. Dockery because of Ms. Dockery's "temperament and background." (Pl. Dep. Tr. 316).

243.   Admit Paragraph 243.

244.   Admit Paragraph 244.

245.   Admit Paragraph 245.

246.   Deny Paragraph 246, except admit that Plaintiff testified that in at least four

separate months between August 2002 and mid 2004, Plaintiff performed monthly review of logs that had been Ms. Rampersant's responsibility, and that Ms. Rampersant was swamped. (Pl. Dep. Tr. 333-4).

247.    Deny Paragraph 247, except admit that Mr. Forker directed Plaintiff to write directions for production of the Quarterly Report, which Plaintiff testified became a major point in June 2004 (Pl. Dep. Tr. 338; supra Point 21-B and ¶ 641-46).

248.    Admit Paragraph 248.

249.    Admit Paragraph 249.

250.    Admit Paragraph 250.

251.    Admit Paragraph 251.

252.    Deny Paragraph 252, except admit that Plaintiff testified that she was entitled to a one hour lunch, that generally swipes should be done for lunch, and that at some point employees had been told not to use a "one minute" swipe for lunch (Pl. Dep. Tr. 570, 573, 576-7, 584; 3/6/08 Pl. Dep. Tr. 13-15).

253.    Deny Paragraph 253, except admit that a one minute swipe, unless changed by hand, implies that the employee worked through lunch, and aver that Plaintiff did not seek to be paid for time reflected by a one minute swipe. (Id.)

254.    Deny Paragraph 254, except admit that on April 21, 2003, Mr. Forker harassed Plaintiff by sending her a buck slip regarding her time sheet and a lunch hour, and refer to the buck slip for its contents.  (Supra Point 14-C and ¶ 578).

255.    Deny Paragraph 255, except admit that on September 18, 2003, Mr. Forker harassed Plaintiff by sending her an email regarding her time sheet and swipes reflected on a time

sheet, and refer to the email for its contents  (Pl. Dep. Exh. 145; Supra Point 14-C and ¶ 578).

256.    Admit Paragraph 256.

257.    Admit Paragraph 257 and refer to supra Point 15 and ¶ 586-87.

258.    Admit Paragraph 258, and aver that the correct date is May 14, 2004, not May 15, 2004 (Pl. Dep. Tr. 583; 3/8/08 Pl. Dep. Tr. 12-13; Supra Point 21-D and ¶ 648).

259.    Admit Paragraph 259.

260.    Admit Paragraph 260.

261.    Deny Paragraph 261, except admit that Plaintiff testified that after she used a one minute swipe, she did raise the issue with Mr. Forker because she was "busy" and was not seeking to be paid for the time (Pl. Dep. Tr. 583) and did not send an email to Mr. Forker "because there was no requirement for that."  (3/6/08 Pl. Dep. Tr. 15).

262.    Admit Paragraph 262.

263.    Admit Paragraph 263.

264.    Admit Paragraph 264.

265.    Admit Paragraph 265.

266.    Deny Paragraph 266 for lack of authority, except refer to Points 21 and 22 herein regarding 2004 emails and the June 3, 2004 incident.  (Supra Points 21, 22 and ¶ 640-60).

267.    Deny Paragraph 267 for lack of authority, except refer to Points 2 and 3 regarding Plaintiff's production of the Quarterly Report and Points 14-D, 21-B, 22 regarding Lotus and Microsoft Software issues.  (Supra Points 2, 3, 14, 14-D, 21, 21-B, 22 and ¶ 498, ¶ 503).

268.    Deny Paragraph 268 for lack of authority, except refer to Points 21 and 22 herein regarding 2004 emails and the June 3, 2004 incident.  (Supra Points 21, 22).

269.    Deny Paragraph 269 for lack of authority, except refer to Points 21 and 22 herein regarding 2004 emails and the June 3, 2004 incident.  (Supra Points 21, 22).

270.    Deny Paragraph 270, except admit that during Plaintiff's medical leave from December 2001-March 2002, Defendant did not produce a quarterly report, nor did anyone else. (Pl. Dep. Tr. 8-9, 279, 286).

271.    Admit Paragraph 271.

272.    Deny Paragraph 272, except admit that Plaintiff was on medical leave from about December 2001 to March 2002 (Dep. Tr. 8-12; Def. Dep. Exh. 1).  During Plaintiff's medical leave, Defendant did not produce a quarterly report.  It was Plaintiff's understanding that the report did not get produced because other employees were busy and because they were busy they did not have time to learn Lotus. (Pl. Dep. Tr. 279, 286-8).  Defendant did not criticize Plaintiff for the fact that the quarterly report was not completed during her leave.  (3/6/08 Pl. Dep. Tr. 182-3; Pl. Dep. Exh. 102).  Plaintiff had no back up, even though other employees did. (Pl. Dep. Tr. 295-7).

273.    Admit Paragraph 273.

274.    Deny Paragraph 274, except admit that in early 2004, after Mr. Stewart denied Plaintiff's request for internet access (which was needed to support Lotus software and for the Quarterly Report) (Pl. Dep. Exh. 140), and Plaintiff converted the Quarterly Report from Lotus format to Microsoft Office format.  (3/6/08 Pl. Dep. Tr. 212).

275.    Deny Paragraph 275, except admit that Plaintiff felt it was necessary to train a backup person to produce the Quarterly Report "in the event anything should happen" to Plaintiff, conveyed same to Mr. Forker (Pl. Dep. Tr. 219, 303), and that Plaintiff was concerned

that she had medical problems that could require further medical treatment and/or surgery.  (Pl. Dep. Tr. 293; 3/6/08 Pl. Dep. Tr. 219).

276.     Admit Paragraph 276.

277.     Deny Paragraph 277, except admit that Anna Marie Perdomo was designated to be trained to produce the Quarterly Report (Pl. Dep. Tr. 301-3; 3/6/08 Pl. Dep. Tr. 218-9).

278.     Admit Paragraph 278.

279.     Admit Paragraph 279.

280.     Admit Paragraph 280 and refer to March 9, 2004 email for its complete contents. (Def. Exh. P).

281.     Deny Paragraph 281, except refer to Plaintiff's March 10, 2004 email to Mr. Forker for its complete contents.  (Def. Exh. P).

282.     Deny Paragraph 282, except refer to March 11, 2004 email for its complete contents.  (Def. Exh. P).

283.     Deny Paragraph 283, except refer to Plaintiff's March 17, 2004 email for its complete contents.  (Def. Exh. P).

284.     Deny Paragraph 284, except refer to Mr. Forker's March 17, 2004 email for its complete contents, and deny the use of the term "menial" in such correspondence.  (Def. Exh. P).

285.     Admit Paragraph 285.

286.     Admit Paragraph 286, and aver that Mr. Forker was referring to the Lotus Manual on April 2, 2004.  (3/6/08 Pl. Dep. Tr. 38).

287.     Admit Paragraph 287 and refer to Mr. Forker's harassing May 27, 2004 email for its complete contents.  (Supra Points 21, 21-E and ¶ 649).

288.     Admit Paragraph 288.

289.     Admit Paragraph 289.

290.     Admit Paragraph 290.

291.     Admit Paragraph 291 and aver the interview date was June 9, 2004.  (Supra Point 23 and ¶ 662).

292.     Deny Paragraph 292, except admit that Plaintiff agreed with the agencies that it was not a match for her.  (Pl. Dep. Tr. 99-102).

293.     Deny Paragraph 293, except admit that by June 2004, Mr. Forker was aware that Plaintiff was interviewing with other City agencies and did not have authority to approve or disapprove of such interviews.  (Supra Point 23 and ¶ 662-63).

294.     Admit Paragraph 294.

295.     Deny Paragraph 295, except admit that Plaintiff received Mr. Forker's June 3, 2004 "task reminder", reviewed it, and then deleted it as duplicative of a March 9, 2004 task request saved in her in box.  (Supra Point 22 and ¶ 658).

296.     Admit Paragraph 296.

297.     Admit Paragraph 297 and refer to Plaintiff's complete testimony for its complete contents.  (3/6/08 Pl. Dep. Tr. 19-23; Supra Point 22 and ¶ 650).

298.     Admit Paragraph 298.

299.     Admit Paragraph 299.

300.     Admit Paragraph 300.

301.     Admit Paragraph 301.

302.     Deny Paragraph 302, except admit that Plaintiff testified, among other items, that

"He suddenly became interested.....And my attempt to stay employed with Transit was to delay writing that manual." (3/6/08 Pl. Dep. Tr. 34).

303.    Deny Paragraph 303 for lack of cited authority, except admit that Mr. Forker falsely accused Plaintiff of various improper conduct and/or violations (Points 14-C, 15, 21-D, 21-E, 22, 23), and that Plaintiff had no formal record of discipline. (Supra Points 2 and 3).

304.    Admit Paragraph 304 and refer to Plaintiff's June 8, 2004 complaint and deposition testimony for a more complete description of the June 3, 2004 assault by Mr. Forker. (Point 22 and ¶ 650, ¶ 651).

305.    Admit Paragraph 305.

306.    Admit Paragraph 306.

307.    Admit Paragraph 307 and refer to the complete report for its contents. (Supra Points 22, 27 and ¶ 652, ¶ 677).

308.    Deny Paragraph 308, except admit that after Mr. Forker's unlawful June 3, 2004 assault, there were additional incidents in which Mr. Forker violated Plaintiff's rights and in which Plaintiff's time sheets were involved. (Supra Point 23 and ¶ 661-63).

309.    Admit Paragraph 309.

310.    Admit Paragraph 310.

311.    Admit Paragraph 311.

312.    Deny Paragraph 312, except admit that on or about June 15, 2004, Mr. Forker received Plaintiff's time sheet and that Plaintiff testified that based upon Mr. Forker's statements, she thought he believed that she went to labor relations at sometime other than her lunch hour. (3/6/08 Pl. Dep. Tr. 74).

313. Deny Paragraph 313, except admit that on June 15, 2004, Mr. Forker gave Plaintiff a buckslip directing her to change the time on her time sheet for June 4, 2004, Plaintiff made the change, "didn't have a problem with making the change on the timesheet", but had a problem with Mr. Forker's accusation that Plaintiff was away without leave ("AWOL"), which was an act of discrimination, harassment and retaliation. (Supra Point 23 and ¶ 661; 3/6/08 Pl. Dep. Tr. 76).

314. Deny paragraph 314, except admit that there was an incident involving in part Plaintiff's time sheet for June 16, 2004 (3/6/08 Pl. Dep. Tr. 60-62, 85; Supra Point 23 and ¶ 663).

315. Admit Paragraph 315.

316. Deny Paragraph 316, except admit that Plaintiff wrote on her time sheet "offsite lunch @ interview" and that Plaintiff worked a full day and was paid for a full day. (Supra Point 23 and ¶ 663).

317. Admit Paragraph 317.

318. Deny Paragraph 318, except admit that Mr. Forker was apparently not pleased with performance of Akhtar. (Pl. Dep. Tr. 556).

319. Deny Paragraph 319, except admit that Plaintiff alleges that the incidents described in her Statement constituted discrimination, harassment and retaliation, and that Mr. Forker engaged in such actions, and that Plaintiff alleges that Mr. Forker engaged in unlawful conduct on behalf of Mr. Stewart and as his agent. (Pl. Dep. Tr. 110-115, 491-2; Supra Points 2-29).

320. Deny Paragraph 320, except admit that Plaintiff alleges, among other items, that Mr. Stewart (1) retaliated against Plaintiff for her November 2, 2002 complaint; (2) unlawfully

denied her internet access in 2003/2004; (3) unlawfully denied her raises; (4) unlawfully denied her promotions; (5) denied her raises and promotions, (6) and engaged in other unlawful conduct, all of which is detailed in Plaintiff's Statement.  (Supra Points 2-29).

321.   Deny Paragraph 321, except admit that Plaintiff testified, among other items, that the denial of internet access was retaliatory because (1) there was a "pattern" of Mr. Stewart's behavior (Pl. Dep. Tr. 495), (2) the "pattern" included assignment of "more menial jobs" such as reviewing manifests, writing memos and "tighter deadlines" (Supra Points 14, 21 and ¶ 576-77, ¶ 641-46); (3) Mr. Stewart made defamatory statements about Plaintiff, including falsely stating that she was not "management material" (Supra Points 18, 22-D and ¶ 620, ¶ 668); (4) Defendant provided internet access to Lisa Schriebeman, a younger female with no need for such access (3/6/08 Pl. Dep. Tr. 198; Pl. Dep. Tr. 156); (5) Mr. Stewart had no legitimate basis to deny Plaintiff internet access, which she had had since 1998 and which Plaintiff needed for her extensive computer duties, software support and production of the Quarterly Report, as documented in her January 7, 2004 request for internet access (Pl. Dep. Exh. 140; Supra Points 2, 3, 14-D and ¶ 579-85).

322.   Deny Paragraph 322, except admit that Plaintiff testified, among other items, that the denial of internet access  was "harassment" for the reasons listed and also because Plaintiff needed internet access for her extensive computer duties, software support and production of the Quarterly Report, as documented in her January 7, 2004 request for internet access (Pl. Dep. Exh. 140; Supra Points 2, 3, 14-D and ¶ 579-85).

323.   Deny Paragraph 323 and aver that as of 2004, when Plaintiff was an ATMA, Plaintiff needed internet access for her extensive computer duties, software support and

production of the Quarterly Report, as documented in her January 7, 2004 request for internet access (Pl. Dep. Exh. 140; Supra Points 2, 3, 14, 14-D and ¶ 497-99, ¶ 579-85), and that Defendant gave internet access to Lisa Schriebeman, a younger female that did not need such access.  (3/6/08 Pl. Dep. Tr. 198, Pl. Dep. Tr. 156).

324.    Admit Paragraph 324.

325.    Deny Paragraph 325, except refer to Plaintiff's complete deposition testimony for its terms.  (Pl. Dep. Tr. 559-561).

326.    Admit Paragraph 326.

327.    Admit Paragraph 327.

328.    Admit Paragraph 328.

329.    Admit Paragraph 329.

330.    Admit Paragraph 330.

331.    Deny Paragraph 331, except that Plaintiff was shown the Quarterly Report for the Fourth Quarter of 2003 and was asked about that report.  (Def. Dep. Exh. 11; Pl. Dep. Tr. 545).

332.    Admit Paragraph 332.

333.    Deny Paragraph 333, except admit that Plaintiff testified that she moved tables and then subsequently moved them back.  (Pl. Dep. Tr. 546-7).

334.    Admit Paragraph 334.

335.    Admit Paragraph 335.

336.    Admit Paragraph 336.

337.    Deny Paragraph 337, except admit that Plaintiff alleges that she was unlawfully denied at least two promotions (Director Force Accounts and Director EFR) and that such denials

constituted discrimination based on sex, discrimination based on age, and retaliation (Compl.;
Supra Points 16, 20).

338.    Admit Paragraph 338.

339.    Admit Paragraph 339.

340.    Admit Paragraph 340.

341.    Admit Paragraph 341 and aver that it is a fact that in 2000 Plaintiff did not apply
for Director EFR and it is a fact that Defendant unlawfully denied Dawn Irby (highly qualified
older female) promotion to Director EFR in 2000 and selected for the position Tim Forker
(younger less qualified male) for the position. (Supra Point 9; see also supra Points 4, 8).

342.    Admit Paragraph 342.

343.    Admit Paragraph 343.

344.    Admit Paragraph 344.

345.    Admit Paragraph 345.

346.    Admit Paragraph 346.

347.    Admit Paragraph 347.

348.    Admit Paragraph 348 and aver that it is a fact that Defendant unlawfully denied
Dawn Irby (highly qualified older female) promotion to Director EFR in 2000 and selected for
the position Tim Forker (younger less qualified male) for the position. (Supra Point 9; see also
supra Points 4, 8). Defendant has listed in Paragraph 348 some of the factors that Plaintiff cited
as supporting her testimony regarding Ms. Irby's superior qualifications for Director EFR. There
are additional factors. (Supra Points 4, 8, 9).

349.    Admit Paragraph 349 and aver that it is a fact that  Defendant unlawfully denied

Dawn Irby (highly qualified older female) promotion to Director EFR in 2000 and selected for the position Tim Forker (younger less qualified male) for the position.  (Supra Point 9; see also supra Points 4, 8).  Defendant has listed in Paragraph 349 some of the factors that Plaintiff cited as supporting her testimony regarding Ms. Irby's superior qualifications for Director EFR.  There are additional factors.  (Supra Points 4, 8, 9).

350.    Admit Paragraph 350.

351.    Admit Paragraph 351.

352.    Deny Paragraph 352, except refer to Mr. Forker's resume for the allegations therein.  (Supra Point 9, Point 8).

353.    Admit Paragraph 353.

354.    Deny Paragraph 354, except refer to the resumes for the allegations therein.  (See Def. Paragraph 354 exhibits-resumes).

355.    Admit Paragraph 355.

356.    Admit Paragraph 356.

357.    Admit Paragraph 357.

358.    Deny Paragraph 358, except admit that Plaintiff testified that Defendant announced a hiring freeze for the period October 2001-August 2003 (Pl. Dep. Tr. 389), and that during the alleged hiring freeze, Defendant promoted male employees including Titus Byaruhanga, and that after the hiring freeze ended Defendant did not provide Plaintiff with a raise. (Supra Points 10, 12, 13, 14 and ¶ 543, ¶ 565-66).

359.    Deny Paragraph 359, except admit that during the alleged hiring freeze, Mr. Byaruhanga left as Director Force Accounts and was promoted to Director Second Avenue

Subway and Long Range Planning.  (<u>Supra</u> Points 10, 12 and ¶ 543, ¶ 565-66).

360.    Deny Paragraph 360, except admit that during the alleged hiring freeze, Mr.

Stewart appointed Mr. Forker Acting Director Force Accounts (<u>Supra</u> Point 10 and ¶ 545).

361.    Deny Paragraph 361, except admit that during the alleged hiring freeze, Defendant

appointed Dawn Irby and Joseph DiLorenzo co-Acting Directors EFR. (<u>Supra</u> Point 11 and ¶

551).

362.    Admit Paragraph 362.

363.    Admit Paragraph 363.

364.    Admit Paragraph 364.

365.    Admit Paragraph 365.

366.    Admit Paragraph 366.

367.    Admit Paragraph 367.

368.    Admit Paragraph 368.

369.    Admit Paragraph 369.

370.    Admit Paragraph 370.

371.    Admit Paragraph 371.

372.    Admit Paragraph 372 and refer to Plaintiff's complete testimony and supporting

testimony of Mr. Byaruhanga, Ms. Nau, Ms. Irby and Ms. Ruiz regarding her qualifications for

promotion to Director Force Accounts.  (<u>Supra</u> Points 2, 3, 4, 5, 16 and ¶ 492-503, ¶ 508, ¶ 514,

¶ 590, ¶ 598, ¶ 603-04).

373.    Admit Paragraph 373 and refer to Plaintiff's complete testimony and supporting

testimony of Mr. Byaruhanga, Ms. Nau, Ms. Irby and Ms. Ruiz regarding her qualifications for

promotion to Director Force Accounts. (<u>Supra</u> Points 2, 3, 4, 5, 16 and ¶ 492-503, ¶ 508, ¶ 514, ¶ 590, ¶ 598, ¶ 603-04).

374.    Deny Paragraph 374 and aver that Plaintiff wrote procedures and submitted them. (<u>Supra</u> Points 2, 3, 16 and ¶ 497, ¶ 590, ¶ 677).

375.    Deny Paragraph 375, except admit that Plaintiff was more qualified than Mr. Forker for promotion to Director Force Accounts for numerous reasons, including among other items, Plaintiff had years of appointed management and supervisory experience, all of which was detailed on her application materials and corroborated by witnesses, and had "actually accomplished the complete clean up of Brooklyn station graffiti" (3/6/08 Pl. Dep. Tr. 138; <u>Supra</u> Points 2, 3, 4, 5, 16 and ¶ 492-503, ¶ 508, ¶ 514, ¶ 590, ¶ 598, ¶ 603-04).

376.    Deny Paragraph 376, except refer to the resumes for the allegations therein (Def. Exh. T).

377.    Admit Paragraph 377 and aver the "interview" was a sham. (<u>Supra</u> Point 16 and ¶ 592-93).

378.    Admit Paragraph 378.

379.    Admit Paragraph 379.

380.    Admit Paragraph 380 and refer to Plaintiff's notes for their complete contents. (<u>Supra</u> Point 16 and ¶ 592-93).

381.    Deny Paragraph 381, except admit that Mr. Pearce asked Plaintiff why she applied for Director Force Accounts, Plaintiff told Mr. Pearce that she was qualified, Plaintiff asked Mr. Pearce "have you read my resume and cover letter" (3/6/08 Pl. Dep. Tr. 142), Plaintiff gave Mr. Pearce another copy of her cover letter and resume, and Plaintiff referred Mr. Pearce to the

-40-

"cover letter summary that enumerated my qualifications."  (<u>Supra</u> Point 16 and ¶ 592-93).

382.    Admit Paragraph 382.

383.    Admit Paragraph 383.

384.    Admit Paragraph 384.

385.    Admit Paragraph 385.

386.    Admit Paragraph 386.

387.    Admit Paragraph 387.

388.    Admit Paragraph 388 and aver that Mr. Pearce also discriminated against, harassed and retaliated against Plaintiff on January 23, 2004 (<u>Supra</u> Point 16 and ¶ 592-594), by making defamatory statements about her (<u>Supra</u> Points 18, 22-D and ¶ 621-22, ¶ 653-55) and by reprimanding her for working through lunch (<u>Supra</u> Point 21-D).

389.    Admit Paragraph 389.

390.    Admit Paragraph 390 and aver that Plaintiff also testified that Mr. Pearce made the same type of defamatory statements about Plaintiff that Mr. Stewart had been making (Pl. Dep. Tr. 121-122; <u>Supra</u> Points 18, 22-D and ¶ 621-22, ¶ 653-55).

391.    Admit Paragraph 391.

392.    Admit Paragraph 392.

393.    Admit Paragraph 393 and aver that Plaintiff also alleges that the denial of promotion to Director Force Accounts was retaliatory and that Mr. Pearce engaged in wrongful conduct by his actions at the January 23, 2004 "interview."  (<u>Supra</u> Points 16, 17 and ¶ 592-94, ¶ 602).

394.    Deny Paragraph 394.  (Pl. Dep. Tr. 146).

395.    Deny Paragraph 395, except refer to the "interview notes" for their contents, aver that the notes are inaccurate (Pl. Dep. Tr. 146), and admit that Plaintiff's February 2004 complaint included, among other items, allegations that Mr. Stewart unlawfully denied Plaintiff software in 1998, unlawfully denied her internet access in 2003/2004, promoted Mr. Forker Director EFR in 2000, and promoted Mr. Forker to Acting Director Force Accounts in 2004 (Supra Point 17 and ¶ 609-19).

396.    Deny Paragraph 396, except refer to Defendant's alleged "notes" regarding any purported interviews, and refer to the deposition testimony of Ms. Irby and Ms. Nau regarding any communications with Mr. Damas.  (Supra Point 17 and ¶ 609-19).

397.    Deny Paragraph 397, except refer to Mr. Damas' report for the allegations therein, certain allegations of which Defendant has typed in its Paragraph 397.  (Supra Point 17 and ¶ 609-19).

398.    Admit Paragraph 398.

399.    Admit Paragraph 399.

400.    Admit Paragraph 400.

401.    Admit Paragraph 401.

402.    Admit Paragraph 402.

403.    Admit Paragraph 403.

404.    Deny Paragraph 404, except admit that Plaintiff testified that she was unable to opine as to whether Ms. Irby was more qualified than all 59 other applicants for Director EFR without reading the resumes and applications of all 59 other applicants (3/6/08 Pl. Dep. Tr. 128-129), which Plaintiff was not asked to do by Defendant during Plaintiff's deposition, and that

Plaintiff stated, among other items, "Maybe, maybe not" when asked whether Plaintiff was more qualified than Ms. Irby, and refer to Plaintiff's complete testimony regarding same.  (Id.; Supra Point 20 and ¶ 626-39).

405.    Deny Paragraph 405, except admit that Plaintiff testified that she was unable to opine as to whether all other 59 applicants were qualified for the position of Director EFT without reading the resumes and applications of all 59 other applicants (3/6/08 Pl. Dep. Tr. 128-129), which Plaintiff was not asked to do by Defendant during Plaintiff's deposition.

406.    Deny Paragraph 406, except refer to the application materials for all 60 applicants for the allegations contained therein, (Def. Paragraph 406), and aver that the materials of Plaintiff, Ms. Irby and Mr. DiLorenzo are relevant and are described in detail herein.  (Supra Point 20 and ¶ 626-39).

407.    Deny Paragraph 407, except refer to the application materials for all 60 applicants for the allegations contained therein, (Def. Paragraph 407), and aver that the materials of Plaintiff, Ms. Irby and Mr. DiLorenzo are relevant and are described in detail herein.  (Supra Point 20 and ¶ 626-39).

408.    Admit Paragraph 408.

409.    Admit Paragraph 409.

410.    Admit Paragraph 410.

411.    Admit Paragraph 411.

412.    Admit Paragraph 412.

413.    Admit Paragraph 413.

414.    Admit Paragraph 414.

-43-

415.     Deny Paragraph 415, except admit that Plaintiff testified that she believed that Mr.

Tsang and Ms. Brown selected Mr. DiLorenzo for Director EFR (3/6/08 Pl. Dep. Tr. 133), and

aver that Plaintiff testified that such managers were acting as the agents of Mr. Stewart, who

made the hiring decision that he wanted to promote Mr. DiLorenzo to Director EFR. (Supra

Point 20 and ¶ 626-39).

416.     Deny Paragraph 416, except admit that when asked if Mr. Tsang engaged in other

retaliatory action against Plaintiff in addition to denying her an interview for promotion to

Director EFR, Plaintiff stated that there was no other such "interaction" with Mr. Tsang. (3/6/08

Pl. Dep. Tr. 10).

417.     Admit Paragraph 417.

418.     Admit Paragraph 418.

419.     Deny Paragraph 419, except state that Plaintiff testified that "members of the unit

are almost always given a courtesy interview" and yet Plaintiff was denied a courtesy interview

for Director EFR. (3/6/08 Pl. Dep. Tr. 132).

420.     Admit Paragraph 420 and aver that Plaintiff testified that the denial of an

interview for Director EFR was both discriminatory and retaliatory. (3/6/08 Pl. Dep. Tr. 130).

421.     Admit Paragraph 421.

422.     Admit Paragraph 422 and aver that Plaintiff also alleged that she was the victim of

unlawful harassment and refer to Plaintiff's written complaint. (Supra Point 24 and ¶ 665-67).

423.     Deny Paragraph 423 (3/6/08 Pl. Dep. Tr. 162-3).

424.     Deny Paragraph 424, except refer to the alleged "interview notes" for the

allegations therein. (Supra Point 24 and ¶ 665-71).

-44-

425. Deny Paragraph 425, except refer to the alleged "interview notes" for the allegations therein. (Supra Point 24 and ¶ 665-71).

426. Admit Paragraph 426.

427. Deny Paragraph 427, except refer to the alleged "interview notes" for the allegations therein. (Supra Point 24 and ¶ 665-71).

428. Admit Paragraph 428.

429. Deny Paragraph 429, except admit that Plaintiff stated that she received "feedback...from a lot of areas", "from a lot of people", "rumor", (3/6/08 Pl. Dep. Tr. 157-8), and further aver that Plaintiff identified Evelyn Nau as a person that told Plaintiff that Mr. Stewart had been making behind the back defamatory comments about Plaintiff, including among other items that Plaintiff was not management material. (Supra Points 18, 24 and ¶ 620, ¶ 669).

430. Admit Paragraph 430.

431. Deny Paragraph 431, except admit that Plaintiff testified that she called Mr. Tsang and Mr. Tsang gave a "stuttering stumbling explanation" that "wasn't answering the question", all of which indicated that he was lying and covering up discrimination/retaliation. (3/6/08 Pl. Dep. Tr. 159-60).

432. Admit Paragraph 432.

433. Admit Paragraph 433.

434. Admit Paragraph 434 and refer to Complaint for the specific allegations therein. (Compl.).

435. Admit Paragraph 435.

436. Admit Paragraph 436 and refer to the September 2005 letter for its contents.

-45-

(Supra Point 28 and ¶ 685).

437.    Admit Paragraph 437 and refer to Complaint for the specific allegations therein.
(Compl.).

438.    Deny Paragraph 438, except admit that Defendant unlawfully constructively
discharged Plaintiff and that Plaintiff subsequently filed retirement papers with NYCERS.
(Compl.; Supra Point 28 and ¶ 682-87).

439.    Admit Paragraph 439.

440.    Deny Paragraph 440, except aver that in or about August 2001 Plaintiff advised
Mr. Byaruhanga that she passed the civil service exam, spoke with him during her leave, and Mr.
Byaruhanga was aware that Plaintiff was eligible to be placed in a Computer Specialist position
outside the Force Accounts Unit.  (Supra Point 12 and ¶ 555-56).

441.    Admit Paragraph 441.

442.    Deny Paragraph 442, except admit that Mr. Byaruhanga wanted to retain Plaintiff
in his Unit, pursued a promotion for her to Computer Specialist and told her that such promotion
would include a raise, and that she held that position from October 2002 through the Fall of
2003. (Supra Points 12, 13, 14, 15 and ¶ 555-56).

443.    Admit Paragraph 443.

444.    Deny Paragraph 444 and aver that Plaintiff applied for internal positions and was
required to attend citywide interviews to maintain her eligibility for such positions.  (Supra
Points 15, 23 and ¶ 662).

445.    Admit Paragraph 445.

446.    Deny Paragraph 446, except admit that Plaintiff was required to accept interviews

-46-

for positions in order to remain the eligibility list for such positions and that Plaintiff took such interviews. The mandatory nature of such interviews was shown by, among other items, the interview notices in 2004. (Supra Point 23 and ¶ 662).

447.   Deny Paragraph 447 for lack of any citation, and aver that Plaintiff was entitled to be paid any monies that were paid to her and it would be illegal for Defendant to deny Plaintiff attendance at such interviews. (Supra Point 23 and ¶ 662).

448.   Admit Paragraph 448.

449.   Admit Paragraph 449 and aver that such interviews were mandatory in order for Plaintiff to remain on the eligibility list, as shown by the notices themselves. (Supra Point 23 and ¶ 662).

450.   Admit Paragraph 450.

451.   Admit Paragraph 451.

452.   Admit Paragraph 452.

453.   Deny Paragraph 453, except state that Plaintiff testified that HR representatives were "more or less" cooperative. (Pl. Dep. Tr. 105, 192).

454.   Admit Paragraph 454.

455.   Admit Paragraph 455.

456.   Admit Paragraph 456.

457.   Admit Paragraph 457.

458.   Admit Paragraph 458.

459.   Admit Paragraph 459, and aver that Defendant omits the fact that Plaintiff took a salary cut when she accepted a position with HRA, as shown by, among other items, the salary

range on the interview notice and other documents in the record. (Def. Dep. Exh. 9; Supra Points 23, 28 and ¶ 662, ¶ 686).

460.   Deny Paragraph 460, except admit that Plaintiff testified that the leave of absence from Defendant was to end on or about July 26, 2005 (Pl. Dep. Tr. 206), not July 26, 2004. (Supra Point 26 and ¶ 675-76).

461.   Deny Paragraph 461, except admit that Plaintiff testified that it was her understanding that upon returning to Defendant from her leave, she would be placed in an ATMA position (Pl. Dep. Tr. 211) and that Plaintiff did not have any entitlement to return to the ATMA position she had in the Force Accounts Unit. (Pl. Dep. Tr. 209; supra Points 26, 28 and ¶ 675-76, ¶ 682-83).

462.   Deny Paragraph 462, except admit that Plaintiff spoke with Kathe Weathers and/or Renalda Goodall, stated that she preferred not to return to the position of ATMA in the Force Account Unit (Pl. Dep. Tr. 209, 211-13), and verbally advised them that she did not want to work for Mr. Stewart or Mr. Forker (3/6/08 Pl. Dep. Tr. 225), and that Plaintiff testified that she did not have such discussion directly with Ms. Coppola. (3/6/08 Pl. Dep. Tr. 225).

463.   Admit Paragraph 463.

464.   Deny Paragraph 464, except admit that Defendant approved her request to utilize vacation allowance beginning on July 26, 2005. (Pl. Dep. Tr. 207, 220, 224-9).

465.   Admit Paragraph 465.

466.   Deny Paragraph 466, except admit that Ms. Weathers and/or Ms. Goodall told Plaintiff that Defendant did not have an ATMA position available for her outside the Force Accounts Unit. (Pl. Dep. Tr. 208-10).

467.     Admit Paragraph 467.

468.     Admit Paragraph 468.

469.     Admit Paragraph 469.

470.     Admit Paragraph 470.

471.     Admit Paragraph 471.

472.     Deny Paragraph 472, except admit that the available position in Mr. Tisdol's unit was "an entry level position into his division", involved "gathering data and writing reports" (Pl. Dep. Tr. 216-7), Mr. Tisdol told Plaintiff that he did not have a job that matched her resume, he advised Plaintiff that the position he had was below her skill set and that there was no path for career advancement. Plaintiff declined that entry level position because it was not comparable to her prior position at Defendant and precluded career advancement.  (Pl. Dep. Tr. 209-210, 213, 215-221; 3/6/08 Pl. Dep. Tr. 194-6; Pl. Dep. Exh. 84; Supra Point 28 and ¶ 684).

473.     Admit Paragraph 473.

474.     Admit Paragraph 474.

475.     Deny Paragraph 475, except refer to the alleged email for the allegations therein. (Def. Exh. Y-12).

476.     Deny Paragraph 476, except refer to the alleged email for the allegations therein. (Def. Exh. Y-13).

477.     Deny Paragraph 477, except refer to the alleged email for the allegations therein. (Def. Exh. Y-13).

478.     Admit Paragraph 478.

479.     Admit Paragraph 479.

480.    Deny Paragraph 480, except refer to the alleged email for the allegations therein. (Def. Exh. Y-18).

481.    Deny Paragraph 481, except refer to Ms. Coppola's letter for its content.  (Supra Point 28 and ¶ 685).

482.    Admit Paragraph 482.

483.    Admit Paragraph 483 and refer to the Complaint for its specific allegations. (Compl. ¶ 115).

484.    Admit Paragraph 484.

485.    Admit Paragraph 485 and aver that Plaintiff's mother read the letter to Plaintiff on the telephone before Plaintiff filed her form with NYCERS on September 19, 2005 (3/6/08 Pl. Dep. Tr. 195-8).

486.    Deny Paragraph 486 and aver that Plaintiff submitted papers to NYCTA (3/6/08 Pl. Dep. Tr. 195-8; Def. Dep. Exh. N).

487.    Admit Paragraph 487.

488.    Admit Paragraph 488.

489.    Admit Paragraph 489 and aver that Plaintiff explained the "confusing" nature of the question and refer to her deposition testimony.  (Pl. Dep. Tr. 240-1).

490.    Admit Paragraph 490.

491.    Admit Paragraph 491.

## ADDITIONAL FACTS PURSUANT TO RULE 56.1(b)
## II.    PLAINTIFF'S BACKGROUND AND EMPLOYMENT WITH DEFENDANT

492.    Ms. Locicero is an adult female, born███████████ (Compl. ¶ 12; Ans. ¶ 12; Pl. Dep. Exh. 7; Goldberg Cert. Exh. A; Goldberg Cert. Exh. B).  She was employed by

Defendant from 1976 until September 19, 2005 and worked in various positions. At the time

Defendant hired her in 1976, she had a B.S. in Physics. (Compl. ¶¶ 13, 14; TB Dep. 52-53, 62-

65; Pl. Dep. Tr. 38-39, 40-43, 64-68, 73, 380-81; see also Def. Dep. Exh. 5).

     493.    In 1981, Plaintiff passed a civil service exam and ranked No. 1 on the exam.

(Def. Dep. Exh. GG; Pl. Dep. Exh. 32). In 1983, Plaintiff was appointed to Principal Transit

Management Analyst, a management position, as shown by the Title Listing for Occupational

Group 266-Transit Management Analyst, containing an "m" for management position. (Pl. Bates

Nos. P01607; Goldberg Cert. Exh. Q). Plaintiff received management training. (Pl. Bates Nos.

P02301, P02319 and P02320, Goldberg Cert. Exh. P).

     494.    In 1997, Ms. Locicero joined Defendant's Subways Capital Programs division, as

an Associate Transit Management Analyst ("ATMA"). (Pl. Dep. Tr. 22-23, 75-82, 334-335).

Plaintiff previously worked as: Assistant Transit Management Analyst, Associate Analyst-

Project Manager, Manager of Administrative Studies, Training Coordinator, Cost Estimating

Division Coordinator, Assistant to Borough Manager, Associate Management Analyst. Plaintiff

had supervisory/managerial experience with Defendant as shown by her resume and 1997

application materials. (Compl. ¶ 17; Ans. ¶ 17; Pl. Dep. Tr. 40-42, 380-381; Pl. Dep. Exh. 1; Pl.

Dep. Exh. 3; Pl. Dep. Exh. 65; Pl. Dep. Exh. 68; Pl. Dep. Exh. 91; Def. Dep. Exh. 7). Plaintiff

worked in that department through 2004. (Pl. Dep. Tr. 248-249).

     495.    From 1997 through about the Fall of 2002, Plaintiff reported to Titus Byaruhanga

(male), Director, Subways Capital Programs. (Compl. ¶ 18; Ans. ¶ 18; TB Dep. 23-54, 62-64;

Pl. Dep. Tr. 22-23, 75-82, 334-335).

     496.    Mr. Byaruhanga worked in Subways Capital Programs since 1994. (TB Dep. 11-

12; Pl. Dep. Tr. 25).  He hired Plaintiff for his department because he was impressed with

Plaintiff's background and skills, including her work experience at Defendant, her educational

background, and her writing skills.  (TB Dep. 43-44 50-62; Pl. Dep. Exh. 1; Def. Dep. Exh. 7).

497.    Plaintiff's job duties, while reporting to Mr. Byaruhanga, included, among other

items: (a) collecting data, verifying accuracy of data, and preparing a quarterly report;

(b) cost verification functions; (c) designing, maintaining and revising databases; (d) performing

analyses; (e) preparing documents for internal use; (f) preparing monthly activity reports; and (g)

serving as a backup to other employees.  (TB Dep. 64-65; Pl. Dep. Tr. 130, 247-8, 260-265, 266-

269, 305-310, 321-324, 335-339, 347-9, 355, 417-9; 3/27/08 Pl. Dep. Tr. 14-16; Def. Dep. Exh.

L-1; Pl. Dep. Exh. 154).  Plaintiff also prepared several Force Accounts estimates, staff

summaries, worked with escalation rates and revised/modified the Force Accounts database.  (Pl.

Dep. Tr. 35-36, 298; 3/6/08 Pl. Dep. Tr. 203).  Plaintiff also wrote a procedure for creating a new

estimate.  (Def. Dep. Exh. Q; 3/27/08 Pl. Dep. Tr. 17-18). A force account is an estimate of how

much NYCTA workforce labor is needed to support a construction project.  (TB Dep. 104-105).

498.    One of Plaintiff's primary job duties was production of a quarterly report,

generally produced four times per year.  Plaintiff gathered data and created a complex report.

This took a substantial amount of time.  (Pl. Dep. Tr. 130-131, 249-260).  The report was

outstanding work product.  (Def. Dep. Exh. 11; Pl. Bates Nos. P00805-842, Goldberg Cert. Exh.

X; Def. Dep. Exh. 22).  Plaintiff and Mr. Byaruhanga originally created the report and Defendant

continued producing that crucial document after Plaintiff's separation.  (Pl. Dep. Tr. 294-295).

499.    Plaintiff also had extensive computer duties under Mr. Byaruhanga, including

maintaining and fixing computer equipment, virus protection updates.  She was essentially the

first line technical support for her unit. (3/6/08 Pl. Dep. Tr. 205-6; Pl. Dep. Tr. 356-63; Def. Dep. Exh. QQ; 3/27/08 Pl. Dep. Tr. 26).

### III.   PLAINTIFF'S JOB PERFORMANCE

500.    Ms. Locicero was fully qualified for her positions with Defendant and performed well. Mr. Byaruhanga testified that Plaintiff's job performance was excellent, that she was a stellar employee, that she had excellent computer skills, that she developed an expertise in the job duties of her co-workers to back them up. (Compl. ¶ 15; TB Dep. 52-53, 62-65). He said "[i]n my unit, she was a stellar employee." and was qualified to be promoted to Director. (TB Dep. 63, 168-169). Ms. Locicero had a clean work record, i.e., no record of any formal discipline. (PNC Dep. 21-23; EN Dep. 38; Pl. Dep. Exh. 64).

501.    From the Fall of 2002 until the end of her employment, Plaintiff reported to Timothy Forker. (Compl. ¶ 19; Ans. ¶ 19; TB Dep. 54; KP Dep. 43, 85; Pl. Dep. Tr. 23-24, 332, 361-3, 557). Mr. Byaruhanga and Mr. Forker both reported to Craig Stewart (male), Chief Officer of Subways, Capital Projects. Mr. Stewart made decisions on hiring, promotions and compensation. (Compl. ¶ 20, 22; DI Dep. 13-14; EN Dep. 12; CS Dep. 56-58, 220-223; KP Dep. 28-29; TF Dep. 138-139; Pl. Dep. Tr. 78-79).

502.    Defendant produced records showing dates of birth. Plaintiff (████████), Dawn Irby (████████) and Evelyn Nau (████████), are all older than Tim Forker (████ ████) and Joseph DiLorenzo (████████). (Compl. ¶ 21; Ans. ¶ 21; Pl. Dep Exh. 7; PL. Dep. Exh. 10; Pl. Dep. Exh. 6; see also TB Dep. 85-86).

503.    Since 1983, Dorothy Ruiz has worked in Defendant's Subways division and since about 1995/1996, she has worked in Capital Programs. From the mid 1990s to about the Fall of

2002, she reported to Mr. Byaruhanga. She reported to Mr. Forker from about the Fall of 2002 to 2007. (DR Dep. 10-13, 39, 41). Dorothy Ruiz worked with Plaintiff for years and testified: (1) Plaintiff was helpful, friendly, good employee; (2) Plaintiff was enthusiastic with her work; (3) Plaintiff's resumes are accurate; and (4) Plaintiff was fully qualified to be a Director. (DR Dep. 9, 23-25, 41-48; Pl. Dep. Exh. 91; Pl. Dep. Exh. 92). When Plaintiff separated from Defendant, her job duties, including preparing the Quarterly Report, were divided among various employees, including newly hired male employees Getis Lewis and Jamal Lopez. (DR Dep. 14-18; 3/6/08 Pl. Dep. Tr. 200-1; Def. Dep. Exh. JJ; 3/27/08 Pl. Dep. Tr. 24-25).

## IV.   **DAWN IRBY**

504.   Dawn Irby was employed by Defendant from February 1978 until July 2007. She is female and African American. (DI Dep. 6, 45; TB Dep. 88-89). Ms. Irby's date of birth is ████ ████ (DI Dep. 5). She has a college degree. (TB Dep. 95).

505.   Ms. Irby worked in a variety of positions at Defendant. From 1996 through July 2007, she worked in the Capital Programs Unit. (DI Dep. 6). From about 1997 through October 2000, Ms. Irby reported to Mr. Byaruhanga. (DI Dep. 7-8; TB Dep. 50-51, 137). From about the Fall of 2000 to the Fall of 2002, Ms. Irby reported to Tim Forker. (DI Dep. 8-9). Ms. Irby joined the Capital Programs Unit as a train dispatcher and performed supervisory duties. She then became an ATMA. (DI Dep. 9-11; TB Dep. 88-89; Pl. Dep. Exh. 47).

506.   As of 1997, when Ms. Irby began reporting to Mr. Byaruhanga, she already had (a) many years of experience at Defendant, (b) supervisory experience, and broad experience in Rapid Transit Operations. Ms. Irby had years of experience supervising flaggers, foreman and other employees. (TB Dep. 91-92, 94-95). When Ms. Irby reported to Mr. Byaruhanga, she

-54-

worked in Employee Facility Rehabilitation ("EFR"), she developed functions in EFR, she was involved in Force Accounts work (TB Dep. 91), and she served as Acting Director from time to time when Mr. Byaruhanga was absent or unavailable. (TB Dep. 103).

507.    According to Mr. Byaruhanga, Ms. Irby was a very good employee, she was qualified to be promoted to Director, and he was fully satisfied with her job performance. (TB Dep. 50-51, 90, 106, 167-168; see also DI Dep. 66-67; Pl. Dep. Exh. 60).

508.    Ms. Irby worked with Plaintiff, Evelyn Nau, Tim Forker and Joseph DiLorenzo (younger male in the unit). She testified that she, Ms. Locicero and Ms. Nau are more qualified than Mr. Forker and Mr. DiLorenzo for promotion. (DI Dep. 9, 33, 80; see also EN Dep. 51-52). Ms. Irby applied several times for promotion to Director. Each application was denied. (DI Dep. 15-16). Mr. DiLorenzo was promoted ahead of Ms. Irby to Director. (DI Dep. 80-81). Ms. Irby believes that Defendant pre-selected Tim Forker and Joseph DiLorenzo for promotion based on sex, age and race and believes that she is a victim of discrimination. (DI Dep. 80-81).

## V.    EVELYN NAU

509.    Evelyn Nau joined Defendant in or about 1987. She is an African American female. Her date of birth is ▆▆▆▆▆▆▆ (EN Dep. 6; TB Dep. 50-51). She has a bachelor of science degree in engineering. (EN Dep. 20-21; TB Dep. 101, 103-104; see also EN Dep. 38).

510.    In or about November 1992, Ms. Nau joined the Capital Programs Unit. Her current position is Associate Project Manager, reporting to Mr. Forker (EN Dep. 6-8). For several years, Ms. Nau worked Capital Programs Management/electrical department of Defendant. (EN Dep. 20-21; TB Dep. 101, 103-104).

511.    From about mid 1997 to the Fall of 2002, Ms. Nau reported to Mr. Byaruhanga.

(EN Dep. 10, 37; TB Dep. 98-100).  According to Mr. Byaruhanga, Ms. Nau (a) was very good in Force Account estimating, (b) was very familiar with rules and procedures for estimating, (c) regularly prepared force account estimates, (d) was a very good employee, and (e) was qualified for promotion to Director. (TB Dep. 50-51, 101-103, 105, 167-168).

512.    Notably, regarding Force Account estimating, Ms. Nau (a) began preparing Force Account estimates in the early 1990s, (b) was an expert in estimating, (c) prepared numerous Force Accounts estimates, (d) designed and redesigned forms for that function, and (e) was a resource and trained staff (including Plaintiff) in procedures for Force Account estimating. (EN Dep. 9, 13, 23-27, 32-36; Pl. Dep. Exh. 93; TB Dep. 102; EN Dep. 23, 50; TB Dep. 102, 104-105; EN Dep. 23-24, 50).

513.    Ms. Nau served as Acting Director when Mr. Byaruhanga was not available.  She continued to serve in that capacity after Mr. Forker became Acting Director Force Accounts. (TB Dep. 103; EN Dep. 23, 31-32; Pl. Dep. Exh. 94; Def. Dep. Exh. W).

514.    Ms. Nau worked with Plaintiff for years.  Ms. Nau confirmed that: (1) Plaintiff was a long term employee with experience in various areas of Defendant, (2) Plaintiff worked with the force accounts database, made improvements or changes to it, and prepared force account estimates, (3) Plaintiff had more experience working with force accounts than Mr. Forker, (4) Plaintiff had sufficient professional/technical knowledge to be Director of Force Accounts, (5) Plaintiff performed the duties listed on her resume, (6) Plaintiff was a helpful and upbeat employee, who worked a full day, and (7) even after Plaintiff separated from Defendant, Plaintiff helped Ms. Nau.  (EN Dep. 26-27, 30, 36, 43-44, 49-50, 58-60, Pl. Dep. Exh. 97; Def. Dep. Exh. C; Def. Dep. Exh. NN; 3/27/08 Pl. Dep. Tr. 9-10).

-56-

## VI.   PLAINTIFF INCORPORATES THE ALLEGATIONS IN THE COMPLAINT

515.    Plaintiff incorporates by reference her Complaint and her supporting documents.

(Compl. ¶ 23-28; Pl Dep. Tr. 187-9, 489-493; Def. Dep. Exh. 4; 3/6/08 Pl. Dep. Tr. 5-6).

Plaintiff alleges a pattern and practice of discrimination in favor of males and younger males.

During the seven years that Plaintiff worked in the Subways Capital Programs division, Mr.

Stewart promoted only one woman (Marva Brown) to a management position there.  Plaintiff

alleges that she, Dawn Irby (over age 50) and Evelyn Nau (over age 40) are all victims.  (Compl.

¶ 30-32; EN Dep. 43-44; 3/6/08 Pl. Dep. Tr. 209-10; Pl. Dep. Exh. 35; Pl. Dep. Exh. 7; Pl. Dep.

Exh. 8).  As of the date of Plaintiff's 2004 leave of absence, the unit had 28 persons, including 11

managers.  10 of the 11 managers were men.  The ratio of males to females holding managerial

titles in Plaintiff's unit was at least 8:1. Of the 28 persons, 15 were men and 13 were women.

(Compl. ¶ 108; Pl. Dep. Exh. 127; Pl. Dep. Exh. 35; Pl. Dep. Exh. 7; Pl. Dep. Exh. 8).[2]

## VII.   1998 DENIAL OF SOFTWARE

516.    In 1998, Plaintiff and Richard Burbridge (younger male) were both working in

Subways' Capital Programs on the same project.  Mr. Burbridge requested two copies of

Microsoft's Visual Studio, at a price of more than $1,000 each.  (Compl. ¶¶ 33-35; TB Dep. 107-

109; Pl. Dep. Tr. 266-278, 283-5; 3/6/08 Pl. Dep. Tr. 189-190, 212). Plaintiff requested one copy

of Lotus SmartSuite, at about $250.  Ms. Locicero requested the software for use in preparing the

quarterly report and because of problems with Microsoft software.  (Compl. ¶ 36; TB Dep. 66-

67; Pl. Dep. Tr. 266-278, 283-5; 3/6/08 Pl. Dep. Tr. 189-190, 212).

517.    Defendant granted Mr. Burbridge's request and denied Plaintiff's request.  Mr.

---

[2]Plaintiff noted two minor corrections to paragraphs 31 and 99 of the Complaint: (a) date of promotion of Marva Brown, ¶ 31 and (b) date Mr. Forker berated Plaintiff, in ¶ 99.

Stewart told Mr. Byaruhanga there was no money to purchase the Lotus software, even though Mr. Stewart had granted Mr. Burbridge's request for more expensive software, which he then did not use. (Compl. ¶ 37; TB Dep. 66-67, 107-109; CS Dep. 204-208).  Plaintiff used her personal copy of Lotus at work for years to produce the Quarterly Report.  (3/6/08 Pl. Dep. Tr. 212).

## VIII.  1999 HIRING OF TIM FORKER

518.    In late 1999, Defendant hired Tim Forker as Associate City Planner.  (Compl. ¶ 38-39; Ans. ¶ 39; TB Dep. 82; CS Dep. 167-168; Pl. Dep. Exh. 5; DI Dep. 11-12; Pl. Dep. Exh. 48; KP Dep. 114).  Mr. Forker is a Caucasian Male, date of birth ▮▮▮▮▮▮▮▮ (DI Dep. 45; Pl. Dep Exh. 7; Pl. Dep. Exh. 10).

519.    Plaintiff alleges that Mr. Forker was younger, less experienced, and less qualified than Plaintiff, Dawn Irby and Evelyn Nau.  (Compl. ¶ 40; Pl. Dep. Exh. 7).  When he was hired, he had no prior experience with Defendant, he did not have a degree in economics, physics, engineering, computers (BA-English and MA-Waste Management), and he had no permanent civil service title and was a "provisional" employee.  (TF Dep. 46-48; Pl. Dep. Exh. 48).

520.    Defendant gave Mr. Forker a starting salary of $60,168, well above the minimum salary for the position (Pl. Dep. Exh. 5; Pl. Dep. Exh. 7; Pl. Dep. Exh. 48; DI Dep. 11-12, 46-47, 95-96; TF Dep. 46-48; Pl. Dep. Exh. 48) and above his prior salary of $56,000 at the Manhattan Borough President's ("MBP") office.  (TF Dep. 6).

521.    Mr. Stewart approved Mr. Forker's salary. (TB Dep. 120-121).  Mr. Forker's starting salary ($60,168) was larger than the salaries of Plaintiff (Pl. Dep. Exh. 3; Pl. Dep. Exh. 7) and Dawn Irby.  Mr. Forker received subsequent raises and his salary remained above that of Plaintiff and Ms. Irby.  (Pl. Dep. Exh. 7; DI Dep. 11-12, 46-47, 95-96; Pl. Dep. Exh. 48).

522. In April 2000, about six months after Mr. Forker was hired, Defendant placed him in the Analyst Core Program for his career advancement. (Compl. ¶ 42; DI Dep. 12-13; TF Dep. 49-51; Def. Bates Nos. 138-141, Goldberg Cert. Exh. T; Compl. ¶ 41; TF Dep. 7-8, 15-17). The Core Analyst Program is a program for Analysts. (PNC Dep. 63-65; Pl. Dep. Exh. 71). Mr. Forker was not an Analyst but was nevertheless placed in that program. (TF Dep. 53-55). Defendant never placed Plaintiff (who was an Analyst) in the Analyst Core Program. (Compl. ¶ 43; TF Dep. 51-52). Between 1996 and 2004, Defendant did not place Dawn Irby in that program. (DI Dep. 13).

523. In October 2000, Defendant promoted Mr. Forker to Director, EFR and gave him a raise. Mr. Stewart approved the promotion. (TB Dep. 83; CS Dep. 186-187; Pl. Dep. Exh. 5, EN Dep. 10-11, 14-15; KP Dep. 114). As Director EFR, Mr. Forker reported to Donald Tsang, Senior Director. (DT Dep. 21-22).

524. In the Fall of 2002, Mr. Stewart appointed Mr. Forker Acting Director, Force Accounts, reporting to Osmond Ken Pearce, Senior Director. This was a promotion. (TB Dep. 84, 122-123; Pl. Dep. Exh. 51; EN Dep. 10-11, 14-15; KP Dep. 63-66, 74-75, 115). In February 2004, Defendant promoted Mr. Forker to Director, Force Accounts. Mr. Stewart approved the promotion. (TB Dep. 83; Pl. Dep. Exh. 5; Pl. Dep. Exh. 7; Pl. Dep. Exh. 53; EN Dep. 10-11, 14-15). In 2007, Defendant promoted Mr. Forker to Senior Director. Mr. Stewart approved the promotion. (TB Dep. 86-87, 153-154; EN Dep. 10-11, 14-15; DR Dep. 13; Pl. Dep. Exh. 19).

525. In October 2000, when Mr. Forker was promoted to Director EFR, his salary increased to $68,831. In 2004, when Mr. Forker was promoted to Director Force Accounts, his salary increased to $82,737. In 2006, Mr. Forker received a raise to $87,776. His salary was

always above that of Plaintiff and Ms. Irby. (DI Dep. 11-12, 46-47, 95-96; Pl. Dep. Exh. 7; Pl.

Dep. Exh. 5; Pl. Dep. Exh. 48; Pl. Dep. Exh. 50).

## IX.   2000 PROMOTION OF FORKER TO DIRECTOR EFR

526.   Plaintiff alleges that Defendant engaged in discrimination regarding promotions,

by "pre selecting" and promoting younger and male employees ahead of older, more qualified

female employees. (Compl. ¶ 44). For example, in 2000, Defendant promoted Mr. Forker to

Director EFR ahead of Ms. Irby, a more qualified older female. (3/6/08 Pl. Dep. Tr. 107, 190-1).

527.   In 2000, Defendant was seeking to fill the position of Director, EFR in the Capital

Programs Unit where Plaintiff, Ms. Nau, and Ms. Irby were employed. (Compl. ¶ 45; Ans. ¶ 45;

TB Dep. 128-129; DT Dep. 35, 38-41, Pl. Dep. Exh. 9).

528.   Defendant issued a Job Vacancy Notice ("JVN") 2000-400 for the Director EFR

position, under which minimum qualifications included a college degree and seven years relevant

experience. (Compl. ¶ 45; TB Dep. 129-131; DI Dep. 24-25; DT Dep. 35; Pl. Dep. Exh. 9).

529.   Defendant's procedures required formation of a "hiring panel", comprised of

multiple Directors (managers), to assess applicants for promotion, conduct interviews and issue a

report. (TB Dep. 49; CS Dep. 73-76, 83, 88).

530.   Donald Tsang (Senior Director) chaired the hiring panel for Director EFR, which

panel also included Mr. Byaruhanga (Director) and Marva Brown (Director). (TB Dep. 18-20,

80; DI Dep. 26; DT Dep. 36-41, Pl. Dep. Exh. 11). The panel interviewed selected applicants

and issued an "applicant flow data" report with the results. (TB Dep. 132-137, 143-146; DT Dep.

36; Pl. Dep. Exh. 11). Dawn Irby, Tim Forker and others applied for the position. (TB Dep. 88-

89, 128-146; DT Dep. 36; Pl. Dep. Exh. 10).

531.    Ms. Irby applied for the position (Pl. Dep. Exhibit 12; TB Dep. 142-143).  She

was highly qualified for the position and met or exceeded the requirements for the position.  Ms.

Irby had years of EFR experience.  (DI Dep. 26-27; Pl. Dep. Exh. 12).  Ms. Irby had been

employed by Defendant since 1978.  She had served as Acting Director when Mr. Byaruhanga

was unavailable. As of 2000, Ms. Irby had many years of relevant experience.  (Compl. ¶ 46; Pl.

Dep. Exh. 50; TB Dep. 88-89, 128-129; supra Point 4).

532.    At the time Ms. Irby applied for the position, she was a train dispatcher in the

Force Accounts unit and had at least three years supervisory experience in that position.  As a

train dispatcher, Ms. Irby: (a) had experience supervising flaggers, foremen and other employees

(DI Dep. 19, 25); (b) developed expertise in the procedures for Rapid Transit Operations

("RTO") and EFR (DI Dep. 20-21, 25-26, 91); and (c) coordinated the EFR program with

Dorothy Ruiz. (DI Dep. 19-20, 22-23).  Ms. Irby had already developed functions in EFR and had

at least seven years' of directly relevant experience.  (DI Dep. 22-23, 25-26, 91).

533.    The hiring panel interviewed Ms. Irby.  Mr. Byaruhanga advocated for Ms. Irby to

receive the promotion because she was the most qualified candidate. (TB Dep. 88-89, 129-146;

DI Dep. 24, 26; DT Dep. 38-41; Pl. Dep. Exh. 11).  He testified: "Basically what I thought is I

thought she was a very good fit for the position, so I put forward my reasons why thought she

was the better candidate." "She had relevant experience, she had worked in the area and showed

that she could do the job very well, and she knew what the field was like." "She had the relevant

education." (TB Dep. 138-139).

534.    The hiring panel deemed Ms. Irby more qualified for Director EFR than Joseph

DiLorenzo, a younger male that also applied for the position. (TB Dep. 88-89, 106-107, 129-

146, 143; Pl. Dep. Exh. 14). In fact, Defendant prepared a report showing that Ms. Irby was

given Disposition Code - 1 which meant "Meets minimum requirements" and Mr. DiLorenzo

was given Disposition Code - 5 which meant "Lack of managerial supervisory experience." (Pl.

Dep. Exh. 11; Pl. Dep. Exh. 26).

535.    Mr. Forker, a younger male employee, who had been with Defendant for less than

one year, also applied for the Director EFR position. (Compl. ¶ 47; TB Dep. 131-132, 145, Pl.

Dep. Exhibit 18; supra Point 8). Defendant selected Mr. Forker for the position. According to

Defendant, Mr. Tsang recommended Mr. Forker and Mr. Stewart approved the promotion. (DT

Dep. 36, 39-41, 54-55, Pl. Dep. Exh. 11). By letter dated September 25, 2000, Defendant denied

Ms. Irby's application for promotion. (Compl. ¶ 48; Pl. Dep. Exh. 49; supra Points 4, 8, 9).

536.    Mr. Tsang testified that Mr. Forker was more qualified than Ms. Irby for

promotion to Director EFR because Mr. Forker had worked at the Manhattan Borough

President's ("MBP") office before joining Defendant, that environment was stressful, and the

Director EFR job was stressful. Mr. Tsang also alleged that Ms. Irby was not a good manager.

(DT Dep. 46-48, 50, 53-56). Plaintiff maintains these arguments are a pretext for discrimination.

537.    Ms. Irby had more relevant experience than Mr. Forker. She joined Defendant in

1978 and Mr. Forker joined Defendant in 1999. (Pl. Dep. Exh. 7; DT Dep. 42-47). Ms. Irby

also had years of EFR experience and Mr. Forker had little or no EFR experience beyond

allegedly "some flavor" of it. (DT Dep. 43-45, 51-52). Ms. Irby had supervisory experience at

Defendant. (DT Dep. 45-47). As of 2000, Mr. Forker had not even received a probationary

evaluation. (TB Dep. 139-140; DT Dep. 42-43). Mr. Forker had no background in Defendant's

business prior to his employment in 1999. (TB Dep. 118-119). Mr. Forker had no background in

finance, mathematics or construction. (3/6/08 Pl. Dep. Tr. 93-108, 210-11; Pl. Dep. Exh. 18).

538.     Mr. Tsang knew Mr. Forker for only 1.5 months before recommending him for

promotion. (DT Dep. 57-59). As of 2000, Mr. Forker reported to Ken Pearce. Mr. Pearce was

not on the hiring panel and no one on the hiring panel supervised or had an opportunity to

evaluate Mr. Forker. (TB Dep. 120, 140-141). Mr. Tsang had never worked at the MBP office.

(DT Dep. 50-51).

539.     Mr. Tsang knew Ms. Irby since the 1990s, knew she had many years of success at

Defendant, many years of relevant experience, was a hard worker and was well liked (DT Dep.

18, 46-60). Mr. Tsang admitted that it can be stressful to work at Defendant and Ms. Irby

successfully did so for many years. (DT Dep. 49). Furthermore, in at least the years 1997-1999,

when Mr. Forker was working at the MBP office, he did not supervise any staff. (TF Dep. 79).

540.     Evelyne Nau, who worked with Ms. Irby and Mr. Forker, testified that in 2000,

Ms. Irby was more qualified than Mr. Forker for promotion to Director, EFR. (EN Dep. 51-52).

Dorothy Ruiz, who worked with Ms. Irby, Mr. Forker and Mr. DiLorenzo, testified that in 2000,

Ms. Irby was more qualified than those males for promotion to Director, EFR. (DR Dep. 20-21,

39-41, 50-51). Even Craig Stewart admitted that Ms. Irby  was highly experienced in EFR and

was qualified to be a Director. (CS Dep. 180-182).

## X.     2002 PROMOTION OF FORKER TO ACTING DIRECTOR FORCE ACCOUNTS
541.     Plaintiff alleges that Defendant continued to engage in discrimination regarding

promotions, by "pre selecting" and promoting younger and male employees. (Compl. ¶ 49).

542.     As of the start of 2002, Mr. Byaruhanga was Director, Capital Program Force

Account Management ("Director CPFAM" or "Director Force Accounts"), at Job Grade F, and

had a staff.  (Compl. ¶ 51; Ans. ¶ 51; Pl. Dep. Exh. 7; Pl. Dep. Tr. 25; supra ¶ 495).

543.    By memorandum dated August 14, 2002, Defendant announced the appointment of Mr. Byaruhanga to Director, Second Avenue Subway & Long Range Planning Department of Subways (Job Grade E).  He was promoted and received a raise. (Compl. ¶ 53; Pl. Dep. Exh. 23; TB Dep. 7-13, 87-88, 109-118, 124-127, 146-147; DI Dep. 33-34; DT Dep. 60; 3/6/08 Pl. Dep. Tr. 134-6; Pl. Dep. Tr. 385-7; Pl. Dep. Exh. 51; Def. Dep. Exh. 16; Pl Dep. Exh. 7).

544.    The position of Director Force Accounts became vacant and its job grade was increased from Grade F to Grade E.  (Compl. ¶ 52-53; Pl. Dep. Exh. 7; TB Dep. 147-152).  Mr. Byaruhanga recommended that Mr. Stewart appoint Evelyn Nau to be Acting Director Force Accounts, because he believed she was the most qualified.  Mr. Byaruhanga told Mr. Stewart that Ms. Nau ran the unit in his absence and understood the functions of the unit. (TB Dep. 147-152).

545.    By memorandum dated August 14, 2002, Defendant announced that Mr. Forker was being appointed Acting Director Force Accounts.  This was a promotion for Mr. Forker, as he moved from Director EFR-Job Grade F to Acting Director Force Accounts-Job Grade E (higher job grade).  Plaintiff alleges that Defendant discriminated against Plaintiff and Ms. Nau based on age and sex in denying them this position.  For example, Defendant promoted Mr. Forker without considering Plaintiff and Ms. Nau and Mr. Stewart disregarded Mr. Byaruhanga's recommendation to select Ms. Nau. (Compl. ¶ 50, 54-58; TB Dep. 146-147; DI Dep. 34; DT Dep. 60; 3/6/08 Pl. Dep. Tr. 134-6; Pl. Dep. Tr. 385-7; Pl. Dep. Exh. 7; Pl. Dep. Exh. 51; Pl. Dep. Exh. 52; Def. Dep. Exh. 16).   According to Mr. Stewart, Ken Pearce (Senior Director) recommended Mr. Forker and Mr. Stewart agreed. (CS Dep. 108-109).

546.    Plaintiff maintains that she and Ms. Nau were more qualified than Mr. Forker for

the Acting Director Force Accounts position.  Plaintiff had prepared Force Account estimates, had worked with the Force Accounts database and improved it, and had more knowledge and experience in Force Accounts than Mr. Forker.  (EN Dep. 26-27, 30; Supra Points 2, 3, 4, 5, 8). Ms. Locicero, as an ATMA, was eligible for promotion to Director.  (PNC Dep. 158-159).

547.    Like Plaintiff, Ms. Nau had more Force Accounts experience than Mr. Forker. (EN Dep. 30). Ms. Nau began working on Force Accounts in the early 1990s, years before Mr. Forker joined Defendant. (EN Dep. 26).  Mr. Stewart admitted that Ms. Nau was qualified to be a Director (CS Dep. 180-182) and admitted that Ms. Nau had served as Acting Director Force Accounts when Mr. Byaruhanga (Director), was absent. (CS Dep. 96-98, 216).

548.    Plaintiff maintains that Mr. Forker was unqualified for the position of acting Director Force Accounts based on his lack of credentials, skills and experience.  He had virtually no Force Accounts experience.  As a city planner from 1999-2000 he did not prepare any Force Account estimates.  (Compl. ¶¶ 60-61; TF Dep. 75-77, 122-123, 137; supra Point 8). Mr. Stewart stated in an evaluation of Ken Pearce that he was supervising "another manager [i.e., Mr. Forker] inexperienced in the relevant force account areas". (Pl. Dep. Exh. 119 at Bates 1644).

549.    Dawn Irby, who worked with Plaintiff, Ms. Nau and Mr. Forker, testified that Plaintiff and Ms. Nau were more qualified than Mr. Forker for the position and that Ms. Nau developed the Force Account program. (DI Dep. 17-18, 34-35).

550.    Dorothy Ruiz, who worked with Plaintiff, Ms. Nau and Mr. Forker, testified that Plaintiff and Ms. Nau were more qualified than Mr. Forker for the position and that Plaintiff had worked with Ms. Nau in revising and improving the function.  (DR Dep. 41-43).

**XI.**   **2002 APPOINTMENT OF MS. IRBY TO ACTING CO-DIRECTOR EFR**

551.    When Defendant promoted Mr. Forker in 2002 to Acting Director Force

Accounts, his Director EFR position became vacant.  (Compl. ¶ 89; CS Dep. 108-110; DI Dep.

36-37, 40; Pl. Dep. Exh. 52).  By memorandum dated August 20, 2002, Defendant announced

that Ms. Irby and Joseph DiLorenzo were appointed to jointly serve as "acting" Co-Directors

EFR in "alternating months", reporting to Donald Tsang, Senior Director.  (CS Dep. 108-110; DI

Dep. 36-37, 40; 3/6/08 Pl. Dep. Tr. 134-136; Pl. Dep. Exh. 52).  Plaintiff maintains that

Defendant should have appointed Ms. Irby <u>sole</u> Acting Director EFR and Defendant's refusal to

do so was another instance of unlawful discrimination.  (<u>Supra</u> Points 4, 11).

552.    Plaintiff maintains that there was no basis for "co-acting" Directors.  In fact, Ms.

Irby and Mr. DiLorenzo had no direct reports as co-acting directors.  Notably, there was only one

Acting Director Force Accounts (Mr. Forker) when that position had a staff. (DT Dep. 60-63, 88-

89; CS Dep. 111. Pl. Dep. Exh. 7; TF Dep. 199-200).

553.    Plaintiff maintains that Ms. Irby was more qualified than Mr. DiLorenzo.  In

2000, Ms. Irby was ranked ahead of him for the Director EFR position.  (Compl. ¶ 90; <u>supra</u>

Points 4, 9, 16, 20).  Ms. Irby had greater tenure at Defendant than Mr. DiLorenzo.  Ms. Irby had

been working in EFR since about 1996.  Mr. DiLorenzo did not have Ms. Irby's EFR experience

and came from budgets.  (Compl. ¶ 91; DI Dep. 37-39).  A list of projects reflected that Ms. Irby

was performing a larger number of projects than Mr. DiLorenzo.  (Goldberg Cert. Exh. GG).

**XII.**   **2002 DENIAL OF RAISE TO PLAINTIFF**

554.    Plaintiff maintains that in 2002, Defendant unlawfully denied her a raise because

of her sex and age.  (Compl. ¶ 62; 3/6/08 Pl. Dep. Tr. 172, 179, 188-9).  A move to a higher level

position is a promotion.  A job grade increase is also a promotion.  (PNC Dep. 40-43; KP Dep.

20-22; TF Dep 131-132; CS Dep. 123). A promotion includes a raise. (TB Dep. 8-9; TF Dep. 65-66; CS Dep. 8; PD Dep. 43, 74-76.). Defendant can also provide a promotion in place that provides a raise without a change of job duties. (PD Dep. 76). A move to another position is also a promotion where the second position has a pay scale at least 10% higher. (TB Dep. 39-40; Pl. Dep. Exh. 24). Defendant can also provide a raise without a promotion. (TB Dep. 89-91).

555.    As of 2001, Plaintiff, then an ATMA, was on a list of persons eligible for promotion to Computer Specialist. (PNC Dep. 38-40, 94-95; Pl. Dep. Exh. 20; Pl. Dep. Exh. 65; Def. Dep. Exh. 13; Def. Bates Nos. 992, Goldberg Cert. Exh. S). During 2001, Plaintiff received an email about a promotion to Computer Specialist (Software) II, but did not get the position. (PNC Dep. 69-77, 91-94; Pl. Dep. Exh. 74; Def. Dep. Exh. 26). Plaintiff was told that the position would include a 10% raise. (Pl. Dep. Tr. 428, 435-9; 3/6/08 Pl. Dep. Tr. 86-90).

556.    In or about March 2002, Mr. Byaruhanga told Plaintiff that he wanted to promote her to Computer Specialist in his group and that she would receive a 10% raise. (Pl. Dep. Tr. 391-415, 419-22, 428, 434-5). Plaintiff and Mr. Byaruhanga discussed that her job duties as Computer Specialist would include her Analyst duties and additional computer duties. (Pl. Dep. Tr. 415-8). Mr. Byaruhanga advocated for the promotion because Plaintiff was a stellar employee and he wanted to retain her in his group. (TB Dep. 44-46, 63; CS Dep. 281-282).

557.    Documentation was generated to move Plaintiff from ATMA to Computer Specialist. (PNC Dep. 80-83, 88-91, 95, 99, 128-129; TB Dep. 154-159; Pl. Dep. Exh. 20; Pl. Dep. Exh. 21; Pl. Dep. Exh. 75; Pl. Dep. Exh. 76; Pl. Dep. Exh. 85). A position evaluation request ("PER") was prepared, edited and eventually signed by all necessary parties, including Craig Stewart and TIS personnel. (Pl. Dep. Tr. 391-415, 419-22, 458; Pl. Dep. Exh. 76). Mr.

Stewart delayed signing the PER form for Plaintiff's promotion, alleging that he needed input from Mr. Forker. However, the PER form was ready for Mr. Stewart's signature before Mr. Forker was promoted to Acting Director Force Accounts. (Pl. Dep. Tr. 530-2).

558.   On or about October 22, 2002, Plaintiff was placed in the Computer Specialist I position. (Pl. Dep. Tr. 423). The Computer Specialist I position is a higher level position than ATMA. (PNC Dep. 76-77). Thus, this was a civil service promotion. (Compl. ¶ 62; PNC Dep. 95-99; Pl. Dep. Exh. 75 at Bates Nos. 612; see also Pl. Dep. Exh. 20; Pl. Dep. Exh. 21; Pl. Dep. Exh. 65; Pl. Dep. Exh. 75; Def. Dep. Exh. 18).

559.   With a promotion from ATMA to Computer Specialist, Plaintiff was entitled to a raise and Mr. Byaruhanga advocated for Plaintiff to get raise. (TB Dep. 44-46, 157). Prior to October 22, 2002, Plaintiff discussed the promotion with Human Resources and was told that a promotion generally came with a raise of 10%. (Pl. Dep. Tr. 486-8). Since Plaintiff's current salary was $64,995 and the salary range for Computer Specialist was $64,761 to $70,186, there was room for Defendant to give Plaintiff a raise. (Pl. Dep. Exh. 7; Pl. Dep. Exh. 79 at Bates P01741; PNC Dep. 149, 151-158; Pl. Dep. Exh. 79).

560.   Defendant denied Plaintiff a raise. (TB Dep. 44-46, 156-160; Pl. Bates Nos. P01740, Goldberg Cert. Exh. R). Plaintiff complained to Defendant, including to Pam Noonan Coppola (HR), Tim Forker, Ken Pearce and Craig Stewart. (Pl. Dep. Tr. 411-3, 424-7). Plaintiff corresponded with Ms. Coppola. (PNC Dep. 67-69, 77-80, 83-85, 108-110; Pl. Dep. Exh. 75).

561.   Ms. Coppola told Plaintiff that she was denied a raise because she was already earning above the minimum salary of a Computer Specialist. (Pl. Dep. Tr. 427, 440-1, 448-51). Mr. Stewart did not generate documentation to give Plaintiff a raise, even though he indicated

that there are forms to do so. Mr. Stewart did not tell Plaintiff had he had denied her a raise. Rather, he blamed Ms. Coppola for the denial of a raise. (CS Dep. 195-197; Pl. Dep. Tr. 484). Mr. Stewart had approval authority on promotion decisions. (TB Dep. 29-30). Ms. Coppola's area simply "signed off" on personnel matters as long as those are within guidelines. (PNC Dep. 10-11, 18-20). Simply put, Mr. Stewart (and Mr. Forker) never requested a raise for Plaintiff. (PNC Dep. 86-87, 99-100, 113-114, 124-125).

562.    Prior to October 2002, Ms. Coppola never advised Plaintiff that a promotion to Computer Specialist would not include a raise. This was addressed only after Plaintiff accepted the promotion and submitted the necessary paperwork. (PNC Dep. 100; Pl. Dep. Exh. 75). Ms. Coppola never advised Plaintiff that Mr. Stewart failed to advocate for a raise for her and that it was Mr. Stewart's decision. (3/6/08 Pl. Dep. Tr. 206-7; PNC Dep. 126-128). Plaintiff later learned that Mr. Stewart had denied her a raise. (3/6/08 Pl. Dep. Tr. 208, 219-21). Ms. Coppola alleged a hiring freeze. (3/6/08 Pl. Dep. Tr. 134-6; Pl. Dep. Tr. 387-9).

563.    Mr. Forker testified that he spoke with Plaintiff and Ms. Coppola, and that Ms. Coppola told him that Plaintiff's move from ATMA to Computer Specialist was lateral only. (TF Dep. 65-66, 123-132). However, Ms. Coppola testified that Plaintiff's move from ATMA to Computer Specialist was to a higher level position. (Supra ¶ 558; PNC Dep. 76-77).

564.    Defendant also alleged that Plaintiff's job duties did not change when she moved from ATMA to Computer Specialist. But Defendant executed documentation reflecting changes in Plaintiff's job duties as Computer Specialist to include extensive computer work. (CS Dep. 256-261, 279-280; TF Dep. 90, 256-259; Pl. Dep. Exh. 76).

565.    During depositions, Ms. Coppola alleged that Plaintiff was not entitled to a raise

because of a "hiring freeze" between 2001 and 2003.  (PNC Dep. 101-103, 112-113; Pl. Dep. Exh. 25; Pl. Dep. Exh. 86).  However, during the "hiring freeze," Defendant promoted Mr. Byaruhanga, and gave him a raise requested by Mr. Stewart. (CS Dep. 48-52; Pl. Dep. Exh. 25; Def. Dep. Exh. 17).   Moreover, the "hiring freeze" documents did not expressly prohibit a raise during the hiring freeze. (PNC Dep. 100, 103-106, 110-111; Pl. Dep. Exh. 7; Pl. Dep. Exh. 51). Ms. Coppola referred to a memorandum by a Herb Martinez.  This memorandum applied to "TIS" employees and Plaintiff was not a TIS employee.  (PNC Dep. 138-151; Pl. Dep. Exh. 78).

566.    The "hiring freeze" ended in August 2003.  When the hiring freeze ended, Defendant again failed to give Plaintiff – then a Computer Specialist – the raise that she had been denied in October 2002.  (Pl. Dep. Exh. 25; Def. Dep. Exh. 17).

567.    Ms. Coppola testified that Plaintiff was already being paid a salary above the minimum for Computer Specialist I. (PNC Dep. 101-103, 112-113; Pl. Dep. Exh. 25; Pl. Dep. Exh. 86).  However, Defendant hired Mr. Forker in 1999 at a salary above the minimum.  (PNC Dep. 48-49, 53-55, 139; Pl. Dep. Exh. 7; Pl. Dep. Exh. 48; Pl. Dep. Tr. 428, 505-8, 533; 3/6/08 Pl. Dep. Tr. 208).

568.    Defendant gave raises to male employees after a short period of time in their positions.  In or about 2000, Defendant gave a raise to Akhtar Akhtaruzzaman, which Plaintiff believes may have been designated a promotion in place ("PIP").  Defendant gave a raise to Geddes Lewis (male) after about 16 months in a position.  (Pl. Dep. Tr. 505-8, 533).  Mr. Stewart hired Mr. Tsang back into the group from buses.  He moved to a lower job title with no decrease in pay.  He later received a raise.  (Pl. Dep. Tr. 430-1; 3/6/08 Pl. Dep. Tr. 208-9, 215-6).

**XIII.   PLAINTIFF'S NOVEMBER 2002 COMPLAINT OF DISCRIMINATION**

569.   On November 7, 2002, Plaintiff filed a written complaint of discrimination and

unlawful denial of a raise, based on sex, with the MTA's EEO office and spoke with Patrick

Damas (EEO Office).  (Compl. ¶ 65; PD Dep. 46-48, 72-73, 79; Pl. Dep. Tr. 432; Pl. Dep. Exh.

28; Pl. Dep. Tr. 439, 440, 442-452, 483-486; see also Def. Dep. Exh. 19; Def. Dep. Exh. 20; Def.

Dep. Exh. 21).  According to Mr. Damas, he conducted an investigation, concluded that Plaintiff

made a lateral move, and wrote a report dated December 18, 2002 denying her claims.  (PD Dep.

27-28, 53-54, 72-75, 79-94, 102, 108-109, 125-126; Pl. Dep. Tr. 455; Pl. Dep. Exh. 29; Pl. Dep.

Exh. 31).  Plaintiff maintains that Mr. Damas' "investigation" was a cover up for discrimination.

570.   Mr. Damas had access to but completely ignored promotion and salary history in

Plaintiff's Unit showing that male employees received raises with promotions.  (PD Dep. 19-20,

61-65, 130-131; Pl. Dep. Exh. 7).  Mr. Damas testified that HR knows when a job change is a

promotion.  (PD Dep. Tr. 76-77).  Here, in May 2001, HR sent an email to Plaintiff stating that a

move from ATMA to Computer Specialist is a promotion.  (PD Dep. 70-72; Pl. Dep. Exh. 27; Pl.

Dep. Exh. 74; Pl. Dep. Exh. 91).  However, as noted above, Plaintiff was still denied a raise.

571.   According to Mr. Damas, Plaintiff referenced communications that she had with

Tim Forker.  (PD Dep. 85).  But Mr. Damas did not interview Mr. Forker.  (TF Dep. 132-133,

139-140).  Mr. Damas knew that Mr. Byaruhanga sought to promote Plaintiff to Computer

Specialist, but did not interview Mr. Byaruhanga.  (PD Dep. 98-101; TB Dep. 161-162).

572.   Mr. Damas interviewed Kevin Counihan, who told Mr. Damas that

"management" made the decision to deny Plaintiff a raise, which Mr. Damas noted in his

December 18, 2002 report, and which term referred to Craig Stewart.  (PD Dep. 86-95; Pl. Dep.

Tr. 452-454, 530; Pl. Dep. Exh. 28, Pl. Dep. Exh. 29, Pl. Dep. Exh. 31). Mr. Damas failed to

interview Mr. Stewart. (PD Dep. 95-99; Pl. Dep. Exh. 29). Mr. Damas testified that Plaintiff

thought Ms. Coppola had denied her a raise, which explains why Plaintiff named Ms. Coppola in

her complaint. Mr. Damas never advised Plaintiff that "management", i.e., Mr. Stewart, denied

her a raise. (PD Dep. 97-98, 101; 3/6/08 Pl. Dep. Tr. 220).

573.    Mr. Damas' notes contained incorrect facts. He never sought documentation to

verify allegations. (PD Dep. 102-106, 127-130, 141-142; Pl. Dep. Exh. 29; Pl. Dep. Exh. 30; Pl.

Dep. Exh. 31; Pl. Dep. Exh. 32; Pl. Dep. Exh. 33). His report omitted information and drafts

were shredded. (PD Dep. 127-128, 137).

574.    On December 18, 2002, the MTA rejected Plaintiff's complaint. (Compl. ¶ 67;

PD Dep. 89-90; Pl. Dep. Exh. 30). Plaintiff alleges that this was a pretext for discrimination.

## XIV.  SUBSEQUENT INCIDENTS
### A.              2002 Denial Of Computer Work To Plaintiff

575.    Plaintiff maintains that after Defendant denied her a raise, Defendant by Mr.

Forker, Mr. Stewart and others discriminated against her, harassed her and retaliated against her.

(Compl. ¶ 63, 66). (3/6/08 Pl. Dep. Tr. 189; Pl. Dep. Tr. 109-112, 114). Plaintiff alleges various

incidents, examples of which are outlined below in Point 14-A to D below.

576.    After Plaintiff filed her November 2002 complaint, Mr. Forker denied Plaintiff

computer work and ordered Plaintiff to perform various menial and denigrating tasks. (Compl. ¶

64; Pl. Dep. Tr. 472; Pl. Dep. Tr. 565-70; 3/6/08 Pl. Dep. Tr. 15-16). He did so even though

Plaintiff was a Computer Specialist with computer work among her job duties. (3/6/08 Pl. Dep.

Tr. 206; Pl. Dep. Tr. 356-372). In 2003, Mr. Forker denied Plaintiff access to computers to

troubleshoot and repair. (Pl. Dep. Tr. 534-40, 550-4). At the same time, when Mr. Forker's own

computer malfunctioned, he had Plaintiff fix it. (3/6/08 Pl. Dep. Tr. 206; Pl. Dep. Tr. 558).

**B.**        **January 2003 Forward - Menial And Degrading Assignments**

577.    Mr. Forker took work away from employees and gave it to Plaintiff. From at least

January 2003 forward, Mr. Forker assigned Plaintiff menial and degrading tasks, including

counting lines on a work train manifest. Plaintiff complained and Mr. Forker said "do it

anyway." He assigned Plaintiff to draft memoranda on short deadlines. (Pl. Dep. Tr. 30-36, 310-

321, 324-334, 339-347, 350-5, 498-99, 536; 3/6/08 Pl. Dep. Tr. 203-4).

**C.**        **April 2003 Forward - Abuse Regarding Time Sheets**

578.    On or about April 21, 2003, Mr. Forker sent Plaintiff a buckslip memo berating

Plaintiff because of her time sheets and her "swiping" a time clock. On September 18, 2003, Mr.

Forker sent Plaintiff an email continuing to berate her because of her time sheets and swiping.

Prior to Plaintiff's protected complaint of November 2002, Defendant had never reprimanded her

for any matter regarding her timesheets or swiping. (Pl. Dep. Exh. 145).

**D.**        **September 2003 Forward - Denial Of Internet Access**

579.    Plaintiff maintains that Defendant unlawfully denied her internet access, rejecting

requests in September 2003, October 2003 and January 2004, which requests fully justified her

need for internet access for her duties as Computer Specialist (October 2002-October 2003) and

ATMA (November 2003 forward). (Pl. Dep. Exh. 99; Pl. Dep. Exh. 140; Def. Dep. Exh. 10).

580.    In 1998, Defendant granted Plaintiff internet access, which was necessary for her

job. As an ATMA, Plaintiff's duties included, among other items, providing personal computer

("PC") support, obtaining updated virus definitions and file patches and updates, all of which

required internet access. (Supra Points 2, 3; TB Dep. 65, 162-163; Pl. Dep. Tr. 116-119; Pl.

Dep. Exh. 22; Pl. Dep. Exh. 138; Pl. Dep. Exh. 139).

581.    Plaintiff continued to have internet access when she became a Computer Specialist (October 2002) and continued to have that access through the Fall of 2003. Plaintiff needed internet access based on her job duties, which continued to include, among other items, virus protection updating. (Pl. Dep. Tr. 116-119; CS Dep. 203, 208-213). Plaintiff had her own internet access account. (3/6/08 Pl. Dep. Tr. 176-7; see Pl. Dep. Exh. 22).

582.    In the Fall of 2003, Plaintiff was advised that she needed to apply for renewal of her internet access account. (3/6/08 Pl. Dep. Tr. 177; Pl. Dep. Exh. 99; Def. Dep. Exh. HH).

583.    On or about September 3, 2003, Plaintiff and John Jue, a younger male, applied to their respective managers for the renewal of internet access privileges. The managers approved the respective requests, but Mr. Stewart overrode the approval as to Plaintiff and denied Plaintiff's request. At that time, Plaintiff was a Computer Specialist. Mr. Stewart continued to deny Plaintiff's requests for internet access through early 2004, and testified that Plaintiff did not need internet access. (Compl. ¶ 68; CS Dep. 203, 208-213; Pl. Dep. Tr. 112-114, 126-128, 140-156, 389-91, 493-99, 529-34, 550; Pl. Dep. Exh. 99; Pl. Dep. Exh. 140; Def. Dep. Exh. 10). In or about January 2004, Mr. Forker told Plaintiff that Mr. Stewart would not approve her internet access and essentially told Plaintiff "don't bother me". (Pl. Dep. Tr. 127-9, 132-133, 139, 151-154). In January 2004, Plaintiff documented that she needed internet access for Lotus software, which she was using to produce the Quarterly Report. Mr. Stewart approved internet access for Mr. Jue but not Plaintiff. (Pl. Dep. Tr. 500; Compl. ¶ 68; Pl. Dep. Exh. 140).

584.    Plaintiff's computer duties had included downloading anti-virus definitions and making them available on the network for all employees in the unit. (Pl. Dep. Tr. 119-120). She had Microsoft Certified System Engineer certification. When Mr. Stewart denied Plaintiff

renewal of internet access, she was unable to perform this function and computers were not

updated for months. (Pl. Dep. Tr. 120-123). In May 2004, Plaintiff advised Mr. Forker in

writing of the negative consequences of the loss of such access and the fact that John Jue was not

performing the functions that Plaintiff had been performing to protect computers. Although Mr.

Jue was designated an technical and information systems ("TIS") liaison to Plaintiff's unit, he

failed to provide the services required by Plaintiff's unit, leaving computers unprotected. (Pl.

Dep. Exh. 45; Pl. Dep. Tr. 123-126, 156, 360-1, 392-3, 488; 3/6/08 Pl. Dep. Tr. 190).

585.    The denial of internet access made Plaintiff's job harder. In addition to Quarterly

Report preparation, Plaintiff served as backup support. She did the essential programming and

automation for spreadsheets and databases used in the unit. She needed internet access to

conduct research on programming issues. Plaintiff needed the Technet and distributed virus

definitions, all of which required internet access. (Pl. Dep. Tr. 129-132, 148-149, 531-34).

## XV.   FALL 2003 - PLAINTIFF'S RETURN TO ATMA POSITION

586.    As of October 2003, Plaintiff had not received any raise in connection with her

"promotion" to Computer Specialist. Her salary was going to decrease because the position was

going to be unionized and she would have to pay dues. On October 1, 2003, Plaintiff submitted a

memorandum to Mr. Forker stating that "I wish to relinquish my position in the title of Computer

Specialist (Software) Level I and return to my old title of Associate Transit Management Analyst

(ATMA) effective with the end of the current pay period. Neither my current duties nor the

economic benefits of the position warrant my continuing in it....Since there was no benefit

increase in the move into the Computer Specialist title, I do not expect any change will be

necessary in leaving it." (Compl. ¶ 69-71; PNC Dep. 133-138; Pl. Dep. Exh. 77; Pl. Dep. Tr.

470-1, 477-80).  As of November 2003, Plaintiff resumed the position of ATMA.  (Compl. ¶ 71; Ans. ¶ 71; Pl. Dep. Exh. 77; Pl. Dep. Exh. 7; Pl. Dep. Exh. 65).

587.    In November 2003, Mr. Forker wrote on Plaintiff's time sheet "Loretta, for a computer specialist, you seem to have a hard time with this technology."  (Pl. Dep. Exh. 131 at Bates Numbers P01842-P01844; 3/6/08 Pl. Dep. Tr. 81-82; Def. Dep. Exh. 23).

## XVI.   2004 DENIAL OF PROMOTION TO DIRECTOR FORCE ACCOUNTS

588.    Plaintiff alleges that Defendant continued to engage in discrimination regarding promotions, by promoting younger and male employees.  In early 2004, Defendant promoted Mr. Forker to Director, Capital Program Force Account Management ("Director Force Accounts" or "Director CPFAM") ahead of Plaintiff and Ms. Nau.  (Compl. ¶ 72; 3/6/08 Pl. Dep. Tr. 179).

589.    On or about December 26, 2003, Defendant posted the position of Director Force Accounts (JVN 002155).  The job posting stated that Defendant would fill the position based on "evaluation of education, skills, experience and interview."  (Compl. ¶ 73, 76; Ans. ¶ 73; Pl. Dep. Exh. 95).  Plaintiff, Evelyn Nau, and Tim Forker were among the persons that applied for the position. (3/6/08 Pl. Dep. Tr. 133-8).

590.    On or about January 13, 2004, Plaintiff filed a written application.  Ms. Locicero was fully qualified for the position based on her experience, qualifications and performance, and she exceeded the stated requirements for the position.  She had a broad understanding of the Force Accounts Unit.  She had prior Force Accounts experience and, as of December 2003, Plaintiff had at least eight years of management and supervisory experience within other transit unit groups.  She had worked on various matters, including charge reversals, staff summaries, assorted studies, and projects, and had written procedures.  She had real accomplishments at

Defendant, including a successful project resulting in clean-up of graffiti at about 125 stations. (Compl. ¶ 77-78; Ans. ¶ 78; 3/6/08 Pl. Dep. Tr. 136-8, 164-165, 211; Pl. Dep. Exh. 97; Pl. Dep. Exh. 36). Plaintiff also had Force Accounts experience and had prepared several Force Accounts estimates (Supra Points 2, 3) and has examples of her work. (Pl. Bates Nos. P01902-1933, P00782-5, P00953-66, P01037-40, P00950-2, Goldberg Cert. Exh. V; Def. Dep. Exh. Q).

591.    In January 2004, Evelyn Nau, applied for the position of Director Force Accounts. Ms. Nau was Associate Project Manager at that time. (Compl. ¶ 82; 3/6/08 Pl. Dep. Tr. 136-8; Pl. Dep. Exh. 93; Supra Point 5). Defendant alleges that Mr. Forker also applied for the position. (KP Dep. 51-57; Pl. Dep. Exh. 123; Def. Bates Nos. 1318-1321, Goldberg Cert. Exh. W).

592.    On January 23, 2004, Plaintiff met with Osmond Ken Pearce, a Senior Director and younger male, who reported to Mr. Stewart. Mr. Pearce told Plaintiff in sum and substance that a satisfactory candidate (i.e., Mr. Forker) was already in place and would not be removed even if a superior candidate was available. Thus, Defendant had pre-selected Mr. Forker. Mr. Pearce ended the meeting by telling Plaintiff in sum and substance that "You know you aren't going to get the position: What will you do about it?" (Compl. ¶ 78-80; Ans. ¶ 79; 3/6/08 Pl. Dep. Tr. 108-9, 139-42, 164-165; Pl. Dep. Exh. 122; Def. Dep. Exh. 31; KP Dep. 48, 76-77).

593.    Mr. Pearce had Plaintiff's resume and cover letter, which demonstrated that she was fully qualified for the position. (KP Dep. 63-64). Prior to the "interview," Mr. Pearce had failed to read Plaintiff's resume (3/6/08 Pl. Dep. Tr. 113). Plaintiff's application stated that she had "several ideas to enhance the functions of the unit that I am eager to demonstrate." While Mr. Pearce made it clear that Plaintiff would not be promoted, he asked for her ideas. (Compl. ¶ 81; Pl. Dep. Exh. 97; Pl. Dep. Exh. 122). Mr. Stewart had Plaintiff's resume in files from at

least 1997 forward. (CS Dep. 145-147).

594.    In or about January 2004, Ms. Nau had an "interview" with Ken Pearce. (EN Dep. 34). The interview was similar to Plaintiff's "interview," and Ms. Nau understood that Mr. Forker was going to be promoted to the position of Director Force Accounts and that Mr. Pearce was following Mr. Stewart's instructions. (Compl. ¶ 83; EN Dep. 36-42).

595.    By letter dated March 8, 2004, Defendant promoted Mr. Forker (younger male), to Director Force Accounts, a higher level job grade, and gave him a salary of $82,737, placing him well above Plaintiff and Ms. Nau. Defendant denied Plaintiff and Ms. Nau a promotion. (DI Dep. 36, 45-46; EN Dep. 13; CS Dep. 158-159, 217-218; Pl. Dep. Exh. 7; Pl. Dep. Exh. 53; Pl. Dep. Exh. 96). Mr. Stewart approved the promotion. (CS Dep. 221-223).

596.    On April 6, 2004, Defendant sent a letter to Plaintiff stating that she had "excellent credentials" but rejecting her application for the position of Director Force Accounts. (Compl. ¶ 94-95; Pl. Bates Nos. P02050, Goldberg Cert. Exh. DD).

597.    Plaintiff maintains that Defendant's proffered reasons for denying Plaintiff or Ms. Nau promotion to Director Force Accounts are a pretext for unlawful discrimination and retaliation. Plaintiff maintains that Defendant pre-selected Mr. Forker for the position of Director Force Accounts, based on age and sex. This was at least the second occasion on which Defendant had promoted Mr. Forker ahead of Plaintiff, Ms. Irby and Ms. Nau, older females that were more qualified than Mr. Forker. (Compl. ¶ 73, 74, 84, 75; supra Points 2, 3, 5, 16).

598.    Plaintiff was more qualified than Tim Forker for promotion to Director Force Accounts. Dorothy Ruiz also testified that Plaintiff was more qualified than Mr. Forker for the position of Director, Force Accounts (DR Dep. 25; Supra Point 3; 3/6/08 Pl. Dep. Tr. 138; supra

-78-

¶ 590).  Plaintiff was fully qualified for the position.  Mr. Pearce testified that all applicants that were interviewed were qualified.  Plaintiff was interviewed and, therefore, she was <u>per</u> <u>se</u> qualified for the position.  (KP Dep. 45, 51-53; <u>see also</u> CS Dep. 182-183).

599.    Ms. Nau was more qualified than Mr. Forker for promotion to Director Force Accounts, as shown by her superior experience, credentials and skills.  Ms. Nau was a long-term employee of Defendant with many years of experience and qualifications in the area of Force Accounts.  As of January 2004, Ms. Nau had about 17 years experience at Defendant.  She had worked in several departments.  She had worked in capital program management for years.  Ms. Nau had performed Mr. Byaruhanga's responsibilities as Director when he was absent.  She was far more qualified than Mr. Forker to perform Force Accounts work.   As noted above, Mr. Forker joined Defendant in 1999.  He had no engineering degree.  He had no background in Force Accounts before his appointment to Acting Director Force Accounts in the Fall of 2002.  Even as Acting Director, he prepared at most 1-2 Force Account estimates and those estimates were minor.  (Compl. ¶ 83; EN Dep. 10, 20-21, 29-30, 35-36, 45-46, 50-51; <u>supra</u> Points 5, 8).

600.    Mr. Pearce testified that Mr. Forker got the job because he had "management experience" as Acting Director. (KP Dep. 62-63).  However, under Defendant's policies and practices, serving as Acting Director is not a requirement for promotion to Director and was not supposed to result in preferential treatment.  (TB Dep. 128; CS Dep. 111-113; <u>supra</u> ¶ 605).

601.    Defendant violated its procedures by failing to convene a full hiring panel of multiple Directors (managers).  Mr. Pearce conduct interviews by himself.  (EN Dep. 39; CS Dep. 219-220; KP Dep. 64-66; TB Dep. 49; CS Dep. 73-76, 83, 88).

602.    Mr. Pearce falsely stated on a written "applicant flow data report" that Ms. Nau

and Ms. Locicero both had a "lack of professional/technical knowledge", giving them a

"disposition" code of "4" which meant same. (KP Dep. 69-70; EN Dep. 34-36; 3/6/08 Pl. Dep.

Tr. 116-117, 123; Pl. Dep. Exh. 26; Pl. Dep. Exh. 96). Ms. Nau was an expert in Force Accounts

and Ms. Locicero was a stellar employee with substantial experience in Force Accounts. (TB

Dep. 63; Pl. Dep. Exh. 93; Pl. Dep. Exh. 97; supra Points 2, 3, 5). Mr. Pearce admitted that Ms.

Nau was qualified for the position and Mr. Byaruhanga told Mr. Stewart that Ms. Nau is

qualified to be Director. (KP Dep. 60-61; CS Dep. 106-108).

603.    Ms. Locicero had a degree in physics and as early 2004, between six and seven

years experience in the Unit, including Force Accounts experience. (Supra Points 2, 3). By

contrast, during Mr. Forker's tenure as Acting Director Force Accounts, Plaintiff observed that

Mr. Forker was a poor manager and failed to develop even basic knowledge in Force Accounts.

He asked Plaintiff questions about Force Accounts that he should have understood. (Pl. Dep. Tr.

25-27, 30-32, 351-352; Pl. Bates Nos. P00734-41; P00758-767, Goldberg Cert. Exh. U).

604.    During depositions, Mr. Pearce falsely alleged that  Plaintiff was not familiar with

Force Account estimating and lacked management skills. (KP Dep. 69-71). To the contrary,

Plaintiff had prepared Force Account estimates and had managerial experience, as shown by her

application. Witnesses confirmed her outstanding qualifications. (KP Dep. 67-68; Pl. Dep. Exh.

97; Pl. Dep. Exh. 36; supra Points 2, 3, 4, 5).

605.    Also, a promotion to Director does not require prior management experience. (KP

Dep. 83; Supra ¶ 600). Indeed, Frantz Polycarpe and Robert Levine (both males) were promoted

from non managerial titles to managerial titles. (CS Dep. 271-274; Pl. Dep. Exh. 7).

606.    During depositions, Mr. Pearce falsely stated that Ms. Nau lacked managerial

-80-

leadership.  To the contrary, Ms. Nau had functioned as Acting Director in Mr. Byaruhanga's absence and had managerial leadership. (KP Dep. 69-70; Pl. Dep. Exh. 93; supra Point 5).

607.    When Mr. Forker applied for promotion to Director Force Accounts in 2004, he submitted a resume stating that 200 Force Account estimates were prepared each year, while his cover letter stated that the number of estimates was only 100. Notwithstanding this contradiction, Defendant promoted Mr. Forker.  (TF Dep. 39-40, 91-92; TB Dep. 34-37; Pl. Dep. Exh. 123).

608.    After Defendant denied Ms. Nau promotion to Director Force Accounts, she met with Mr. Stewart, who had made the promotion decision.  Stewart said he was impressed with Mr. Forker's alleged managerial background.  However, Ms. Nau was more qualified than Mr. Forker and had supervisory experience at Defendant.  (EN Dep. 49-51; Supra Points 5, 8).

## XVII.    FEBRUARY 2004 - PLAINTIFF'S COMPLAINT OF DISCRIMINATION

609.    In February 2004, Plaintiff filed another written complaint with Patrick Damas (MTA's EEO office) alleging, among other items, (a) discrimination based on age and sex in connection with the denial of Plaintiff's application for promotion to Director Force Accounts, (b) wrongdoing by Craig Stewart and Ken Pearce, and (c) that other "older women" (Ms. Irby and Ms. Nau) were victims. (Pl. Dep. Exh. 127; 3/6/08 Pl. Dep. Tr. 142-3).

610.    According to Mr. Damas, he investigated the complaint and generated a May 26, 2004 report denying wrongdoing.  (Compl. ¶ 85; PD Dep. 27-29, 106-109, 127, 153; KP Dep. 90-91;  Pl. Dep. Exh. 130; see Pl. Dep. Exh. 34; Pl. Dep. Exh. 128; Def. Dep. Exh. 32; Pl. Dep. Exh. 38).  Plaintiff alleges the "investigation" was a cover up for discrimination and retaliation.

611.    Mr. Damas did not retain his drafts of the May 26, 2004 report.  (PD Dep. 135-137).  Mr. Damas' report does not include all data he allegedly gathered.  (PD Dep. 127-128).

Mr. Damas did not seek to verify witness allegations through documents. (PD Dep. 131-134). For example, Mr. Stewart allegedly told Mr. Damas that Unit employee John Jue downloaded anti virus programs to update computer protections. (PD Dep. 133-134; Pl. Dep. Exh. 34; Def. Dep. Exh. 32). Plaintiff had a memo showing that she did that work. (Pl. Dep. Exh. 45).

612.    Mr. Damas' report states that he interviewed Donald Tsang, but Mr. Damas never interviewed Mr. Tsang. Mr. Damas never interviewed Mr. Forker even though Mr. Forker was promoted ahead of Plaintiff to Director, Force Accounts. (PD Dep. 107-108, 137-140; Pl. Dep. Exh. 130; see also Pl. Dep. Exh. 34; Def. Dep. Exh. 32). Plaintiff identified Dawn Irby, Evelyn Nau and Mr. Byaruhanga as witnesses. Ms. Nau herself had been denied promotion to Director Force Accounts. Mr. Damas did not even investigate that issue. (EN Dep. 52-55).

613.    Mr. Damas testified that he took notes during his witness interviews. However, witnesses such as Craig Stewart testified that Mr. Damas' notes were inaccurate. (PD Dep. 125-126; CS Dep. 223-229; Pl. Dep. Exh. 34; Def. Dep. Exh. 32).

614.    Mr. Damas stated that Mr. Byaruhanga said that Plaintiff was not qualified for promotion. (PD Dep. 143-145, 153-154; Pl. Dep. Exh. 130; see also Pl. Dep. Exh. 34; Def. Dep. Exh. 32). To the contrary, Mr. Byaruhanga told Mr. Damas that Plaintiff was qualified for promotion. (TB Dep. 15-18, 168-169).

615.    Mr. Damas testified that during his investigation, he concluded that Mr. Forker was qualified to be Director, Force Accounts. However, Mr. Damas never interviewed Mr. Forker and never reviewed his application for promotion. (PD Dep. 51, 107-108, 141-142, 146).

616.    Mr. Damas testified that Plaintiff was not qualified for that position. (PD Dep. 53-54). However, Mr. Damas knew (a) Plaintiff was long term employee, had worked in various

areas of Defendant, had a computer background and achievements, (b) Plaintiff reported to Titus Byaruhanga for years, and (c) Plaintiff had worked in the Infrastructure Department. (PD Dep. 46-50, 56-57). Mr. Damas reviewed Plaintiff's application and resume materials and knew that Plaintiff had prior managerial experience at Defendant. Clearly Mr. Damas knew Plaintiff was fully qualified for promotion. (PD Dep. 50, 54, 57-58, 110-112, 141-143; Pl. Dep. Exh. 36).

617.   Mr. Damas admitted that relevant factors for comparing two employees include relevant experience, education and resume. (PD Dep. 154-155, 158-161). Mr. Damas did not undertake such a comparison between Plaintiff and Mr. Forker. He did not interview Mr. Forker or review any documents regarding his credentials/performance. (PD Dep. 141-142, 146).

618.   Mr. Damas knew that Mr. Forker had only been employed by Defendant since 1999. (PD Dep. 54-55). He noted that Mr. Forker had been Acting Director Force Accounts before his promotion to Director. (PD Dep. 54-55, 151-152, 155). However, Mr. Damas admitted that service as Acting Director was not supposed to give him an advantage over Plaintiff in the promotion process. (PD Dep. 151-152, 155-156; supra ¶ 600, 605).

619.   At a later point in Mr. Damas' deposition, he even attempted to change his testimony to state that Mr. Forker was simply more qualified than Plaintiff. (PD Dep. 146-151).

**XVIII.      2004 STATEMENTS BY STEWART AND PEARCE**
620.   Mr. Stewart was aware of Plaintiff's February 2004 complaint to Mr. Damas. On or about March 4, 2004, Mr. Stewart told Ms. Nau about Plaintiff's complaint and falsely stated that Plaintiff was not qualified to be a Director. Ms. Nau told Mr. Stewart that Plaintiff was qualified. On or about March 16, 2004, Plaintiff complained to Mr. Damas about Mr. Stewart's actions. (Compl. ¶ 87; CS Dep. 94-96; EN Dep. 46-49; PD Dep. 112; Pl. Dep. Tr. 510-11, 514-

23, 527-528, 549; 3/6/08 Pl. Dep. Tr. 131; 3/6/08 Pl. Dep. Tr. 16; Pl. Dep. Exh. 37).  Mr. Stewart

also stated that Plaintiff was a computer geek and "did nothing."  (Pl. Dep. Tr. 114).

621.    Mr. Pearce was aware of Plaintiff's February 2004 complaint to Mr. Damas.  In or

about March 2004, Mr. Damas interviewed Mr. Pearce. (KP Dep. 41-44, 77-81; Pl. Dep. Exh.

128).  Plaintiff maintains that Mr. Pearce defamed her. (KP Dep. 99; 3/6/08 Pl. Dep. Tr. 109-115;

Pl. Dep Exh. 130; 3/6/08 Pl. Dep. Tr. 116-7, 122-23).  Examples are below.

622.    Mr. Pearce falsely stated that Plaintiff had no Force Accounts experience.  (KP

Dep. 82-83; Pl. Dep. Exh. 130).   Plaintiff had Force Accounts experience. (Pl. Dep Exh. 97; Pl.

Dep. Exh. 36; Supra Points 2, 3).  Mr. Pearce falsely stated that Mr. Byaruhanga complained

about Plaintiff. (KP Dep. 91-92).  To the contrary, Mr. Byaruhanga testified that Plaintiff was a

stellar employee.  (Supra Points  2, 3; TB Dep. 63).  Mr. Pearce falsely stated that Plaintiff was

difficult.  However, Plaintiff never reported to him and he had minimal interaction with her.  (KP

Dep. 86-87, 91, 98, 116-117).  Plaintiff never violated any rule. (KP Dep. 91, 96, 110-111).

623.    On or about March 2, 2004, Plaintiff, by counsel, filed a complaint letter with

Defendant.  (Compl. ¶ 86; Pl. Bates Nos. P02001-3, P02040, Goldberg Cert. Exh. FF).

## XIX.   MARCH 2004 - PLAINTIFF'S NYSDHR COMPLAINT

624.    On or about March 23, 2004, Plaintiff filed a charge of discrimination/retaliation

with the New York State Division of Human Rights, which forwarded a copy to EEOC and

Defendant.  In that document, Plaintiff alleged, among other items, unlawful discrimination and

retaliation, including among other items (1) denial of promotion to Director Force Accounts; (2)

denial of internet access; and (3) other matters.  (Compl. ¶ 6, 88; Pl. Bates Nos. P00672-4,

P01111, P01114-7, Goldberg Cert. Exh. Z; Pl. Dep. Tr. 44-61, 526; Def. Dep. Exh. 2).

625.    In April 2004, Plaintiff supplemented her NYSDHR complaint with additional

claims, including denial of promotion to Director EFR. (Pl. Bates Nos. P01104-7, Goldberg

Cert. Exh. AA). In 2005, Plaintiff further supplemented her NYSDHR submissions with 63

supporting exhibits. (Pl. Bates Nos. P02208-38, P0001-29, P00695-01068, Goldberg Cert. Exh.

BB; Pl. Dep. Tr. 60-62; Def. Dep. Exh. 3). Plaintiff incorporated by reference her NYSDHR

Charge and her supporting exhibits. (Pl. Dep. Tr. 175; 3/6/08 Pl. Dep. Tr. 186-9, 227-31, 234-6).

## XX.    2004 - DENIAL OF PROMOTION TO DIRECTOR EFR
626.    In March 2004, Defendant posted the position of Director EFR by Job Vacancy

Notice ("JVN") 002233, vacated by Mr. Forker and currently being performed by acting "co-

directors" Ms. Irby and Mr. DiLorenzo. (Compl. ¶ 92; Ans. ¶ 92; Pl. Dep. Exh. 54). Various

employees applied for the position, including Plaintiff, Dawn Irby and Joseph DiLorenzo.

(3/6/08 Pl. Dep. Tr. 127-129; Pl. Dep. Exh. 153; Pl. Dep. Exh. 116).

627.    In March 2004, Plaintiff applied for promotion to Director EFR. (Compl. ¶ 93;

Pl. Dep. Exh. 110). She was fully qualified for the position. (3/6/008 Pl. Dep. Tr. 129-130). In

March 2004, Dawn Irby applied for promotion to Director EFR. (DT Dep. 67-69; DI Dep. 46-

51; Pl. Dep. Exh. 55). She was fully qualified for the position. (3/6/008 Pl. Dep. Tr. 129-130).

Defendant alleges that Mr. DiLorenzo applied as well. (Pl. Dep. Exh. 109; Pl. Dep. Exh. 116).

628.    Donald Tsang (Senior Director) chaired the hiring panel for the position of

Director EFR and alleged that he reviewed resumes and selected candidates to interview for the

position of Director EFR. (DT Dep. 32-33, 40, 78-83; Pl. Dep. Exh. 108).

629.    Plaintiff maintains that Defendant unlawfully denied Plaintiff an interview for the

position of Director EFR and unlawfully denied her application for promotion. According to Mr.

Tsang (who reported to Mr. Stewart), he denied Plaintiff an interview for Director EFR because Plaintiff's resume was three pages and, therefore, was too long. Mr. Tsang prepared a report dated April 27, 2004 indicating that Joseph DiLorenzo was the candidate selected for promotion. (DT Dep. 69-72; Pl. Dep. Exh. 110; Pl. Dep. Tr. 115, 130-1, 549-50; 3/6/08 Pl. Dep. Tr. 7-10, 179). Plaintiff maintains that Mr. Tsang's stated reason for denying Plaintiff an interview was a pretext for unlawful discrimination and retaliation. Defendant selected Mr. Forker for promotion to Director EFR in 2000 when Mr. Forker's resume was three pages long and Mr. Tsang chaired that hiring panel. (DT Dep. 72-74; Pl. Dep. Exh. 11; Pl. Dep. Exh. 18).

630. Defendant generated a report listing applicants for Director EFR and stating that Plaintiff was "Qualified not Best Candidate" - meaning that she was qualified for promotion to Director EFR. (CS Dep. 113-115; Pl. Dep. Exh. 152). Mr. Tsang read Plaintiff's resume and admitted that she was qualified for the position. (Compl. ¶ 98; DT Dep. 25-27, 69-72; Pl. Dep. Exh. 108; Pl. Dep. Exh. 110). Mr. Tsang knew Plaintiff was a long-term employee and was friendly. (DT Dep. 17-18). In 2002, Mr. Stewart stated that Unit employees would receive at least a courtesy interview for Director positions. However, in 2004, Defendant denied Plaintiff (in the Unit) at least a courtesy interview for the Director EFR job. (3/6/08 Pl. Dep. Tr. 132-3).

631. Mr. Tsang granted Ms. Irby an "interview" for the position. This was merely a "pro forma" interview and Ms. Irby understood that she would not be promoted to Director EFR. (DI Dep. 48-51, 94-95). By letter dated June 4, 2004, Defendant denied Ms. Irby's application for promotion to Director EFR. Ms. Irby believes she was denied promotion because of her sex, age and race. (DI Dep. 15-17, 57, 89-90; Pl. Dep. Exh. 56).

632. By memorandum dated June 15, 2004, Defendant formally announced that Mr.

DiLorenzo (younger male) had been promoted to Director, EFR.  (DI Dep. 34-37, 57-58, 90; CS Dep. 158-159; Pl. Dep. Exh. 57).  Defendant increased Mr. DiLorenzo a salary to  $81,998, placing him well above Plaintiff and Ms. Irby. (Compl. ¶ 96; DI Dep. 58; Pl. Dep. Exh. 7).

633.   Plaintiff maintains that Defendant promoted Mr. DiLorenzo ahead of Plaintiff and Ms. Irby based on sex and age.  (3/6/08 Pl. Dep. Tr. 190-191), and maintains that Defendant unlawfully "pre-selected" Mr. DiLorenzo for promotion to Director EFR, by first making him "acting" co-Director with Ms. Irby and then promoting Mr. DiLorenzo to the permanent position when it was posted.  (Compl. ¶ 97; DI Dep. 38-41, 44-46; TF Dep. 199; supra Point 11).

634.   Plaintiff was more qualified than Mr. DiLorenzo.  (Supra Points 2 and 3). Plaintiff had years more managerial and supervisory experience than Mr. DiLorenzo, had at least equal expertise in EFR, and had real accomplishments, including clean up of station graffiti. (DR Dep. 25; 3/6/08 Pl. Dep. Tr. 210-211).  Ms. Irby agreed that Plaintiff was more qualified than Mr. DiLorenzo: "She had been a supervisor before.  You know, he had never supervised anyone and he really didn't put anything into employee facilities at all." (DI Dep. 17, 56-57).

635.   Dawn Irby was more qualified than Mr. DiLorenzo for promotion to Director EFR.  (DI Dep. 15-17; DR Dep. 50-51; 3/6/08 Pl. Dep. Tr. 214-215).  Ms. Irby had been in the Unit since the 1970s and as Acting Co-Director, she had accomplishments and achievements. Mr. DiLorenzo did not have those accomplishments and been with the Unit since about 1999/2000.   After Mr. DiLorenzo was promoted to Director EFR, he became Ms. Irby's boss and Mr. Tsang asked Ms. Irby to explain the EFR function to Mr. DiLorenzo. (DI Dep. 61-64, 100; Supra Point 4).  Ms. Nau, who worked with Ms. Irby and Mr. DiLorenzo, testified that in 2004, Ms. Irby was more qualified than Mr. DiLorenzo for Director, EFR.  (EN Dep. 51-52).

636.    Mr. Tsang testified that the hiring panel voted to promote Mr. DiLorenzo to

Director EFR. (DT Dep. 32-33, 40).  However, Mr. Forker, who sat on the hiring panel, testified

that no vote was taken by the hiring panel.  Mr. Forker also admitted that Ms. Irby was qualified

for the Director position.  (TF Dep. 56-64).

637.    Mr. Forker alleged that Ms. Irby had a bad interview and was nervous.  (TF Dep.

260-263; see CS Dep. 234-235, 239).  However, Mr. Forker alleged he was nervous when he

interviewed for promotion to Director Force Accounts and he still got the job. (TF Dep. 136-137,

260-263).  Plaintiff observed that Mr. Forker became agitated in the office. (3/6/08 Pl. Dep. Tr.

106).  Mr. Tsang testified that Mr. Forker needed improvement in people skills (DT Dep. 21-22)

638.    Mr. Tsang alleged that Mr. DiLorenzo had a better technical background than Ms.

Irby. (DT Dep. 67). To the contrary, Ms. Irby had better qualifications. (Supra Points 4, 9 and ¶

534).

639.    In 2002, Ms. Irby asked Mr. Tsang what steps she needed to take to obtain the

permanent Director EFR position.  Ms. Irby did everything that Mr. Tsang suggested.  She

worked longer hours than Mr. DiLorenzo.  She took courses including budgeting classes.  (DI

Dep. 40-42, 81-83, 86-89, 98-99; DT Dep. 67; Pl. Dep. Exh. 58; Pl. Dep. Exh. 59; Pl. Dep. Exh.

63; Goldberg Cert. Exh. Y).  She developed the capital plan for the next five years.  Mr.

DiLorenzo did not contribute (DI Dep. 42-43).  Ms. Irby developed an expertise as Acting Co-

Director while Mr. DiLorenzo did not.  (DI Dep. 44-45).  Moreover, Mr. Stewart and Mr. Tsang

admitted that Ms. Irby performed well as Acting Co-Director. (CS Dep. 111; DT Dep. 61, 66-

67).  In his application, Mr. DiLorenzo improperly listed Mr. Tsang as a reference.

Notwithstanding this improper listing, he was promoted.   (DT Dep. 69; Pl. Dep. Exh. 109).

**XXI.   2004 - ADDITIONAL INCIDENTS**
**A.**                                    **Introduction**
640.    Plaintiff maintains that throughout 2004, Mr. Forker discriminated, harassed and

retaliated against her by abusing her regarding attendance, lunch hours, and time sheets, through

a June 3, 2004 assault, and by assigning her arbitrary and burdensome tasks, often with

impossible deadlines. (Pl. Dep. Tr. 36-37, 137, 139, 508-9; Compl. ¶ 105).  Examples are below.

**B.**             **March 2004 Forward - Overburdening Plaintiff With Work**
641.    On March 17, 2004 Mr. Forker sent an email to Plaintiff listing six projects.  He

demanded that Plaintiff write and submit procedures for production of the quarterly report by

March 22, an impossible deadline. (Pl. Dep. Exh. 103; Goldberg Cert. Exh. NN; Compl. ¶ 105;

3/6/08 Pl. Dep. Tr. 79-80).

642.    In 2002, Plaintiff had given Mr. Forker a manual for producing the Quarterly

Report, which report was then being prepared by Plaintiff with Lotus software.  In April 2004,

Mr. Forker directed Plaintiff to update the 2002 manual.  The manual was inapplicable because

Plaintiff was producing the Quarterly Report with Microsoft Office software. (3/6/08 Pl. Dep. Tr.

44-45).  Plaintiff advised Mr. Forker that she needed to complete the quarterly report for the first

quarter of 2004 before writing procedures or a new manual.  (3/6/08 Pl. Dep. Tr. 33-40, 44-45).

643.    Mr. Forker harassed Plaintiff by demanding that she write procedures. (Pl. Dep.

Tr. 299-300, 304-305, 337-338).  He did not ask other staff to do so.  (3/6/08 Pl. Dep. Tr. 201-2).

644.    Mr. Forker required Plaintiff to make multiple unnecessary revisions to her work,

including to the quarterly report for the first quarter of 2004. (Pl. Dep. Tr. 114, 540-9, 554).

645.    Mr. Forker demanded that Plaintiff continue to revise the Force Accounts

database. (Goldberg Cert. Exh. OO; Def. Dep. Exh. X; Def. Dep. Exh. Y).

646.   In March 2004, Plaintiff asked Mr. Forker for feedback on other matters.  Mr.

Forker did not respond until May 2004 and did not even provide the requested feedback.

(Goldberg Cert. Exh. PP).  Rather, Mr. Forker overburdened Plaintiff with assignments on short

deadlines.  (Def. Dep. Exh. 25).

**C.**                              **April 2004 - Denial of Raise**

647.   In April 2004, Defendant issued a memorandum stating that raises could be

provided to employees (i.e., a "promotion in place" or "PIP").  Mr. Stewart again denied Plaintiff

a raise.   (CS Dep. 172-175, PNC Dep. 55-60, 65-66; 3/6/08 Pl. Dep. Tr. 179; Pl. Dep. Exh. 69).

**D.**            **May 2004 - Harassment For Working Through Lunch**

648.   On or about May 14, 2004, Plaintiff worked through lunch to cover her Unit when

it was short staffed.  Plaintiff's time sheet had a <u>pro forma</u> swipe for lunch and she did not seek

any extra pay for working through lunch.  Within a few days, Mr. Forker verbally abused and

harassed Plaintiff. (Compl. ¶ 99; Pl. Dep. Exh. 131 at Bates Numbers P00069; Pl. Dep. Tr. 566-

8, 570-86; 3/6/08 Pl. Dep. Tr. 11-15, 17; Def. Dep. Exh. 23 at Bates P00069).

**E.**            **May 2004 - False Accusation That Work Took Too Long**

649.   On May 27, 2004, Mr. Forker sent an email to Ms. Locicero accusing her of

taking too long to prepare the quarterly report for the first quarter of 2004.  Plaintiff always

timely completed the quarterly report, did so for years, and timely completed the 2004 quarterly

reports.  (Pl. Bates No. P01050-53, Goldberg Cert. Exh. MM; TF Dep. 143-145). After Plaintiff

separated from Defendant, Defendant did not produce the quarterly report faster and made it a

group project for multiple employees as well.  (3/6/08 Pl. Dep. Tr. 200-1; <u>supra</u> ¶ 503, 659).

**XXII.  FORKER'S ASSAULT AGAINST PLAINTIFF ON JUNE 3, 2004**

**A.**                              **June 3, 2004 - Assault**

650.   On June 3, 2004, Mr. Forker assaulted, verbally attacked and threatened Plaintiff,

and violently hit his desk while yelling loudly at Plaintiff. Mr. Forker told Plaintiff "get in here

now" and asked why she deleted a email "task request." Plaintiff explained that she already had

the "task request" saved in her in-box. Mr. Forker pounded his desk and violently threatened

Plaintiff, stating among other items, "Do you want to start something". (Compl. ¶ 102; Pl. Dep.

Exh. 88; 3/6/08 Pl. Dep. Tr. 17-31, 58-59, 86). Plaintiff maintains Mr. Forker acted unlawfully.

**B.**        **June 8, 2004 - Complaint**

651.    On or about June 8, 2004, Plaintiff filed an internal written complaint with

Defendant's Office of Employee Policy Compliance ("OEPC") against Mr. Forker, regarding the

June 3, 2004 assault. (Compl. ¶ 103; Ans. ¶ 103; Pl. Dep. Exh. 39; Pl. Dep. Exh. 88; See also Pl.

Dep. Exh. 39; Def. Dep. Exh. 24; 3/6/08 Pl. Dep. Tr. 31; see also TB Dep. 163-164).

**C.**        **Investigation And Report Upholding Complaint**

652.    Defendant's Office of Employee Policy Compliance ("OEPC") investigated and

upheld Plaintiff's complaint, issuing an August 9, 2004 report. (3/6/08 Pl. Dep. Tr. 54; Pl. Dep.

Exh. 87; Pl. Dep. Exh. 40; see also Pl. Dep. Exh. 73; Pl. Dep. Exh. 90; Def. Dep. Exh. A;

Goldberg Cert. Exh. EE). Renee Coker (OEPC) interviewed Plaintiff and others (Def. Dep. Exh.

A; 3/27/08 Pl. Dep. Tr. 4-5), including Ms. Ruiz and Ms. Nau, who corroborated the complaint.

(DR Dep. 26-33, 48-49; EN Dep. 55-57; Pl. Dep. Exh. 87; Pl. Dep. Exh. 89; Pl. Dep. Exh. 98).

**D.**        **Defamatory Statements By Pearce And Forker**

653.    According to Defendant, on or about June 21, 2004, Mr. Forker was interviewed.

(Pl. Dep. Exh. 146). Plaintiff maintains that Defendant made false statements. (Pl. Dep. Tr. 500-

501). Ms. Coker interviewed Mr. Pearce and Plaintiff alleges he defamed her. (3/6/08 Pl. Dep.

Tr. 114-116; KP Dep. 98-99; Pl. Dep. Exh. 87; Pl. Dep Exh. 129). Examples are listed below.

654.    Mr. Pearce falsely stated that Plaintiff had problems with Mr. Byaruhanga. (KP

Dep. 109-110).  To the contrary, Mr. Byaruhanga  testified that Plaintiff was a stellar employee.
(TB Dep. 63).  Mr. Pearce falsely stated that Plaintiff is quirky.  But he admitted that Plaintiff
was professional and cordial with him.  (3/6/08 Pl. Dep. Tr. 114-116; KP Dep. 110-112).

655.    Mr. Pearce falsely stated that Plaintiff complicated tasks.  But Mr. Pearce was
unable to identify any specific task. (KP Dep. 108-109).  Mr. Pearce said Plaintiff talked too
much, but admitted that male employee Robert Karlovitz was talkative and was promoted. (KP
Dep. 105-108; see e.g. Pl. Dep. Exh. 129).

656.    After the June 3, 2004 assault, Mr. Forker wrote a memo defaming Plaintiff.  Mr.
Forker failed to give a copy of the memo to Plaintiff, in violation of policy. (3/6/08 Pl. Dep. Tr.
213-214, 217-219; KP Dep. 17-18, 88-90, 95-96; Pl. Dep. Exh. 105).  On or about June 24, 2004,
Mr. Forker issued a memo to Ms. Coker that further defamed Plaintiff. (Pl. Dep. Tr. 560; 3/6/08
Pl. Dep. Tr. 214; Pl. Dep. Exh. 106; see also Pl. Dep. Exh. 145).

657.    Mr. Forker's memos were contradicted by his deposition testimony, in which he
admitted that Plaintiff (a) had good skills (TF Dep. 236-237), (b) timely completed 2004
quarterly reports, perhaps early (TF Dep. 143-145), (c) worked a full day (TF Dep. 85-86) and (d)
was assigned work that Mr. Forker took away from other employees (TF Dep. 34-37).

658.    Mr. Forker alleged that on June 3, 2004 Plaintiff improperly deleted an email that
he sent her with an assignment.  To the contrary, on June 3, 2004, Mr. Forker sent Plaintiff an
email that simply duplicated a prior March 9, 2004 email ("task request") for the quarterly report
handbook, which email had been saved by Plaintiff in her in-box, and Plaintiff so advised Mr.
Forker.  (Pl. Dep. Exh. 102; Pl. Dep. Exh. 104; Goldberg Cert. Exh. QQ; 3/6/08 Pl. Dep. Tr. 40-
42, 48-49, 183-6; Def. Dep. Exh. M; 3/27/08 Pl. Dep. Tr. 16).

659.    Mr. Forker admitted that after Plaintiff commenced her leave of absence, the

quarterly report previously prepared by Plaintiff became a group project. Plaintiff had been doing

the work of several employees.  (TF Dep. 69-72; DR Dep. 14-18; 3/6/08 Pl. Dep. Tr. 200-1).

660.    Mr. Forker disputed Plaintiff's resume, but during depositions, essentially

conceded that Plaintiff's resume was truthful. (TF Dep. 75-76, 89-90; Supra Points 2, 3, 4, 5).

## XXIII.    JUNE 2004 - ACCUSATION THAT PLAINTIFF WAS AWOL

661.    On June 4, 2004, Plaintiff went to Labor Relations to obtain documents regarding

policies and procedures.  Mr. Forker was absent and Plaintiff advised Ms. Nau, who was in

charge, that she was going to Labor Relations.  On June 15, 2004, Mr. Forker falsely accused

Plaintiff of being absent without leave ("AWOL") on June 4.  Mr. Forker unlawfully tampered

with and defaced Plaintiff's time sheets, writing "absent...w/o leave" on Plaintiff's time sheet.

Mr. Forker also threatened Plaintiff not to go to Labor Relations.  (Compl. ¶ 104; Pl. Dep. Exh.

31; Pl. Dep. Exh. 131 at buck slip and time sheet bearing #5a and #5b at top and P00070; Def.

Dep. Exh. 23 at Bates Number P00070; Pl. Dep. Tr. 508-9; 3/6/08 Pl. Dep. Tr. 59-79; Pl. Bates

No. P02058, Goldberg Cert. Exh. LL; 3/6/08 Pl. Dep. Tr. 123-124).

662.    In June 2004, Plaintiff received notification of interviews on June 9 and 16 for

Computer Specialist positions with the NYC Human Resources Administration ("HRA").  The

interviews were mandatory for Plaintiff to retain her eligibility for a Computer Specialist position

and she was entitled to take them. (Pl. Dep. Tr. 100, 199-200; Def. Bates Nos. 577, P02121,

P00048-49, Goldberg Cert. Exh. II).  HRA interviewed Plaintiff and offered her a job. (Pl. Dep.

Tr. 198-199, 201, 204, 568; Pl. Dep. Tr. 102, 190).

663.    On June 16, 2004, Plaintiff interviewed with HRA.  On June 30, 2004, Mr. Forker

sent a memo to Plaintiff, essentially accusing her again of being AWOL, allegedly because her

time sheet contained the words offsite, lunch and interview. (3/6/08 Pl. Dep. Tr. 59-62, 85; Pl.

Dep. Exh. 131 at P00046 and P00047; Def. Dep. Exh. 23 at Bates Number P00046).  Plaintiff

had substantial accrued and unused vacation and sick time.  (Pl. Dep. Exh. 66; Pl. Dep. Exh. 67).

664.    Frantz Polycarpe, a male employee, conducted personal business on company

time.  No action was taken against him.  (Pl. Dep. Exh. 132; Def. Dep. Exh. B; 3/27/08 Pl. Dep.

Tr. 5-9; KP Dep. 115-116; Bates Nos. P02137-2148, Goldberg Cert. Exh. JJ).

**XXIV.    JUNE 10, 2004 - PLAINTIFF'S COMPLAINT TO MTA EEO OFFICE**

665.    On or about June 10, 2004, Plaintiff filed a complaint with Diane Walcott

(MTA's EEO office), alleging unlawful denial of promotion to Director EFR and harassment.

On or about June 23, 2004, Plaintiff filed a written complaint (Compl. ¶ 106; Ans. ¶ 106; 3/6/08

Pl. Dep. Tr. 153-164; Pl. Dep. Exh. 41; see also Pl. Dep. Exh. 42; Def. Def. Exh. HH; Def. Dep.

Exh. 33).  Plaintiff also requested a transfer.  (3/6/08 Pl. Dep. Tr. 223).

666.    In July 2004, Plaintiff amended her complaint to include, among other items,

ongoing harassment by Mr. Forker, including false accusations that Plaintiff was AWOL in June

2004.  (3/6/08 Pl. Dep. Tr. 51-54, 166; Pl. Dep. Exh. 42).

667.    Plaintiff documented ongoing workplace harassment, including among other

items, arbitrary and burdensome, if not impossible, deadlines and/or denial of tools and

equipment.  (Compl. ¶ 105; Pl. Dep. Exh. 41 at Bates Numbers P02065-6; Pl. Dep. Exh. 42; Pl.

Dep. Exh. 103; Pl. Dep. Exh. 131; Pl. Dep. Exh. 136; Pl. Dep. Exh. 141; Pl. Dep. Exh. 142; Pl.

Dep. Exh. 143; Pl. Dep. Exh. 145; Pl. Dep. Exh. 155; 3/6/08 Pl. Dep. Tr. 184-5).

668.    Plaintiff maintains that Mr. Stewart made false statements to Ms. Walcott (MTA's

EEO Office).  In August 2004, Mr. Stewart filed a memorandum with Ms. Walcott, alleging that

only qualified employees were interviewed for the position of Director EFR, i.e., that Plaintiff

was not qualified for the position.  (CS Dep. 76-80; Pl. Dep. Exh. 150; CS Dep. 103-105; Pl.

Dep. Exh. 151).  To the contrary, Defendant generated a report listing applicants for Director

EFR and stating that Plaintiff was "Qualified not Best Candidate" - meaning that she was

qualified for promotion to Director EFR.  (CS Dep. 113-115; Pl. Dep. Exh. 152).   Moreover, Mr.

Stewart admitted he never evaluated Plaintiff.  (CS Dep. 29-30, 163).

669.    In August 2004, Plaintiff amended her complaint to Ms. Walcott to include a

claim of breach of confidentiality rules by Mr. Stewart.  (Compl. ¶ 110; Pl. Dep. Exh. 43).

670.    Mr. Tsang stated in an August 2004 memorandum that the hiring panel for

Director EFR collectively selected candidates to interview.  However, Mr. Tang testified that he

decided which applicants would be interviewed.  (DT Dep. 32-33, 40, 78-83; Pl. Dep. Exh. 115).

671.    On or about December 6, 2004, the MTA sent a letter to Plaintiff stating that her

internal complaints to Diana Walcott in 2004 were being closed because of her NYSDHR

complaint.  (Compl. ¶ 111; Pl. Dep. Exh. 44; 3/6/08 Pl. Dep. Tr. 167).

## XXV. 2004 - DENIAL OF RAISE TO MS. IRBY AND HER COMPLAINT
672.    In or about March 2004, Mr. Damas contacted Ms. Irby regarding Plaintiff's

February 2004 complaint to the MTA's EEO Office.  Ms. Irby told Mr. Damas that she was a

victim of discrimination and would pursue a claim if she was denied promotion to Director EFR.

(DI Dep. 51-54).  After Defendant denied Ms. Irby a promotion to Director EFR, she contacted

Human Resources to file a complaint of discrimination based on age, sex and race.  She was

turned away.  (DI Dep. 51-52, 55, 63-64, 90-93, 98, 102-103,112).

673.    Ms. Irby filed with Mr. Damas a verbal complaint of discrimination for denial of promotion to Director EFR, based on age, sex and race.  Mr. Damas did not investigate the complaint.  (DI Dep. 54-56, 67-68, 90; PD Dep. 67-68; see DI Dep. 64-66; Pl. Dep. Exh. 59).

674.    On June 15, 2004, Ms. Irby filed a memorandum with Donald Tsang and Craig Stewart requesting a raise based on her job performance as Acting Co-Director, EFR.  Mr. Tsang had no basis to dispute the memo.  (DI Dep. 59-62, 64-66; Pl. Dep. Exh. 58).  Ms. Irby met with Mr. Stewart, to no avail.  (DI Dep. 62-63, 95-98, 112-113).  Defendant denied Ms. Irby's request for a raise.  (DI Dep. 61; CS Dep. 170-172; Pl. Dep. Tr. 150, 501-505, 510).

**XXVI.    JULY 2004 - PLAINTIFF'S LEAVE OF ABSENCE**
675.    In or about June/July 2004, Plaintiff discussed with Human Resources personnel taking a one year leave of absence from Defendant without pay to work for HRA.  (Pl. Dep. Tr. 95-108, 191-197).  In July 2004, Plaintiff submitted a request to take a leave of absence and began that leave on or about July 26, 2004. (Comp. ¶ 107; Pl. Dep. Tr. 86-87, 188-191, 205-6; PNC Dep. 159-166; Pl. Dep. Exh. 80; Pl. Dep. Exh. 84; Pl. Dep. Exh. 144; Def. Dep. Exh. 9).

676.    Plaintiff took a leave of absence because of the discrimination, harassment, retaliation and hostile work environment.  Plaintiff's blood pressure had increased.  Plaintiff was concerned that Mr. Forker's conduct could escalate to physical violence and was also concerned that he was seeking to have Plaintiff discharged.  (Pl. Dep. Tr. 87-88, 108, 190; 3/6/08 Pl. Dep. Tr. 19-21, 181-2,193-4, 231-3; Pl. Dep. Exh. 101).  Plaintiff hoped that Defendant would take remedial action during her leave of absence. (3/6/08 Pl. Dep. Tr. 198-9).  Mr. Stewart admits that Plaintiff was qualified to rejoin NYCTA after that leave.  (CS Dep. 275-276).

**XXVII.    DEFENDANT'S AUGUST 9, 2004 REPORT IN PLAINTIFF'S FAVOR**
677.    Defendant upheld Plaintiff's June 8, 2004 complaint against Mr. Forker.  (KP

Dep. 34-38). On or about August 9, 2004, Defendant sent a letter to Plaintiff stating that "Forker exhibited unprofessional behavior towards you." (Compl. ¶ 109; Pl. Dep. Exh. 40; Pl. Dep. Exh. 73; Pl. Dep. Exh. 90). An August 9, 2004 report by OEPC substantiated Plaintiff's claim that Mr. Forker was seeking to coerce her resignation by overloading her with assignments. Mr. Forker directed Plaintiff to write procedures but did not ask others to write procedures. (TF Dep. 142-143; Pl. Dep. Exh. 87). Plaintiff wrote numerous procedures, including to create Force Accounts estimates. (Def. Dep. Exh. Q; Bates Nos. P00967-P01036, Goldberg Cert. Exh. KK).

678.    Defendant did not take any adverse action against Mr. Forker. Mr. Pearce, who was Mr. Forker's supervisor, gave Mr. Forker a rating of "excellent" for his 2004 job performance and omitted any reference to Plaintiff's complaint. (KP Dep. 22-27, 38-41; Pl. Dep. Exh. 4 at Bates Number 1638). Mr. Pearce alleged that Mr. Forker's conduct was an anomaly, even though Plaintiff had previously complained about Mr. Forker. (KP Dep. 113).

679.    Mr. Stewart admitted that Mr. Forker's conduct was a serious infraction. However, Mr. Stewart did not take any adverse action against Mr. Forker. To the contrary, Mr. Stewart promoted Mr. Forker to Senior Director in or about 2007. (CS Dep. 20-22, 35-43, 47-48). In 2004, Mr. Forker sent nasty and improper emails to Ms. Irby and was rude, abrupt and gruff. (DI Dep. 69-71, 113-115; Pl. Dep. Exh. 62). Mr. Stewart admitted that Mr. Forker was too aggressive with Ms. Irby, yet supported and protected him. (CS Dep. 176-180; Pl. Dep. Exh. 62).

680.    Neelu Reedy (older female employee) transferred away from Mr. Forker. (Compl. ¶ 109; DR Dep. 33-34; EN Dep. 67), who had turnover. (KP Dep. 87-88, 112-113; TF Dep. 43).

681.    Defendant never took any adverse action against Mr. Forker, Mr. Pearce or Mr. Stewart for their unlawful conduct towards Plaintiff or any other older female employee. (CS

Dep. 30-31; Goldberg Cert. Exh. HH; Pl. Dep. Exh. 148; CS Dep. 43-46).

## XXVIII.    2005 - CONSTRUCTIVE DISCHARGE OF PLAINTIFF

682.    On July 26, 2005, Plaintiff sent a letter to Defendant regarding her leave of

absence and plans for returning to work.  Plaintiff called Defendant before sending the letter.

(Compl. ¶ 88, 112; Pl. Dep. Exh. 81; Pl. Dep. Tr. 40, 205-208, 210-214; 3/6/08 Pl. Dep. Tr. 221-

24).  After Plaintiff sent the letter, Plaintiff repeatedly called Defendant to pursue an appropriate

position with Defendant.  Defendant said they had no position for Plaintiff. (Pl. Dep. Tr. 208-13).

Mr. Stewart did not seek a position for Plaintiff to return to.  (CS Dep. 267-268).

683.    In August 2005, Plaintiff sent a resume to Defendant seeking an appropriate

position that she could return to, away from the unlawful discrimination, harassment and

retaliation, and with the possibility of career advancement.  (Pl. Dep. Exh. 82; Def. Dep. Exh. 12;

Pl. Dep. Tr. 378; 3/6/08 Pl. Dep. Tr. 224). Plaintiff advised Defendant that she did not want to

return to work for Mr. Stuart or Mr. Forker (3/6/08 Pl. Dep. Tr. 225).

684.    In or about August 2005, Plaintiff spoke twice with Kevin Tisdol, Rapid Transit

Operations.  He had an available entry level position that did not match Plaintiff's resume.  Mr.

Tisdol told Plaintiff that he did not have a job that matched her resume.  He advised her that the

position he had was below her skill set and there was no path for career advancement. Plaintiff

declined that entry level position because it was not comparable to her prior position at

Defendant and precluded career advancement.  (Pl. Dep. Tr. 209-210, 213, 215-221; 3/6/08 Pl.

Dep. Tr. 194-6; Pl. Dep. Exh. 84).  Nothing else was presented to her.  (Pl. Dep. Tr. 229-232).

685.    On September 15, 2005, Defendant sent a letter to Plaintiff ordering her to return

to work – and report to Mr. Forker -- on September 26.  Defendant was forcing Plaintiff to return

to work for the persons that had violated her rights. This was prior to Plaintiff's exhaustion of leave time. Defendant sent its letter to give the false impression that Plaintiff was AWOL, to unlawfully coerce her resignation and/or to create documents to support her unlawful discharge. (Compl. ¶ 113-114; Pl. Dep. Exh. 83; 3/6/08 Pl. Dep. Tr. 199-200; Pl. Dep. Tr. 94-95, 224-232).

686.    Defendant unlawfully constructively discharged Plaintiff effective September 19, 2005. (Compl. ¶ 13, 16, 29, 115; 3/6/08 Pl. Dep. Tr. 196-198; Pl. Dep. Tr. 93-94, 233-246; Def. Dep. Exh. N; 3/27/08 Pl. Dep. Tr. 16-17). Plaintiff was forced to sacrifice at least 28 years of seniority with Defendant. Plaintiff was forced to tender her early retirement, at loss of at least 27% of her benefits. (Compl. ¶ 116-117; Def. Dep. Exh. N).

687.    The constructive discharge resulted from Defendant's unlawful conduct. This was supported by Plaintiff's doctors and expert witness Dr. Robert Goldstein, who examined Plaintiff and wrote a report. Plaintiff's blood pressure raised substantially in 2004 when Defendant, including Mr. Forker, was harassing her. (Pl. Dep. Exh. 100; Pl. Dep. Exh. 101; Expert Report of Dr. Goldstein, Goldberg Cert. Exh. CC; Pl. Dep. Tr. 5-8, 3/6/08 Pl. Dep. Tr. 180).

**XXIX.    2006 - PLAINTIFF'S FILING OF THIS LAWSUIT**

688.    On or about May 31, 2006, the NYSDHR issued a Determination And Order Of Dismissal For Administrative Convenience. The EEOC issued a Notice Of Right To Sue. Plaintiff filed this lawsuit. (Compl. ¶ 7-8; Ans. ¶ 7; Pl. Dep. Tr. 60, 62-65; Def. Dep. Exh. 4).

Dated: New York, New York
        November 13, 2009

                                                GOLDBERG & FLIEGEL LLP

                                    By:    *Kenneth A. Goldberg*
                                                Kenneth A. Goldberg (KG 0295)
                                                60 East 42nd Street, Suite 3421
                                                New York, N.Y. 10165 (212) 983-1077
                                                Attorneys for Plaintiff