130 Livingston Street       Thomas F. Prendergast
Brooklyn, NY 11201          President

# MTA  New York City Transit

(718) 694-3892

January 5, 2011

**BY ECF**

Hon. Frederic Block
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

Re:    **Locicero v. New York City Transit Authority**
          CV-06-4793 (FB)(JO)

Dear Judge Block:

This office represents defendant in the above-entitled action.  This letter is written for three reasons: first, to request that the report and testimony of Steven M. Kaplan, a Certified Public Accountant, be ruled inadmissible because, as a matter of law, it cannot assist the trier of fact; second, to request that plaintiff be ordered to cooperate in an examination by defendant's psychiatric expert, Dr. Paul Nassar, to permit a current assessment of plaintiff's mental status; and three, to assist in resolution of the rates requested by plaintiff's experts for their depositions.

In 2008, when it appeared that this action was trial ready, plaintiff provided defendant with reports from a Certified Public Accountant (Steven M. Kaplan) and a psychiatrist (Robert L. Goldstein)(copies attached).  The Kaplan report was purportedly relevant to plaintiff's alleged economic losses and, obviously, the psychiatric report was relevant to a claim of emotional damages.  Plaintiff's counsel has advised this office both reports will be offered into evidence at trial, but has not advised whether the reports will be updated.  Depositions of plaintiff's experts cannot be conducted until plaintiff reveals whether the reports will be updated.  Further, plaintiff's counsel refuses to produce plaintiff for an examination by defendant's psychiatric expert, Dr. Paul Nassar, for an assessment of her current mental status.

In 2008, Kaplan opined that plaintiff was entitled to $971,000 for economic losses.  The only arguable economic loss suffered by plaintiff, however, was a loss of salary from the denial of a promotion.  Plaintiff was denied one promotion in February or March 2004, and it is not in dispute that plaintiff voluntarily left the Transit Authority in July 2004 to pursue a higher paying civil service computer specialist position with New York City Human Resources Administration. Damages for the loss of income claim is a simple matter for a jury (or the Court) to calculate.  The jury does not need an accountant's assistance to resolve this damage claim.  See Federal Rules of Evidence, Rules 104 and 702.  See generally Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579(1993).  It is respectfully requested, therefore, that Kaplan's report and testimony be ruled inadmissible.

In the event that the Court declines to exclude Kaplan's report and testimony, defendant intends to depose him.  That deposition, however, cannot be conducted until plaintiff reveals whether Kaplan will update his 2008 report. Kaplan's report makes numerous assumptions, many of which are entirely unfounded and irrational.  After Kaplan's deposition, defendant expects to retain an economist to review Kaplan's report.  Thereafter, it is likely that defendant will request a Daubert hearing to challenge Kaplan's expertise.

Finally, Kaplan requests to be paid $1,750 for a deposition which will last approximately one hour. The request is unreasonable.  There is no doubt that experts are entitled to "a reasonable fee for time spent in responding to discovery".  See Rule 26(b)(4)(c).  In addition to a reasonable fee for the time actually engaged in deposition, most courts have permitted reasonable travel expenses.  While courts are divided on whether the Rule permits compensation for preparation time, it is noted that many courts have allowed reasonable compensation for preparation. See Packer v. SN Servicing Corp., 243 F.R.D. 39, *8 (U.S.D.C., E.D.N.Y., 2007).  When evaluating the reasonableness of the time billed for preparation, courts have considered the length of time between the preparation of the report and the deposition, the complexity of the case, and the length of the deposition.  Id.  Indeed, in Packer, the court limited compensation for preparation to the number of hours actually spent in the deposition.  Id.

Here, Kaplan, a CPA, requests to be paid at the rate of $350/hour, the same rate requested by Robert Goldstein, M.D.  Given the simplicity of the economic loss issue, very little preparation time is required.  Further, Kaplan requests 3 hours of travel time at $350/hour.  Kaplan is only entitled to reasonable travel expenses.  The deposition will be conducted at Mr. Goldberg's office, located at 60 East 42nd Street, which is across the street from Grand Central Station.  Kaplan's office is in White Plains.  The Metro North trip from White Plains to Grand Central Station costs $21 and takes about 37 minutes.  In the event that Kaplan's report is not stricken, it is requested that the Court assist in establishing a reasonable fee for Kaplan's deposition testimony.

One issue exists with respect to the rate requested by Dr. Goldstein. As noted, it has been agreed that the depositions will be held at Mr. Goldberg's office. Dr. Goldstein will be traveling from his 54th Street East Side office to East 42nd Street for his deposition. Travel time is minimal and while he is entitled to reasonable travel expenses, the $350 rate is excessive. Finally, Dr. Goldstein's opinion rendered in 2008 makes it essential that defendant's expert be permitted to assess plaintiff's current mental status. In 2008, Dr. Goldstein opined that plaintiff "suffer[ed] from a serious psychiatric condition. Depressive Disorder Not Otherwise Specified (DSM-IV-TR-131)". Dr. Goldstein noted that plaintiff's condition had improved, that her prognosis was "fair", and that she "continue[d] to experience clinically significant emotional distress." Defendant will depose Dr. Goldstein after plaintiff reveals whether he will update his 2008 opinion. Plaintiff refuses, however, to permit Dr. Nassar to examine her to determine whether her condition has changed since 2008. It is requested that the Court order plaintiff to appear for an examination by Dr. Nassar.

For these reasons, the assistance of the Court is requested. Thank you for your kind consideration in this matter.

Very truly yours,

Robert K. Drinan
Assistant General Counsel

**By ECF**

cc:   Kenneth A. Goldberg, Esq.
Goldberg & Fliegel LLP
60 East 42nd Street, Suite 3421
New York, New York  10165

# ROBERT  LLOYD  GOLDSTEIN,MD,PC

SUTTON  PLACE  APARTMENTS

405  EAST  54TH  STREET

SUITE  5-M

NEW  YORK,  NY  10022

Telecopier (212) 995-1215

Telephone (212) 595-6480

**forensicgold@att.net**

---

FOR PROFESSIONAL SERVICES          My Tax ID Number is 57-1142353

December 30, 2010

## LOCICERO v. NYCTA

**APPEARANCE FOR DEPOSITION**
**1 HOUR RESERVED AT $350/HOUR**          $   350.00

**ROUND-TRIP TRAVEL TIME**
**1 HOUR @$350/HOUR**                                      350.00

**PREPARATION**
**1 HOUR @ $350/HOUR**                                    350.00

                              **TOTAL DUE**    $   1,050.00

Diplomate of the American Board of
Psychiatry & Neurology

Clinical Professor of Psychiatry
College of Physicians & Surgeons of
COLUMBIA UNIVERSITY

# ROBERT LLOYD GOLDSTEIN, M.D., P.C.

## SUTTON PLACE APARTMENTS
## 405 EAST 54TH STREET
## NEW YORK, NY 10022

Dr. Goldstein is Clinical Professor of Psychiatry and has served for over 20 years as Director of the "Legal Issues in the Practice of Psychiatry" Course at Columbia University's College of Physicians and Surgeons. He was formerly Director of Outpatient Psychiatric Services at the New York VA Medical Center, Deputy Director of the NYU-Bellevue Forensic Psychiatry Service, Medical Director of the Forensic Psychiatry Clinic of the Supreme Court of the State of New York (in Manhattan), Director of Psychiatry at New York Hospital Downtown, and Director of Psychiatric Education, Research and Quality Assurance at Long Island Hospital. He is a Board Certified Diplomate of the American Board of Psychiatry and Neurology, a Distinguished Life Fellow of the American Psychiatric Association and an Officer of the Tri-State Chapter of the American Academy of Psychiatry and the Law. He received Postgraduate Fellowship training in Child and Adolescent Psychiatry and in Psychoanalytic Psychotherapy. He has authored over 80 publications in leading professional journals and in authoritative texts, including The American Journal of Psychiatry, Psychiatric Clinics of North America, The Journal of the American Academy of Psychiatry and the Law, The Harvard Medical School Mental Health Letter, The New England Journal of Medicine, The Journal of Forensic Sciences, Psychiatric Annals, Critical Issues in American Psychiatry and the Law, and Principles and Practice of Forensic Psychiatry. He is a recognized authority on the Insanity Defense, Diminished Capacity, Extreme Emotional Disturbance, Stalking and various Paranoid conditions. He served as Chairman of the Special Colloquium of Judges and Psychiatrists under the auspices of the Hunter College Trial Judges Institute (for over 10 years). He evaluates and treats patients in private practice in New York City. He has served as a psychiatric consultant to the New York Police Department's Psychological Services Unit. From time to time, he is called on as a psychiatric consultant and psychiatric expert witness by the Government and private law firms in civil and criminal cases. He has been qualified as a psychiatric expert in both State and Federal Courts.

DIPLOMATE OF THE AMERICAN BOARD OF
PSYCHIATRY AND NEUROLOGY

CLINICAL PROFESSOR OF PSYCHIATRY
COLLEGE OF PHYSICIANS &
SURGEONS OF COLUMBIA UNIVERSITY

ROBERT LLOYD GOLDSTEIN, M.D., P.C.
SUTTON PLACE APARTMENTS
405 EAST 54TH STREET
NEW YORK, NEW YORK 10022

(212) 595-6480
FACSIMILE (212) 995-1215
forensicgold@medscape.com

March 21, 2008

Kenneth A. Goldberg, Esq.
Goldberg & Fliegel, LLP
60 East 42nd Street, Suite 3421
New York, NY 10165

**Re: Loretta Locicero**

Dear Mr. Goldberg:

I am writing to you at this time in order to report my findings and conclusions after completing my psychiatric examination of your client, **Loretta Locicero**. I saw Ms. Locicero at my private offices on February 18, 2008. At that time, I conducted a comprehensive psychiatric examination, which comprised an anamnesis (*i.e.* a detailed in-depth psychiatric history) and a mental status evaluation. In addition to my own direct face-to-face psychiatric examination, I also had occasion to review and analyze relevant clinical records and legal documents pertaining to her case. (A complete list of the materials I reviewed and analyzed is set forth in the Appendix to this report.) My conclusions, to a reasonable degree of psychiatric certainty, are based on my psychiatric examination and my review and analysis of the materials listed in the Appendix.

**Loretta Locicero**

Ms. Locicero is a 58-year-old woman, who alleges that she was the target of unlawful discrimination based on sex and age, harassment and retaliation while employed by the New York City Transit Authority ("NYCTA"). Ms. Locicero was employed by the NYCTA from 1976 until September 19, 2005, at which time she claims she was constructively discharged.

Ms. Locicero alleges that her employer engaged in a pervasive pattern of unlawful discrimination based on sex and age, harassment and retaliation. She alleges that she was denied a number of promotions for which she was better qualified than less experienced, less qualified younger men (who she claims were "pre-selected" for said promotions to the detriment of better qualified older women candidates like herself). She further alleges that she was denied pay raises to which she was entitled, subjected to trumped up criticism of her intelligence, skills and performance, given inappropriate, menial and demeaning work assignments, not provided with requested equipment and tools (including internet access) which she needed to perform her job (while at the same time her younger male colleague was provided with even more expensive equipment and tools), and so on.

Ms. Locicero claims that when she made a number of internal complaints in writing about this pattern of discriminatory behavior and harassment through proper channels, her complaints generally were rejected, not properly investigated or no corrective action was undertaken. (In one instance, the NYCTA upheld a complaint, but still failed to take corrective action.) She felt she had no choice but to take her complaints to outside governmental agencies and

Loretta Locicero

ultimately filed a civil lawsuit against her employer. She alleges that she was retaliated against for registering complaints and that the pattern of discrimination based on sex and age and the harassment escalated. She has documented numerous examples of these allegations about the escalation in her Complaint. She began to feel that her superiors were now out to get her and that these reprisals were aimed at building a case against her, setting her up for possible termination, and getting rid of her altogether. According to Ms. Locicero, the ensuing reprisals were initiated by her supervisor, Timothy Forker, who she contends had been promoted to his position by the improper "pre-selection" process which discriminated against better qualified older women employees such as herself. She sets forth a litany of complaints about Mr. Forker's discriminatory and harassing behavior toward her, culminating in an explosive outburst on June 3, 2004, when she claims he unlawfully assaulted, verbally attacked and threatened her, "violently hit his desk" in a threatening manner, and menacingly yelled at her "Do you want to start something?" Notwithstanding the memo she received from the Office of Employee Policy Compliance (dated 8/9/04) indicating that her complaint about the incident of 6/3/04 had been corroborated and that the matter had been referred for appropriate disciplinary action, Ms. Locicero believes that no disciplinary action was ever taken against Mr. Forker (and indeed that he received an "excellent" performance rating for that year).

Ms. Locicero states that the alleged relentless pattern of discrimination based on sex and age, harassment and retaliation caused her to experience

**Loretta Locicero**

years of overwhelming stress, with deleterious effects on her health status,
including significant  physical and psychiatric symptoms (to be described below).
As a result of these physical and psychiatric symtoms, which she found
"alarming," she felt compelled to take a leave of absence without pay,
commencing on July 26, 2004. She hoped that taking time off would remove her
from the stressful work environment that was threatening her wellbeing and allow
her time to formulate a constructive plan to resume work at the NYCTA under
more tolerable circumstances. In the interim, she took a job with HRA as a
computer specialist, which she viewed as a stopgap measure, allowing her to
bring in some income while she was on the leave of absence without pay. She
contacted NYCTA about her intention and plans to return to work after her leave
of absence. She made good faith efforts to secure a comparable position at
NYCTA when she returned, working at a different location with a different group.
She believed that this would enable her to resume her duties in a workplace
setting at NYCTA in which she would not be subjected to the same unbearably
stressful and pervasive discrimination based on sex and age, harassment and
retaliation. However, these efforts on her part were completely rejected, she was
not offered an appropriate position, and she was ordered by letter (dated
September 15, 2005) to return to work on September 26, 2005 and report to
Timothy Forker, Director, Capital Program Force Account Management,
Subways, to resume her former position. She viewed this as a totally
uncompromising form of coercion, an attempt to force her to return to the same
hostile  environment at work under the very same abusive circumstances and

**Loretta Locicero**

stresses that had forced her to take a leave of absence in the first place. She didn't want to leave her NYCTA job and fully intended to return to work under conditions that were tolerable. However, given her frame of mind at the time, she could not endure being forced to return to the same pernicious stresses in the same hostile environment she had just left. In effect, she reasonably felt that she had been constructively discharged at that point by the NYCTA, the final stage of the sex and age discrimination, harassment and retaliation she had previously endured. She felt her employer had made it impossible for her to return and there was nothing left for her to do but seek early retirement from the NYCTA job, although this entailed a sacrifice of many years of seniority and loss of a significant percentage of her benefits.

Ms. Locicero was born into an intact loving family in Brooklyn. She presently lives in Brooklyn with her elderly mother. Her father, who was a tailor, died in 2001 of "old age." She has an older brother who resides in Florida. She reports a normal happy childhood. She was never abused or neglected. There is no family history of psychiatric illness, alcoholism, or drug abuse.

Ms. Locicero earned a B.S. in physics from Fordham University and subsequently enrolled in postgraduate programs at Fordham for two years (in physics) and then at Polytechnic Institute for two years (in system engineering). She worked for the American Institute of Physics and as a New York State Public Health Inspector, before starting at the NYCTA in 1976 as an assistant transit management analyst. In 2002, she received a promotion from associate transit management analyst to computer specialist (software) I. Following the promotion,

she claims she was discriminated against based on sex and age and harassed when she was denied the pay raise to which the promotion entitled her and given menial and demeaning assignments rather than work commensurate with her new position.

Ms. Locicero's past medical history includes asthma, hypertension and low back problems following an accident in 2001 (which later required spinal surgery). Ms. Locicero had no prior history of psychiatric difficulties. She has no history of alcoholism or drug abuse. During the period of time she was subjected to unlawful discrimination based on sex and age, harassment and retaliation, Ms. Locicero's health was adversely affected by the relentless stress she experienced at work. She states that as the stress at work escalated, especially in the first six months of 2004, her emotional symptoms significantly worsened: she was chronically anxious, depressed and apprehensive. She was always looking over her shoulder, fearful and on guard about what would happen next at work. She had difficulty sleeping and dreaded getting up to go to work, expecting to be barraged with criticism and attacks. Her energy level was diminished, she had no appetite and she was losing weight. During this same period, as the stress at work escalated, her physical symptoms also significantly worsened: she experienced alarming upward spikes in her blood pressure (requiring increased doses of anti-hypertensive medications) and an exacerbation of back pain and mobility. She was under the care of an accupuncturist and also saw a chiropractor for her back condition. Her acupuncturist, Vanessa Scotto, reported the following:

**Loretta Locicero**

I treated Loretta Locicero with acupuncture during the period of February 2004 to August 2004. During this time, Ms. Locicero discussed with me her increased stress and anxiety. She complained of back pain and elevated blood pressure, which she attributed to problems she was having at her workplace.  (report dated 5/10/07)

Ms. Locicero is a single woman who lives with her elderly mother in Brooklyn. She has a number of friends and enjoys socializing with them. She also has a number of interests, *e.g.* photography, raising orchids, knitting, etc. During the stressful period she experienced at work, she lost interest in many of her previous activities and pursuits, avoided her friends and had no motivation to participate in social activities.

On mental status examination, this is a tense woman who is cooperative and forthcoming. She becomes sad-looking when describing the episodes of dscrimination, harassment, and retaliation.There is no thought disorder. Affect is still somewhat anxious and more so depressed. Both anxiety and depression have lessened in intensity since she left her position at the NYCTA. Her insomnia has likewise improved. Her appetite and energy level have returned to normal. There are no psychotic or suicidal symptoms. Concentration and memory are within normal limits, although she is still preoccupied with painful, intrusive recollections of the traumatic stresses to which she was subjected at her NYCTA job. Her self-esteem and self-image have been significantly damaged.

In view of my findings, I have reached the following conclusions in this case:

1.  Ms. Locicero is suffering from a serious psychiatric condition.  Her diagnosis is **Depressive Disorder Not Otherwise Specified (DSM-**

Loretta Locicero

IV-TR 311). Her condition has improved since she left her stressful position at the NYCTA, which she perceived as a hostile and abusive work environment; however, she still has residual psychiatric symptoms. Her prognosis is fair.

2.  As a result of her condition, she continues to experience clinically significant emotional distress. She exhibited a decline in functioning in a number of important areas during the stressful period she experienced in the workplace.

3.  In my differential diagnosis, I have considered and ruled out a medical condition as the cause of her psychiatric condition. Likewise, I have considered and ruled out malingering as the cause of her psychiatric condition.

4.  Her condition is directly and causally related to the protracted and overwhelming traumatic stress she experienced as a result of the pattern of unlawful sex and age discrimination, harassment, and retaliation to which she was subjected during her employment at the NYCTA. Based on my evaluation and analysis, it was reasonable for Ms. Locicero to feel that she was constructively discharged from her employment with the NYCTA.

5.  She needs psychiatric treatment for an indefinite period to attempt to resolve her residual psychiatric difficulties.

**Loretta Locicero**


Very truly yours,

ROBERT LLOYD GOLDSTEIN, M.D.

RLG:gc

Clinical Professor of Psychiatry
College of Physicians & Surgeons of
COLUMBIA UNIVERSTY

**Loretta Locicero**

## APPENDIX

Summons and Complaint
Report from acupuncturist, Vanessa Scotto
Ms. Locicero's medical records (2000-2007)
Various Time and Attendance Reports of Ms. Locicero, various memos
   to and from Ms. Locicero and from Mr. Forker, Ms. Locicero's request
   for a LOA



December 29, 2010

Robert K. Drinan, Esq.
New York City Transit Authority
Brooklyn, NY 11201

Re:  **Locicero v. New York City Transit Authority 06 Civ. 0734 (FB) (JO)**

Dear Mr. Drinan:

I write in follow up to our conversation in July, 2008, and your recent follow up conversation with Kenneth Goldberg, Esq., with respect to payment in advance for my upcoming testimony in a deposition to be taken by you in the above referenced matter.

Please be advised that by the terms of my retainer agreement with Ms. Locicero, my rate per hour is $350, with trial related testimony to be paid in advance.  That rate includes preparation time for testimony, travel time to and from, and of course actual time at deposition and/or trial.  You have expressed to me that you anticipate my deposition testimony to not exceed one hour in duration.  My understanding is that the deposition will take place in New York City.  I estimate one hour of preparation time, one hour for testimony, and 3 hours of travel time.  Accordingly, my anticipated fee is $1,750 for the combined five hours.

As requested, please also note that the employer identification number for the firm is 13-4195933.

If you have any questions, please feel free to contact me.

Sincerely,


Steven M. Kaplan, CPA/ABV, MBA
Partner - Business Valuation, Forensic Accounting and Litigation Support Services
For Eisman, Zucker, Klein & Ruttenberg, LLP


Cc: Kenneth Goldberg, Esq.

# EZKR
### Certified Public Accountants & Consultants

Elsman, Zucker, Klein & Ruttenberg, LLP

March 31, 2008

Kenneth A. Goldberg, Esq.
Goldberg & Fliegel LLP
60 East 42nd Street, Suite 3421
New York, NY 10165

**Re: Loretta Locicero v. New York City Transit Authority**
**Index 06 CV 4793 (FB) (JO)**

Dear Mr. Goldberg:

I have been hired by you and your client, Ms. Loretta Locicero, to review certain records and documents pertaining to the above captioned litigation and render my professional opinion with respect to the following issue:

- The economic loss to Loretta Locicero, calculated as of July 26, 2004, resulting from her leave of absence from the New York City Transit Authority on July 26, 2004 due to unlawful employment discrimination, harassment and retaliation.

In the course of my work, I relied upon the following documents and information sources:

1. Payroll data, including Forms W-2, of Loretta Locicero from the New York City Transit Authority (NYCTA) and the New York City Human Resource Administration (HRA).
2. Resume of Loretta Locicero.
3. Summary Plan Description and Related Information for Tier 2 Members, New York City Employees' Retirement System (NYCERS).
4. HRA MIS overtime Tracking System analysis as of March 24, 2008.
5. Job Details Summary re: NYCTA and Employee Locicero, Loretta J.
6. Complaint and Jury Demand.
7. Correspondence dated October 26, 2006 between you and Peter T. Shapiro, Esq.
8. Tele-interview of Ms. Locicero on March 10, 2008, with follow up conversations thereafter.
9. United States Life Tables, 2003, Volume 54, Number 14, April 19, 2006 – National Vital Statistics Reports

## BACKGROUND UNDERSTANDING OF PERTINENT RELEVANT FACTS

Loretta Locicero, a Caucasian female, was born on March 11, 1950. She has a Bachelor of Science degree in Physics from Fordham University, and has also completed some course work towards an MS in Physics and also in Systems Engineering. Ms. Locicero commenced her employment with the New York City Transit Authority on October 27, 1976 as an Associate Transit Management Analyst. She went on leave of absence from the New York City Transit Authority on July 26, 2004 (Age: 54), and thereafter commenced employment with the Human Resource Administration of the City of New York. Ms. Locicero officially separated from service with the NYCTA on September 19, 2005, due to an alleged unlawful constructive discharge from NYCTA on that date. Ms. Locicero's targeted retirement age prior to her leave of absence and then separation from service with the NYCTA was and remains age 70. Ms. Locicero is described as medically able to work through at least age 70.

I have made the following assumptions in my calculation:

1. Ms. Locicero should have received a raise of 10% in 2002, and 3% in 2003.
2. Ms. Locicero should have received a salary increase to $82,737 in 2004.
3. Ms. Locicero should have been receiving a salary of $85,219 at the date of discharge/separation had she not been denied a promotion.
4. Ms. Locicero had a life expectancy of 28.9 years at the time of employment termination[1].
5. Ms. Locicero's earnings as a manager would have increased after the date of discharge at a rate of approximately 3.0 percent per year, based upon the earnings history of Ms. Locicero and others who had similar positions within her department.
6. The date of trial is unknown. Accordingly, my calculations have not been subjected to present value calculation, and will be updated prior to trial.

## ANALYSIS

The economic loss is a result of the alleged discrimination. Ms. Locicero's losses are calculated based on past losses [back pay] and future losses [front pay]. The past loss represents the amount of income Ms. Locicero would have earned from the date of leave of absence to the date of trial, but for leave of absence. The future loss is the present net cash value of lost earnings and fringe benefits from the date of trial through the anticipated life expectancy of Ms. Locicero.

### Earnings

AT NYCTA, Ms. Locicero received $64,995 in annual wages in the year before taking leave of absence on July 26, 2004. She earned a straight salary of $64,995, based upon a base work week of 35 hours per week. Those wages, however, do not reflect denied

---

[1] United States Life Tables, 2003 (April 19, 2006 Report revised as of March 28, 2007), Volume 54, No. 14 – Table 5, Life table for white females: United States, 2003.



promotions and salary increases thereto, which form the basis for the analysis. Earnings reflected in this report are based upon projections were Ms. Locicero to have been awarded the promotions and salary increases to which she believes she was denied.

## Discount Rate

The date of trial is unknown. Accordingly, my calculations have not been subjected to present value calculation, and will be updated prior to trial, utilizing an appropriate discount rate at that time, by referring to the Economic Report of the President and Selected Interest Rates, a Federal Reserve Statistical Release and similar such sources. The discount rate should be based upon the rate of interest that would be earned on "the best and safest investments", which I consider to be the rate of return available in short-term U.S. Treasury securities. The effects of inflation are removed to provide the real rate of interest, without regard to inflation. U.S. Treasury securities are exempt from state income tax; therefore only federal income tax is considered in calculating the after-tax rate.

## Summary and Conclusions

*Losses over work life to intended retirement at age 70 with denied promotions and wage increases.*

### Wages and Fringes (Pension)

| | | |
|---|---|---|
| Loss to date of trial, exclusive of prejudgment interest | $ | 78,576 |
| Loss from date of trial through intended retirement | $ | 892,443 |
| Total economic loss: Wages and Fringes | $ | 971,019 |
| | | |
| Total Economic Losses (Rounded) | $ | 971,000 |

I reserve the right to amend, modify, or supplement this report based upon the receipt of new or additional information.

Sincerely,
Eisman, Zucker, Klein & Ruttenberg, LLP

Steven M. Kaplan, CPA/ABV, MBA
Principal – Business Valuation, Forensic Accounting and Litigation Support Services



## COMPENSATION

The fees for performing this engagement are based on my standard hourly rate of $300 per hour.

## EXPERT WITNESS TESTIMONY

I have testified as an expert at trial or by deposition in the following cases within the preceding five years:

| *Case Name* | *Trial or Deposition* | *Where Given* | *When* |
|---|---|---|---|
| *Conn Guardianship* | Bench Trial Justice Peter Rosato | NYS Supreme Westchester County | Nov. 2007 |
| *Davis v. O'Brien* Index 038217/2004 | Bench Trial Justice S. Krauss | NYS Supreme Kings County | October 2006 |
| *Dury v. Dury* Index 350062/2005 | Bench Trial SHO M. Dershowitz | NYS Supreme New York County | October 2006 |
| *Tenteromano v Tenteromano* Index 6808/2003 | Bench Trial Justice M. Garvey | NYS Supreme Rockland County | Feb. 2004 |
| *Murphy v. Murphy* | Bench Trial Justice Torack | NJ Superior Court Bergen County | Dec. 2003 |
| *Murphy v. Bolahouache* Index 105890/2002 | Jury Trial Justice M. Schulman | NYS Supreme NY County | October 2003 |
| *Valente v. Valente* Index 2490/1998 | Bench Trial Justice B. Tolbert | NYS Supreme Westchester County | August 2002 |

Note: As an appointed neutral valuator / forensic accountant, many additional matters have resulted in reports being submitted to the appointing Court, and admitted as direct testimony, without a subsequent need to appear for cross examination.

## PUBLISHED MATERIALS

Published materials are as noted in the appended curriculum vitae



## *CURRICULUM VITAE*

**STEVEN M. KAPLAN, CPA/ABV, MBA**
**Eisman, Zucker, Klein & Ruttenberg, LLP**
**120 Bloomingdale Road -- Suite 402**
**White Plains, NY 10605**
**914-428-7733 x 280**
**914-428-7903 Fax**
**skaplan@ezkrcpa.com**

Certifications:
American Institute of Certified Public Accountants (CPA)
Accredited Business Valuator (ABV)

Memberships:
American Institute of Certified Public Accountants
- Business Valuation/Forensic and Litigation Services Section
- Tax Section
- Personal Financial Planning (PFP) Section

New York State Society of Certified Public Accountants

Special Training:
Mr. Kaplan is trained in Collaborative Divorce Practice as well as in mediation.

Present Position:
Mr. Kaplan is a principal in the accounting and consulting services firm of Eisman, Zucker, Klein & Ruttenberg, LLP ("EZKR"), where he is in charge of EZKR's Business Valuation, Forensic Accounting and Litigation Support Services practice areas. He provides business valuation, forensic accounting, collaborative practice, alternative dispute resolution, litigation support and tax services for matrimonial, estate and gift, economic damage, dissenting shareholder and merger and acquisition purposes.

Experience:
Prior to joining EZKR, Mr. Kaplan was a partner in the valuation and litigation support firm of Blaustein, Lynne & Co., LLP. Mr. Kaplan began his career with Laventhol & Horwath as a junior audit and then senior tax specialist from 1986 to 1989. He has also served as Senior Accountant and then Tax Manager for Theodore Samet & Co., P.C., Konigsberg Wolf & Co., P.C. and Marshall Granger & Co., P.C. From 1998 through 2000 Mr. Kaplan was a manager with the litigation support firm of Goodman, Kahn, Hoffman & Hochman Consulting Co., LLC and its accounting and


EZKR Certified Public Accountants & Consultants

tax practice affiliate, Kahn, Hoffman & Hochman, LLP, before admission
and subsequent service as a partner from 2001 through 2003.

He has written tax articles for the *CPA Journal*, appeared on the PBS
*"Dollar for Dollar"* TV program, served as a tax editor and consultant for
Thompson Publishing Co. and Harcourt Brace Professional Publishing,
and lectured on a variety of tax and matrimonial dissolution topics for the
New York State Society of Certified Public Accountants and the
Foundation for Accounting Education.

Mr. Kaplan recently served as a member of the New York State Society of
CPA's statewide Professional Ethics Committee. He currently serves on
the Board of the New York Association of Collaborative Professionals,
representing financial specialists. He also serves as Treasurer.

Mr. Kaplan is past President and prior Executive Board member of the
New York State Society of Certified Public Accountant's Rockland
chapter, and is also past Co-Chair of the New York State Society of
Certified    Public    Accountant's    Westchester    Chapter    Litigation
Support/Cooperation with the Bar Committee. Mr. Kaplan was also a
member of Representative Benjamin Gilman's Economic Advisory
Council, and recently served as an advisory board member for the North
Rockland High School Academy of Finance. He has also served as a
member of the Editorial Advisory Board and been a contributing author for
Aspen Publishing's *CPA Litigation Service Counselor* and for *National
Litigation Consultants' Review*.

Mr. Kaplan has held the Series 7 General Securities Representative
license issued by the National Association of Securities Dealers. He also
is licensed as a Life and Health Insurance Agent in New York State.

**Education:**
Mr. Kaplan is a 1986 graduate of the State University of New York at
Albany, and received his Master of Business Administration - Taxation
degree in 1992 from The Bernard M. Baruch College.

**Expert Testimony Experience:**
Mr. Kaplan has testified before, been appointed by and/or qualified as an
expert in New York State Supreme Court, Westchester County
Surrogates Court, and New Jersey Superior Court, and has assisted in
hundreds of cases to render a professional opinion concerning the
valuation of closely held businesses, professional practices and various
other assets, such as pensions, licenses and stock options for
matrimonial, estate and gift, dissenting shareholder and merger and
acquisition purposes. Mr. Kaplan's testimony has also included economic
damage analysis.



**Speaking Engagements:**

Mr. Kaplan has presented to a variety of professional organizations, including the Rockland County Bar Association, the New Rochelle Bar Association, the United Jewish Appeal Annual Estate Conference, the New York State Society of Certified Public Accountants and the Westchester County Association. Topics of discussion have included valuation issues related to matrimonial and estate and gift matters, as well as taxation issues incidental to matrimonial dissolution.

**Community Involvement:**

Mr. Kaplan has been elected to the Blind Brook – Rye Union Free School District Board of Education for a 3 year term from July, 2006 through June, 2009, where he serves on a variety of committees, including its audit committee.

